**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>G-I HOLDINGS INC., et al.,<br><br>       Debtors. | Civil No. 02-3082 (SRC) |
| UNITED STATES,<br><br>       Plaintiff<br><br>       v.<br><br>G-I HOLDINGS INC., et al.,<br><br>       Defendants. | Bankr. Case Nos.<br>01-30135 (RG)<br>01-38790 (RG)<br>(Jointly Administered)<br><br><br>**OPINION** |

APPEARANCES:

Christopher J. Christie
Susan Steele
US ATTORNEY'S OFFICE
970 Broad Street
Room 700
Newark, NJ 07102

Richard G. Jacobus
Charles M. Flesch
Dashiell C. Shapiro
TAX DIVISION, U.S. DEPARTMENT OF JUSTICE
P.O. Box 227
Ben Franklin Station
Washington, D.C. 20044

ATTORNEYS FOR PLAINTIFF UNITED STATES OF AMERICA

Dennis J. O'Grady

J. Alex Kress
Mark E. Hall
RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
One Speedwell Avenue
Morristown, NJ 07692

Albert H. Turkus
Julia M. Kazaks
Byron A. Christensen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

ATTORNEYS FOR DEFENDANTS AND DEBTORS G-I HOLDINGS INC. AND ACI INC.


**CHESLER**, **District Judge**

This matter comes before the Court on the motion of the Plaintiff, United States of America ("Government"), for Partial Summary Judgment Regarding Debtors' Claim for "Binding Contract" Transitional Relief from Section 731(c) of the Internal Revenue Code [docket #139]. Defendants and Debtors, G-I Holdings Inc. and ACI Inc.[1] (collectively, "Debtors"), submitted an opposition to this motion and cross-moved for summary judgment on their claim for binding contract transitional relief [docket #164]. The Government submitted a reply brief in support of its motion for summary judgment and in opposition to the Debtors' cross-motion [docket #184]. This brief also requested that this Court strike and disregard the Jenner Affidavit submitted by Debtors in support of their cross-motion. In addition, the Debtors submitted a reply brief in support of their cross-motion [docket #181]. For the following reasons, the Court **GRANTS** the Government's motion for partial summary judgment; **DENIES** the Debtors' cross-motion for

---

[1]G-I Holdings Inc. and ACI Inc. are the successors in interest to GAF Chemicals Corporation and Alkaril Chemicals, respectively, both of which were subsidiaries of GAF Corporation, the entity whose tax return is at issue in this case.

partial summary judgment; and **DISMISSES AS MOOT** the Government's motion to strike the Jenner Affidavit.

## I.    BACKGROUND

This adversary proceeding, stemming from the massive bankruptcy of G-I Holdings Inc., arises out of a dispute regarding the proper characterization for tax purposes of a February 1990 transfer of property (the "1990 Transaction")[2] from GAF Chemicals Corporation and Alkaril Chemicals, Inc. (collectively referred to as "GAF") to Rhone-Poulenc Surfactants & Specialties, L.P. ("RPSSLP") and a February 1999 distribution of property (the "1999 Transaction") that Debtors received from RPSSLP.  The present motion concerns only the 1999 Transaction, which terminated GAF's investments in RPSSLP in February 1999 in exchange for approximately $48 million cash and 30-year U.S. Treasury bonds valued at approximately $407.5 million.  The Government contends that this transaction caused GAF to recognize a taxable gain under § 1001 of the Internal Revenue Code ("the Code").[3]  Except as where noted, the following facts are undisputed.

On February 12, 1990, GAF transferred the assets of its surfactants chemicals business, valued at $480 million, to RPSSLP, purportedly as part of a new limited partnership between

---

[2] The details of the 1990 transaction are described in this Court's September 8, 2006 Opinion granting the Government's motion for partial summary judgment on the adequate disclosure issue and denying the Debtors' motion for partial summary judgment and for a bifurcated trial.  *See In re: G-I Holdings Inc.*, No. 02-3082 [docket # 220], 2006 U.S. Dist. LEXIS 68263 at *3-6 (D.N.J. September 8, 2006).

[3] As noted by the Government, the amount of GAF's taxable gain or loss in 1999 depends on the Court's determination whether the 1990 Transaction was a taxable event to GAF because any gain recognized by GAF in 1990 will result in a commensurate reduction of the gain recognized by GAF in 1999.  *See* Gov't Mem. in Supp. Summ. J. 6, n.2 (filed Sept. 7, 2005) ("Gov't Mem.").

GAF and Rhone-Poulenc, S.A. ("RPSA").[4]  *See* Gov't Mem. 5; Def. Mem. in Opp. and Cross

Mot. 1 (filed Nov. 9, 2005) ("Def. Mem.").  In exchange, GAF received a Class A Limited

Partner interest in RPSSLP.  *See* Gov't Mem 6, Def. Mem. 1.  The other members of the

partnership were ESSL-RP, a wholly owned subsidiary of Citibank ("ESSL"), which also

received a Class A Limited Partner Interest, and Rhone-Poulenc Speciality Chemicals Inc.

("RPSCI") and Rhone-Poulenc Holdings Inc. ("RPHI"), indirect subsidiaries of RPSA (together

with RPSCI, RPHI, and other direct and indirect subsidiaries, "RP").  *See* Def. Mem. 1; Gov't

Mem. 6.

On April 26, 1994, GAF, ESSL, and RP entered into an agreement amending the

RPSSLP Partnership Agreement ("1994 Amendment").[5]  *See* Def. Mem. 2; Gov't Mem. 6.  The

1994 Amendment required RPSSLP to redeem the limited partnership interests of GAF and

ESSL in exchange for a "Deferred Property Distribution" on or after January 15, 1999 and on or

before February 16, 1999.  *See* Def. Mem. 2; Gov't Mem. 6.  As to the nature of the Deferred

Property Distribution, the 1994 Amendment provided:

---

[4] The parties dispute whether RPSSLP was a partnership for federal income tax purposes.
However, for the purposes of the instant partial summary judgment motion, the Government
accepts this allegation as true.  *See* Gov't Mem. Supp. Summ. J. 6, n.2.  As such, the Court need
not address this issue at this time.

[5] Debtors contend that this agreement stems from a dispute that arose in April 1991
between GAF and RP.  Def. Mem. 1.  GAF indicates that this dispute led to RP giving notice in
April 1993 of its intent to retire GAF and Citibank's Class A Partnership Interest and, in
response, GAF filing a complaint against RP in Brazoria County, Texas.  The Debtors further
state that the 1994 Amendment was entered into as part of the settlement of that litigation.  The
Court does not find the circumstances giving rise to the 1994 Amendment material to the present
motion.

The Class A Limited Partner[6] shall be entitled to receive a Deferred Property Distribution having an aggregate value equal to $463,826,718.75 (the "Deferred Property Distribution Amount").  The property to be distributed to the Class A Limited Partner pursuant to this Section 3.3 (b) shall be determined by a unanimous agreement of the parties hereto, and may consist of assets owned or acquired by [RPSSLP] or any of its subsidiaries as necessary to comply with such agreement of the Partners; provided that such a determination may be subject to such terms and conditions as the Class A Limited Partner and the General Partner[7] may agree, and provided further that, if the Class A Limited Partner and the General Partner for any reason do not agree prior to such date that is at least 90 days prior to the Deferred Property Distribution Date as to the type of assets of the Partnership to be distributed to the Class A Limited Partner or to the terms and conditions to which such a determination shall be subject, or if the type of assets of the Partnership to be distributed to the Class A Limited Partner or the terms and conditions to which such a determination is subject are unacceptable to the Class A Limited Partner for any reason, the type of assets to be distributed to the Class A Limited Partner shall consist of (i) cash in an amount not to exceed $48,000,000 (except as provided in the next paragraph) and (ii) the remaining distribution shall consist of a direct interest in debt instruments (the "Securities") issued by the United States Government that have a maturity date that is not less than twenty-nine (29) years after the date of the Deferred Property Distribution... It is the intention of the parties that the value of the Securities on the Deferred Property Distribution Date (valued as provided below) shall, when taken together with the cash delivered pursuant to clause (i) above, equal the Deferred Property Distribution Amount.

Gov't Mem. Ex D, 1994 Amendment to Partnership Agreement § 3.3 (b), GAF02-001525-27.

Essentially, this section provides that the value of the Deferred Property Distribution would be

$463,826,718.75, with the property to be distributed to be agreed upon by the Class A Limited

Partner (GAF and ESSL) and the General Partner (RP).  If the parties were unable to agree on the

type of property to be distributed, the Deferred Property Distribution would consist of (i) cash in

an amount not to exceed $48 million, and (ii) government securities with a maturity date not later

---

[6] The term "Class A Limited Partner" is defined in the agreement as referring to GAF and ESSL.

[7] The term "General Partner" is defined in the agreement as referring to RP.

than 29 years from the date of distribution.

On February 9, 1999, pursuant to § 3.3 (b) of the 1994 Amendment, RPSSLP transferred to the Class A Limited Partners property valued at $463,826,718.75, consisting of $47,999,038.13 cash and Treasury Bonds with a maturity date of August 15, 2028 and a fair market value of $415,827,680.62 and a principal amount of $411,838,000.00.  Gov't Mem. 7, Def. Mem. 4.  GAF, as the beneficial owner of approximately 98% of the Class A Limited Partnership interests in RPSSLP, recieved $47,033,539.89 cash and Treasury Bonds with a fair market value of $407,466,458.44 and a principal amount of $403,557,000.00.  Gov't Mem. 7, Def. Mem. 4.[8]

On its 1999 federal income tax return, GAF reported the 1999 Transaction as an event that resulted in no recognition of gain for federal income tax purposes.  Gov't Mem. 7, Def. Mem. 4.  Debtors contend that this was appropriate because the transaction was not taxable under § 731(c) of the Code because the transaction was "grandfathered" under a transitional binding contract exception ("Binding Contract Exception") to § 731(c) set forth in Public Law No. 103-465, § 741, 108 Stat. 4808, 5006-10 (Dec. 8, 1994) ("Statute").  Gov't Mem. 7, Def. Mem. 4.

## II.  SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  In deciding whether there is a disputed issue of

---

[8] As the owner of approximately 2% of the Class A interests, ESSL received the remaining $965,428.24 of cash and Treasury Bonds with a fair market value of $8,361,222.19. Gov't Mem. 4, n3, Def. Mem. 7, n3.

material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."  *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 247-48.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold").

Under Rule 56, a motion for summary judgment need not be dispositive of the entire controversy, but instead can be brought on only some of the claims.  *See, e.g.*, Fed. R. Civ. P. 56(a), (d).  The ability of a court to enter partial summary judgment "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact."  Fed. R. Civ. P. 56, Advisory Committee Notes.

### III.   SECTION 731 OF THE INTERNAL REVENUE CODE AND THE BINDING CONTRACT

EXCEPTION

Generally, under § 731(a) of the Code, when a partnership distributes property, the recipient partner recognizes taxable gain only to the extent that the amount of money distributed exceeds the partner's basis in its partnership interest.[9]  Thus, a liquidating distribution of "property" (other than money) ordinarily does not cause the recognition of taxable gain, regardless of the value of the property distributed.  If both money and property are distributed, the partner recognizes a taxable gain only if the amount of money distributed exceeds its basis in its interest.  The partner's basis in its partnership interest is applied first to the money distributed, and then to other property.[10]

It is undisputed that under the rules existing at the time the 1994 Amendment was signed, the 1999 Deferred Property Distribution would be nontaxable.  Gov't Mem at 2; Def. Mem. 6.  At that time, the Code treated securities as "property" and not "money."  Also, GAF's basis in its partnership interest exceeded the maximum amount of "money"(cash) that it could receive in the

---

[9] Section 731(a) of the Code provides, in relevant part:
(a) Partners. In the case of a distribution by a partnership to a partner--
     (1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution ...
Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner.
26 USC § 731 (2000).

[10] Section 732(b) of the Code provides:
(b) Distributions in liquidation. The basis of property (other than money) distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.
26 USC § 732 (2000).

Deferred Property Distribution.  Therefore, under § 731 of the Code as in effect at the time of the 1994 Amendment, GAF would not have recognized a taxable gain on its receipt of cash and Treasury Bonds in the Deferred Property Distribution.

In 1994, Congress passed the Statute, which amended § 731 and added a new § 731(c). *See* § 741, 108 Stat. at 5006-10.  As amended, § 731(c) provides that a distribution of marketable securities from a partnership is treated as a distribution of money equal to the fair market value of the marketable securities on the date of distribution.[11]  26 USC § 731(c)(1) (2000).  The statute was amended because "[c]oncern ha[d] arisen that taxpayers can exchange interests in appreciated assets for marketable securities while deferring or avoiding tax on the appreciation, by using the present-law rules relating to partnership distributions."  H.R. Rep. No. 103-316, at 1069-70, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4345, 1994 WL 16137731.   It is undisputed that if § 731(c) applies to the 1999 Transaction and the Deferred Property Distribution, the distributed Treasury Bonds would be treated as money (not property), and GAF would recognize a taxable gain on its receipt of the cash and Treasury Bonds from RPSSLP.  *See* Def. Mem. 6; Gov't Mem. 2.

Generally, § 731(c) applies to all partnership distributions occurring after December 8, 1994. § 741(c)(1), 108 Stat. at 5009.  The amending Statute, however, contained a transitional rule which exempted certain qualifying transactions from § 731(c).  This Binding Contract

---

[11] Section 731(c)(1) of the Code provides, in relevant part:
(c) Treatment of marketable securities.
    (1) In general. For purposes of subsection (a)(1) and section 737
        (A) the term "money" includes marketable securities, and
        (B) such securities shall be taken into account at their fair market value as of the
date of the distribution.
26 USC § 731(c) (2000).

Exception is set forth below:

    (c) Effective Date.--
        (3) Distributions in liquidation of partner's interest.-- The amendments made by this section shall not apply to the distribution of a marketable security in liquidation of a partner's interest in a partnership if–

            (A) such liquidation is pursuant to a written contract which was binding on July 15, 1994, and at all times thereafter before the distribution, and

            (B) such contract provides for the purchase of such interest not later than a date certain for--

                (i) a fixed value of marketable securities that are specified in the contract, or

                (ii) other property.

The preceding sentence shall not apply if the partner has the right to elect that such distribution be made other than in marketable securities.

§ 741(c)(3), 108 Stat. 4808, 5009.  To qualify for the Binding Contract Exception, a liquidating distribution must satisfy four requirements set forth by the Statute: (1) it must be made "pursuant to a written contract which was binding on July 15, 1994, and at all times thereafter before the distribution"; (2) the contract must provide for "the purchase of such interest not later than a date certain"; (3) the contract must provide that the purchase will be made for a "fixed value of marketable securities that are specified in the contract" or "other property"; and (4) the contract may not grant the liquidating partner "the right to elect" to receive property other than marketable securities.  *Id.*  If all of these requirements are not met, the liquidating distribution does not receive the benefit of the Binding Contract Exception, and is subject to § 731(c).

**IV.**    **DISCUSSION**

    As noted above, the issue presented to this Court is whether the 1999 Transaction caused

- 10 -

GAF to recognize a taxable gain under §§1001 and 731(c) of the Code.  There are no issues of

disputed fact— the sole issue for the Court is whether, as a matter of law, the 1994 Amendment

and subsequent 1999 Transaction qualify for the Binding Contract Exception to § 731(c) of the

Code.  Debtors argue that GAF recognized no taxable gain because the 1994 Amendment and

subsequent 1999 Transaction meet the four requirements of the Binding Contract Exception as

set forth in the Statute.  *See* § 741(c)(3), 108 Stat. at 5009.  The Government argues that the

Binding Contract Exception is inapplicable for two reasons: (1) the 1994 Amendment does not

provide that GAF would receive a "fixed value of marketable securities" as required by the

Statute; and (2) the 1994 Amendment is not "binding" in the senses contemplated by Congress

because it allowed GAF and the other investors in RPSSLP to later negotiate what the 1999

payment to GAF would consist of.  Because the Court agrees with the Government that the 1994

Amendment does not provide that GAF would receive a "fixed value of securities" as required by

the Statute, the Court grants the Government's motion for summary judgment and denies the

Debtors' cross-motion.[12]

The Government argues that the 1994 Amendment does not provide that GAF would

receive "a fixed value of marketable securities" as necessary under the Statute because "the 1994

---

[12] Because the Court finds in favor of the Government on its first argument, the Court
finds it unnecessary to address the Government's argument that the 1994 Amendment is not
"binding" as required by the Binding Contract Exception.  The Court notes, however, that it does
not find this argument persuasive.  The 1994 Amendment clearly provided for the sale of GAF's
partnership interest in exchange for a Deferred Property Distribution having an aggregate value
equal to $463,826,718.75.  This contract constituted a "binding" agreement.  While § 3.3(b) of
the 1994 Amendment contemplated that the parties could agree to a distribution of $463.8
million in other property in lieu of Treasury Bonds and cash, parties to an executory contract are
always free to amend the contract.  The possibility that the parties may do so by mutual consent
does not render the original agreement either "legally indefinite" or "unenforceable."

- 11 -

Amendment states no fixed value of Treasury Bonds that GAF was to receive in February 1999."
Gov't Mem. 3.  Instead, the Government contends, "the plain language of the 1994 Amendment
allows the cash component of the 1999 payment to GAF to range anywhere from zero to $48
million, with the Treasury Bond component varying accordingly."  *Id.* at 9.

      The Supreme Court has established this basic principle of statutory interpretation: "Our
first step in interpreting a statute is to determine whether the language at issue has a plain and
unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if
the statutory language is unambiguous and the statutory scheme is coherent and consistent."
*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *see also BedRoc Ltd., LLC v. United States*,
541 U.S. 176, 183 (2004).  Here, the Statute requires that the contract in question provide for the
purchase of a partnership interest in exchange "for-- (i) a fixed value of marketable securities that
are specified in the contract, or (ii) other property."  Webster's defines fixed as "to establish
definitely."  *Webster's II New College Dictionary* 423 (Margery S. Berube et al. eds., 2001).
Therefore, the plain language of the Statute indicates that the contract must provide for the
purchase of a partnership interest in exchange for (i) a definite, established value of securities; or
(ii) other property.  The contract may allow the partnership to choose between the two options at
the time of distribution, but the Binding Contract Exception will not apply if the exiting partner
is given a choice between the two options.  *See* § 741(c)(3), 108 Stat. at 5009 ("The preceding
sentence shall not apply if the partner has the right to elect that such distribution be made other
than in marketable securities.").

      Under this plain language, the 1994 Amendment does not meet the requirements of the
Statute, and thus the 1999 distribution by the Partnership to GAF does not qualify for the Binding

Contract Exception.  Section 3.3(b) of the 1994 Amendment provides that the Class A Limited Partner is entitled to receive "a Deferred Property Distribution having an aggregate value equal to $463,826,718.75," which shall consist of "(i) cash in an amount not to exceed $48,000,000 ... and (ii) the remaining distribution shall consist of [Treasury Bonds]."  Gov't Mem. Ex D, 1994 Amendment to Partnership Agreement § 3.3 (b), GAF02-001525-27.  Under this section, the amount of cash distributed by the Partnership could vary anywhere between zero and $48,000,000, and the amount of Treasury Bonds distributed could correspondingly vary anywhere between $415,826,718.75 and $463,826,718.75.  A distribution of Treasury Bonds that could vary in amount by $48,000,000 is not "a definite, established value."  Therefore, the 1994 Amendment does not qualify for the Binding Contract Exception.  As a result, the 1999 Transaction triggered the recognition of a gain by GAF under § 731(c) of the Code.

Debtors present a number of arguments as to why § 3.3.(b) of the 1994 Amendment satisfies the fixed value requirement of the Statute.  The Court will address each of these arguments in turn.

First, Debtors argue that the fixed-value requirement is satisfied because "[t]he 1994 Amendment provided for a fixed distribution of not less than $415,836,718.75 in Treasury Bonds."  Def.'s Mem. 14.  Debtors contend that "[t]he fact that the Partnership might have distributed additional Treasury Bonds in no way diminishes the mandatory and fixed nature of the $415,826,718.75 in Treasury Bonds required to be distributed by the 1994 Amendment."  Def. Mem. in Reply 2 (filed Nov. 30, 2005) ("Def. Rep.").  The Court disagrees.  While the $415,836,718.75 was certainly "fixed" as a minimum amount of securities to de distributed, the 1994 Amendment, when read as a whole, allowed the distribution of Treasury Bonds to vary

- 13 -

between $415,826,718.75 and $463,826,718.75.  The statute plainly requires that the "contract" must provide for the purchase of the partnership interest "for... a fixed value of marketable securities."  *See* § 741(c)(3), 108 Stat. at 5009.  When read in its entirety, the "contract" in question, the 1994 Amendment, provides not for a "fixed value" of securities to be distributed, but for an amount of securities with a value of between $415,826,718.75 and $463,826,718.75 to be distributed.  Essentially, Debtors are requesting that this Court read the Statute as requiring a "fixed minimum value," rather than a "fixed value."  The Court will not rewrite the Statute; if Congress had meant to require only a "fixed minimum value" it certainly could have done so.

Second, Debtors argue that the Statute's use of "or" is permissive and permits "a distribution of 'other property' in lieu of some or all of the 'fixed value of marketable securities.'" Def. Mem. 15; *see also* Def. Rep. at 7 ("In this context, the use of 'or' is permissive: it broadens the scope of the [Binding Contract Exception] to apply to any binding contract that provides for the distribution of a fixed value of marketable securities, even if the contract also contemplates a distribution of 'other property.'").  This does not comport with the plain language of the Statute.  The use of the disjunctive "or" indicates that the two options are, as argued by the Government, mutually exclusive and may not be combined.  The Statute permits the contract to provide the partnership with the option of choosing, at the time of distribution, whether to distribute *either* a fixed value of securities or other property, as long as both options have been set forth in the contract.  The Statute does not, however, permit the partnership to combine these options and distribute a fixed value of securities as well as other property, nor is the partnership entitled to vary the amount of securities distributed, nor may the partnership distribute other property in lieu of some or all of the fixed value of marketable securities.  The language of the Statute is clear– in

order to qualify for the Binding Contract Exception, the contract must specify that the exiting

partner's interest will be purchased for either "a fixed value of securities" or "other property."[13]

Finally, Debtors argue that the Court should find that the Binding Contract Exception

applies to the 1994 Amendment because "Congress, prompted by GAF's efforts, intended the

[Binding Contract Exception] to apply to the Partnership's distribution of Treasury Bonds to

GAF."  Def. Mem. 10.  In support of this proposition, GAF offers the Affidavit of Gregory F.

Jenner[14], an outside professional retained by GAF in 1994 to seek legislative relief from the

proposed amendments to § 731 in the form of a "transition rule."  Def. Mem., Ex. B, Aff. of

Gregory F. Jenner (Oct. 3, 2005).  Even were the Court to find it necessary to resort to legislative

history,[15] the Jenner affidavit fails to provide the Court with evidence of Congressional intent,

---

[13] Debtors point to various other provisions of the Code, as well as regulations
promulgated by the IRS, that interpret "or" as meaning "and."  *See* Def. Rep. 7 ("Section
707(a)(2)(B) does not apply unless, inter alia, a partnership makes a related transfer of 'money <u>or</u>
other property' to a partner... The Regulations promulgated under Section 707(a)(2)(B) make it
very clear that Section 707(a)(2)(B) can apply if a partner receives a transfer of money <u>and</u> other
property." (citations omitted)).  If these regulations did pertain to the Statute in question, the
Court would, if appropriate, consider the agency's interpretation of the regulation.  *See Chevron
U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("[When a] statute
is silent . . . with respect to the specific issue, the question for the court is whether the agency's
answer is based on a permissible construction of the statute").  The IRS has not promulgated any
regulations relating to this Statute, however, and the Court does not find those cited by the
Debtors sufficiently persuasive to counter the plain language of the statute.

[14] The Government has moved to strike the Jenner Affidavit, arguing that the affidavit
fails to meet the requirements of Rule 56(e) and that GAF's untimely disclosure of the affidavit
bars its introduction to oppose the United States' motion for partial summary judgment.  This
motion to strike is dismissed as moot because, as discussed above, the Court gives this affidavit
absolutely no weight in considering what the legislative intent was.

[15] Where, as here, the language of the statute is clear, it is unnecessary and indeed unwise
for the court to consider legislative history and Congressional intent in determining the meaning
of a statute.  *See, e.g.*, *W. Va. Univ. Hosps. Inc. v. Casey*, 499 U.S. 83, 98-99 (1991) ("The best
evidence of [legislative] purpose is the statutory text adopted by both Houses of Congress and

and does not constitute legitimate legislative history.  The value of legislative history lies in its

ability to "reveal[] the background of the law and the assumptions shared by those who wrote and

voted on the bills."  *Covalt v. Carey Canada, Inc.*, 860 F.2d 1434, 1438-39 (7th Cir. 1988); *see*

*also Garcia v. United States*, 469 U.S. 70, 76 (1984) (courts should look only to Committee

Reports that "represent[] the considered and collective understanding of those [legislators]

involved in drafting and studying the proposed legislation.").  The Supreme Court has explained

that private interest groups' roles in lobbying for or against legislation provide a dubious basis

from which to infer intent:

> Legislative history is problematic even when the attempt is to draw inferences
> from the intent of duly appointed committees of the Congress.  It becomes far
> more so when we consult sources still more steps removed from the full Congress
> and speculate upon the significance of the fact that a certain interest group
> sponsored or opposed particular legislation.... We ought not attribute to Congress
> an official purpose based on the motives of a particular group that lobbied for or
> against a certain proposal -- even assuming the precise intent of the group can be
> determined.  It is for the Congress, not the courts, to consult political forces and
> then decide how best to resolve conflicts in the course of writing the objective
> embodiments of the law we know as statutes.

*Circuit City Stores v. Adams*, 532 U.S. 105, 120 (U.S. 2001).  The affidavit of a lobbyist,

especially when written during the course of litigation, provides no evidence of contemporaneous

Congressional intent, and thus is of no value to a court seeking to divine congressional intent

from legislative history.  Consequently, were the Court to consider the legislative history of the

---

submitted to the President.  Where that contains a phrase that is unambiguous– that has a clearly
accepted meaning in both legislative and judicial practice– we do not permit it to be expanded or
contracted by the statements of individual legislators or committees during the course of the
enactment process.");  *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005) ("[T]he
authoritative statement is the statutory text, not the legislative history or any other extrinsic
material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a
reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.").

Statute, it would give no weight to the Jenner Affidavit.  In any event, as noted above, the plain meaning of the Statute is clear.  As such, there is no need for this Court to consult the circumstances surrounding the Statute's enactment or consider whether Congress intended the Statute to apply to the Partnership's distribution of Treasury Bonds to GAF.  *See CBS v. Primetime 24 J.V.*, 245 F.3d 1217, 1224 (11th Cir. 2001) (declining to consider parties' argument that statute's grandfather clause was enacted for their benefit and as such the Court should adopt their interpretation of the clause because the clause was clear and unambiguous).

The Court therefore finds, as a matter of law, that under the plain language of the Statute, the 1994 Amendment does not provide that GAF would receive "a fixed value of marketable securities" in exchange for its interest in the Partnership.  Consequently, the 1994 Amendment and the subsequent 1999 Transaction do not qualify for the Binding Contract Exception and § 731(c) of the Code applies to the distribution that GAF received from the Partnership in 1999.[16] Thus, the Government's motion for partial summary judgment will be granted and the Debtors' cross-motion for partial summary judgment will be denied.

## V.   CONCLUSION

For the reasons stated above, the Government's motion for partial summary judgment

---

[16] As noted above, it is undisputed that if § 731(c) applies to the 1999 Transaction and the Deferred Property Distribution, the distributed Treasury Bonds would be treated as money, and GAF would recognize a taxable gain on its receipt of the cash and Treasury Bonds from RPSSLP.  The Government asserts that the distribution received by GAF of $454,499,998.33 exceeds GAF's adjusted basis in its investment in RPSSLP by over $400 million "according to GAF's asserted position in this litigation."  Gov't Mem. 2.  Therefore, the Government argues, under §§ 731(a) and 1001 of the Code, GAF recognized a gain of over $400 million.  Although the Court has determined that the 1999 Transaction resulted in a recognizable taxable gain for GAF, there is not sufficient evidence before the Court to permit a determination of the amount of that gain at this time.

- 17 -

regarding Debtors' claim for "binding contract" transitional relief from section 731(c) of the Internal Revenue Code is **GRANTED.**  Debtors' cross-motion for partial summary judgment regarding debtors' claim for binding contract transitional relief from § 731(c) of the Internal Revenue Code is **DENIED**.  The Government's motion to strike the Jenner Affidavit is **DISMISSED AS MOOT**.

/s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.

Dated: June 8, 2007

- 18 -