Albert H. Turkus (AHT 7000)
Julia M. Kazaks (JMK 7504)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue N.W.
Washington, D.C.  20005
(202) 371-7000

Dennis O'Grady (DO 7430)
Mark Hall (MH 9621)
RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI
One Speedwell Avenue
Morristown, New Jersey  07962
(973) 538-0800

Counsel for Debtors

John B. Magee (JBM 0787)
Sanford W. Stark (SWS 8984)
MCKEE NELSON LLP
1919 M Street N.W., Suite 200
Washington, D.C.  20036
(202) 775-1880

Jonathan T. Molot
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C.  20001-2075

Special Counsel

Max Gitter
CLEARY, GOTTLIEB,
STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006

Special Counsel
(Admission Pending)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## (AT NEWARK)

|  |  |  |
|---|---|---|
| In re: | ) | Civ. No. 2:02cv03082 (SRC) |
|  | ) | Chap. 11 Nos. 01-30135 (RG) and |
| G-I HOLDINGS INC., et al., | ) | 01-38790 (RG) (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Honorable Stanley R. Chesler |
|  | ) |  |

**MEMORANDUM IN OPPOSITION TO THE
GOVERNMENT'S MOTION IN LIMINE (DOCKET NO. 263)
AND IN SUPPORT OF GAF'S MOTION FOR RECONSIDERATION OF THE
COURT'S JUNE 2007 PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................4

    I.  The 1994 Binding Contract at Issue......................................................................4

    II.  The Transition Rule ..............................................................................................7

ARGUMENT ................................................................................................................10

    I.  The Government's Position Rests on a Clearly Erroneous Interpretation of the
       Transition Rule....................................................................................................11

        A.  The Identity of the Transition Rule's Intended Beneficiary May Not Be
            Ignored ........................................................................................................11

        B.  The Government's Reading of the Transition Rule Is Patently Incorrect ..................11

    II.  The Government's Position Rests on a Clearly Erroneous Interpretation of GAF's
        Contract..............................................................................................................16

    III. GAF Must Be Permitted To Present Evidence Regarding its Reliance on the
         Transition Rule To Avoid Penalties....................................................................19

    IV. This Record Compels Reconsideration and Vacation of the Partial Summary
         Judgment Order, Based on Multiple Factors the Caselaw Treats as Grounds for
         Reconsideration...................................................................................................23

CONCLUSION.............................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Ace America Insurance Co. v. Wachovia Insurance Agency Inc.*, No. 08-4369, 2008 WL 4951239 (D.N.J. Nov. 18, 2008).............................................................28

*Airborne Freight Corp. v. United States*, 153 F.3d 967 (9th Cir. 1998)....................................1, 14

*American National Insurance Co. v. United States*, 690 F.2d 878 (Ct. Cl. 1982)........................14

*Amersham Biosciences Corp. v. PerkinElmer, Inc.*, No. 03-4901, 2006 WL 3485918 (D.N.J. Nov. 30, 2006)..........................................................................................245, 28

*Benham v. Commissioner*, T.C. Memo 2000-165, 79 T.C.M. (CCH) 2054 (2000) ....................22

*Betson v. Commissioner*, 802 F.2d 365 (9th Cir. 1986)................................................................21

*Bizcap, Inc. v. Olive*, 892 F.2d 1163 (3d Cir. 1989) ....................................................................22

*Bridge v. U.S. Parole Commission*, 981 F.2d 97 (3d Cir. 1992) ..................................................23

*Brooks v. FDIC*, No. 92-418, 1994 WL 258744 (D.N.H. Mar. 3, 1994).....................................24

*Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003) .............................22

*Butler v. Commissioner*, T.C. Memo 2002-314, 84 T.C.M. (CCH) 681 (2002)...........................22

*Crown Castle USA Inc. v. Fred A. Nudd Corp.*, No. 05 -6163, 2008 WL 3841298 (W.D.N.Y. Aug. 13, 2008).................................................................................24, 27, 29

*Danforth v. Powell*, No. 2-396, 1993 WL 666623 (D.N.H. Mar. 10, 1993)................................24

*Deal v. United States*, 508 U.S. 129 (1993)................................................................................12

*Durrett v. Commissioner*, 71 F.3d 515 (5th Cir. 1996)................................................................21

*Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394 (D.N.J. 2000) ......................................................................................................................23

*ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513 (3d Cir. 1998) ................................................11

*Estate of La Meres v. Commissioner*, 98 T.C. 294 (1992)...........................................................22

*Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005).........................................22

*Gallant v. Telebrands Corp.*, 35 F. Supp. 2d 378 (D.N.J. 1998)........................................24, 26, 27

*Garrett v. Firestone Tire & Rubber Co.*, No. 88-0708, 1989 WL 21778 (D.N.J. Mar. 7, 1989) ........................................................................................................................................27

*Green v. Bock Laundry Machine Co.*, 490 U.S. 504 (1989)........................................................13

*Gridley v. Cleveland Pneumatic Co.*, 127 F.R.D. 102 (M.D. Pa. 1989)...............24, 25, 26, 27, 28

*Herrmann v. Cencom Cable Associates*, 978 F.2d 978 (7th Cir. 1992) ...........................12, 13, 14

*Hill v. Tammac Corp.*, No. 05-1148, 2006 WL 529044 (M.D. Pa. Mar. 3, 2006)....................................................................................................25, 26, 29

*Holbrook v. Woodham*, No. 05-304, 2009 WL 365681 (W.D. Pa. Feb. 13, 2009) ..................................................................................................24, 28, 29

*In re Dow Jones & Co., Inc. v. Irwin & Leighton, Inc.*, No. 89-3641, 1990 WL 8733 (D.N.J. Jan. 29, 1990), *aff'd*, 941 F.2d 1200 (3d Cir. 1991)..............................................24, 26

*In re G-I Holdings, Inc.*, 369 B.R. 832 (D.N.J. 2007) .............................................................1, 16

*Klee v. Lehigh Valley Hospital*, No. 97-4642, 1998 WL 966011 (E.D. Pa. Nov. 30, 1998), *aff'd*, 203 F.3d 817 (3d Cir. 1999).........................................................25, 26, 27, 29

*Max's Seafood Cafe v. Quinteros*, 176 F.3d 669 (3d Cir. 1999) ..............................................23

*Morissette v. United States*, 342 U.S. 246 (1952).......................................................................13

*National Recovery Agency, Inc. v. AIG Technical Services, Inc.*, No. 05-0033, 2005 WL 2100702 (M.D. Pa. Aug. 26, 2005)......................................................................................28

*National State Bank of Elizabeth, N.J. v. Smith*, 591 F.2d 223 (3d Cir. 1979)..........................13

*Oak Systems, Inc. v. Francotyp-Postalia, Inc.*, No. 01-2794, 2002 WL 442104 (E.D. Pa. Feb. 5, 2002) ...................................................................................................................25, 28

*Panna v. Firstrust Savings Bank*, 760 F. Supp. 432 (D.N.J. 1991) ......................................23, 25

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995).................................................................3

*Raya-Rodriguez v. Sears Roebuck Co.*, 389 F. Supp. 2d 275 (D.P.R. 2005)...............................24

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006)......................3

*Shrader v. CSX Transportation*, No. 94-34, 1994 WL 721364 (W.D.N.Y. Dec. 7, 1994),
    *aff'd*, 70 F.3d 255 (2d Cir. 1995) ................................................................25, 28

*State Farm Mutual Automobile Insurance Co. v. All-Care Chiropractic*, No. 04-175,
    2004 WL 1446033 (E.D. Pa. June 28, 2004) ................................................25, 28

*Triax Co. v. United States*, 20 Cl. Ct. 507 (1990) ..............................................24

*United States v. Centennial Savings Bank FSB*, 499 U.S. 573 (1991) ...................12

*United States ex rel. Haskins v. Omega Institute, Inc.*, 25 F. Supp. 2d 510 (D.N.J. 1998) .....25, 27

*United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994) .......................................12

*United States v. Boyle*, 469 U.S. 241 (1985) .....................................................21

*United States v. Fausto*, 484 U.S. 439 (1988) .............................................14, 16

*United States v. Kjellstrom*, 916 F. Supp. 902 (W.D. Wis. 1996), *aff'd*, 100 F.3d 482 (7th
    Cir. 1996) ..................................................................................................1, 16

*Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, No. 91-3423, 1992 WL 80951
    (D.N.J. Apr. 13, 1992) ..................................................................................29

## STATE CASES

*AT&T Corp. v. Lillis*, 953 A.2d 241 (Del. 2008) ..............................................18

*Beal Bank, SSB v. Lucks*, No. 14896, 2001 WL 220252 (Del. Ch. Feb. 20, 2001) ...........18

*E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108 (Del. 1985) ..............17

*Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228 (Del. 1997) ............18

*Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728 (Del. 2006)..............17

## FEDERAL STATUTES & REGULATIONS

Fed. R. Civ. P. 54(b) ......................................................................................23

I.R.C. § 707 ..................................................................................................16

I.R.C. § 731 ....................................................................................................7

I.R.C. § 732 ..................................................................................................18

I.R.C. § 1059(e)(3)(C)(i) ...................................................................................14

I.R.C. § 6662 ....................................................................................................19

I.R.C. § 6662(d)(2)(B)(i) ..................................................................................19

I.R.C. § 6664(c)(1) ......................................................................................19, 20

Treas. Reg. § 1.368-2(h) ...................................................................................15

Treas. Reg. § 1.6662-4(d)(3) .............................................................................20

Treas. Reg. § 1.6664-4(b) ..................................................................................20

Treas. Reg. § 1.6664-4(c)(2) ..............................................................................21

Treas. Reg. § 25.2702-3(b) ................................................................................15

## LEGISLATIVE HISTORY

H.R. 5110, 103d Cong. (Sept. 27, 1994) ........................................................2, 9

S. 2467, 103d Cong. (Sept. 27, 1994) ............................................................2, 9

Pub. L. No. 83-591, § 731, 68A Stat. 245 (1954) ...............................................7

Pub. L. No. 102-486, § 1937(b)(2), 106 Stat. 2776, 3033 (1992) ......................7

Pub. L. No. 103-465, § 741(c)(3), 108 Stat. 4809, 5009 (1994) .....................1, 9

## MISCELLANEOUS

American Heritage Dictionary (3d ed. 1994) ...............................................11, 12

Charm Forex—Help—Forex Dictionary, http://charmforex.com/index.php?pg=forex-
    dictionary (last visited Apr. 16, 2009) .......................................................13

John F. Manning, *Textualism as a Nondelegation Doctrine,* 97 Colum. L. Rev. 673
    (1997) ..........................................................................................................14

John F. Manning, *What Divides Textualists from Purposivists,* 106 Colum. L. Rev. 70,
    (2006) ..........................................................................................................12

## INTRODUCTION

The government's motion *in limine* carries this Court's 2007 partial summary judgment ruling[1] to preposterous extremes.  Having already convinced the Court to deprive GAF of the relief that Congress afforded it in the binding contract exception transition rule to section 731(c) (the "Transition Rule"),[2] the government seeks not only penalties but also the exclusion of all evidence regarding GAF's reasonable belief that its contract fell within the legislation that GAF sought and obtained in 1994.

GAF's research shows—and the government's failure to identify any contrary instance in response to GAF's two recent specific requests confirms—that the government has never sought to deny the benefits of a transition rule to its undisputed intended beneficiary, let alone to seek penalties for reliance on the rule.  Indeed, the government's briefs in *Airborne Freight Corp.* and *Kjellstrom*[3] affirmatively argued that only the *intended* beneficiary of a tax transition rule should qualify for its benefits.[4]  The government never told any of this to the Court or to GAF.

But the government's overreaching motion has had one salutary, albeit ironic, effect:  it stimulated GAF to conduct an in-depth investigation to build on the penalty-phase discovery depositions conducted in the fall of 2008.  The result is a massive record of new information not

---

[1] *In re G-I Holdings, Inc.*, 369 B.R. 832 (D.N.J. 2007).

[2] Except as otherwise provided, section references are to the Internal Revenue Code of 1986, as amended (26 U.S.C *et seq.*).  The Transition Rule was set forth in Pub. L. No. 103-465, § 741(c)(3), 108 Stat. 4809, 5009 (1994) (Ex. O).

[3] *Airborne Freight Corp. v. United States*, 153 F.3d 967, 970 (9th Cir. 1998); *United States v. Kjellstrom*, 916 F. Supp. 902 (W.D. Wis. 1996), *aff'd*, 100 F.3d 482 (7th Cir. 1996).

[4] *See* discussion *infra* pp. 11, 15-16; Brief for the Appellant at 42, *Airborne Freight Corp. v. United States*, 153 F.3d 967 (9th Cir. 1998) (No. 97-35129) ("[L]egislative history [of transition rule] . . . indicates that Congress had one particular taxpayer in mind.") (Ex. C); Memorandum in Support of United States' Motion for Summary Judgment at 11, *United States v. Kjellstrom*, 916 F. Supp. 902 (W.D. Wis. 1996) (No. Civ. 95-C-0091-C) ("[L]egislative history of the [this] . . . and the other transition rules included in the 1986 Act establishes that [this] exception, and a number of the other transitional rules, were intended to benefit a specific taxpayer.") (Ex. D).

previously presented to the Court, which bears directly on the history of the Transition Rule and the interpretation of *both* the statute and GAF's contract—a record that includes four depositions, six affidavits (one from a Treasury Department official), two Senate staff statements under seal, and seventeen other exhibits including public information and substantial interpretive analysis. This new record: (i) compels the denial of the government's motion; (ii) negates the key arguments that formed the basis for the partial summary judgment decisions; and (iii) compels reconsideration and vacation of the Court's June 2007 rulings—to correct clear errors and avert manifest injustice.

This extensive new record, presented here as the accompanying Offer of Proof, conclusively shows, first and foremost, that every person with any role in the Transition Rule legislation—from Congressman Daniel Rostenkowski, Chairman of the House Ways and Means Committee,[5] to the Treasury Department, the congressional staff, and GAF's executives, lobbyists, and internal counsel—recognized that GAF was *the* object of the Transition Rule, which was *specifically tailored to fit GAF's contract*. The resulting statute matched all seven key elements of GAF's contract.[6] If the summary judgment is not reversed, it will have a bizarre and impermissible impact: this specially crafted statute will apply to *nobody*.[7]

---

[5] *See* Quinn Deposition Summary ¶ 5 (Ex. G) (GAF's issue would be "taken care of.").

[6] The new information regarding the history and interpretation of the Transition Rule includes: Affidavit of Michael D. Thomson (Treasury Department) (Ex. A); Senate Finance Committee Staff Statements (filed under seal) (Ex. B); government briefs in the *Airborne* and *Kjellstrom* transition rule cases (Exs. C, D); post-summary-judgment deposition summaries of Messrs. Samuel Heyman (GAF's CEO), Paul Aronson (GAF Tax Department), Thomas Quinn (lobbyist), and Gregory Jenner (lobbyist) (Exs. E, F, G, H); Affidavit of Gregory Jenner (lobbyist) (Ex. I); the private chronology of GAF's contacts with Congress and Treasury (Ex. J); the public chronology of the statute (Exs. K, L, M, N, O); a memorandum from Aronson to Heyman describing the results of GAF's lobbying efforts (Ex. 540); and alternative definitions for "fixed" (Exs. P, Q).

[7] *See, e.g.*, *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 57–58 (2006)

2

Second, this new record conclusively demonstrates that the government's interpretations of the key language in both the statute ("fixed value of marketable securities") and in GAF's contract ("cash not to exceed $48,000,000 (except as provided in the next paragraph)"), which together are essential bases for its present motion and the summary judgment decision, are clearly erroneous. The quoted statutory term *cannot* mean, as a matter of financial reality, an "invariable" value (marketable securities fluctuate in value). The government's isolation of the words "fixed value" from "marketable securities," the very object of this special legislation, distorts the statute. The statute means, instead, according to common financial usage, dictionary definitions, and in context, "established" or "determined" by the contract. The quoted contract phrase *cannot*, in the context of accompanying contract language and economic considerations of the parties, mean "any amount from $0 to $48 million." The government's isolation of the words "not to exceed" from "(except as provided in the next paragraph)" distorts the contract. The contract can mean *only* "cash in the amount of $48,000,000 *and no more*," subject to the true-up provision referenced in the parenthetical beginning "except," thus fixing $48 million as the minimum amount of cash.[8] Thus, even if the government's interpretation of the statute were correct, the summary judgment was erroneous because the contract "fixed" the total distribution at $463.8 million and "fixed" the allocation at $48 million cash and $415.8 marketable securities, subject only to minor adjustments for market fluctuations, as is always necessary for transactions

<hr />

(rejecting reading that "would render [Act] a largely meaningless exercise"); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 216 (1995) (rejecting interpretation rendering Act applicable to "a null set" of cases).

[8] New contract interpretation information includes: an analysis of the bond value true-up provisions of the contract that clarify the minimum cash payout (Joint Exs. 2001-062, 2002-013); Affidavits of Messrs. Samuel J. Heyman (GAF's CEO), Michael Leo (RP), Michael Nissan and Norman Chirite (Weil, Gotshal & Manges) (Exs. R, S, T, U); new exhibits regarding a proposed liquidating distribution under the 1990 Agreement that "fixed" the bond purchase with reference to the full cash amount (Exs. V, W, X); and Bloomberg Screen Information on 30-year Treasury bond fluctuations and available denominations in 1994 and 1998–99 (Ex. Y).

in marketable securities.

GAF understands that this Court would have been better served had this additional record been developed and presented during the summary judgment proceedings. But the government's motion requires its consideration now. This new record not only fully rebuts the government's present motion and its penalty claims, but further demonstrates that all of the traditional factors supporting reconsideration are compellingly present here. *See infra* Part IV.

## BACKGROUND

### I.        The 1994 Binding Contract at Issue

As the Court is aware, GAF and Rhone-Poulenc ("RP") were in litigation in 1993 and 1994 regarding the threatened liquidation of 98% of GAF's partnership interest under provisions of the original 1990 RPSSLP partnership agreement (the "1990 Agreement") that were similar to the liquidation provisions of the 1994 Amendment to Partnership Agreement ("1994 Agreement").[9] Absent mutual agreement on business property, the 1990 Agreement required the payment of cash "not to exceed $80 million"—then GAF's tax basis in the partnership—and the remainder in Treasury bonds.[10] The exhibits contained in and summarized as Exhibit V show that in 1992 and 1993, RP prepared to retire GAF's interest with $80 million in cash, even as its estimate of the total due to GAF changed. In fact, it purchased $381 million in Treasury bonds,[11] which with cash of $80 million would equal GAF's estimated capital account. These documents and the testimony of Messrs. Heyman (GAF's CEO) and Leo (RP's Senior Vice

---

[9] *See* Final Pretrial Oder ("JPTO") ¶¶ 3.VII.B.250-C.302 at 72-81 (tracing dispute history). *Compare* Ex. 2001-062, at GAF03-011269 (§ 9.8(b)(iii)), *with* Ex. 2002-013, GAF02-001066-70 (§ 3.3(b)). For simplicity, references to GAF's interest cover the total outstanding Class A limited partnership interests, of which Citibank owned a small fraction.

[10] *See* Joint Ex. 2001-062, at GAF03-011270; JPTO ¶ 3.V.G.166 at 51.

[11] *See* United States Ex. 422, at RHODIA 007876 (attached at Ex. V); JPTO ¶ 3.VII.B.267 at 75.

President of Legal and Regulatory Affairs) reflect their mutual understanding that the words "not to exceed $80 million" meant "$80 million in cash and no more."[12]

The 1994 Agreement reduced that cash component to $48 million because GAF's basis had decreased,[13] and the liquidated value of GAF's capital account was fixed at $463.8 million, the amount of the Deferred Property Distribution scheduled for 1999.[14]  The 1994 Agreement further provided that, failing mutual agreement on business property to satisfy this amount, GAF was to receive on the distribution date (i) "cash in an amount not to exceed $48,000,000 (*except as provided in the next paragraph*)" and (ii) Treasury bonds, which, under the 1994 Agreement, RPSSLP was required to purchase 70 days in advance of the distribution date.[15]

The parenthetical beginning "except" confirms that the "not to exceed" language meant—like the cognate provision in the 1990 Agreement[16]—"$48 million in cash and no more (except for the true-up)."[17]  The parenthetical refers to the "true-up" provisions on page 12 of the 1994 Agreement,[18] which operated to ensure that the full $48 million in cash would be distributed.  Under these provisions, RPSSLP bore the entire risk of any *decline* in value of the Treasuries during the 70-day period before the distribution, because it was required to make up for such a decline in cash (potentially causing cash to exceed $48 million).  The potential for

---

[12] *See* Ex. R ¶ 5; Ex. S ¶ 4; Ex. V ¶ 5; Ex. W at 1.

[13] *See* Ex. U ¶ 9; JPTO ¶¶ 3.VII.C.282-284 at 77-78.

[14] *See* Joint Ex. 2002-013, at GAF02-001066-67; Ex. T ¶ 6.c; JPTO ¶ 3.VII.C.283 at 77.

[15] *See* Joint Ex. 2002-013, at GAF02-001067-68 (emphasis added).

[16] *See* Joint Ex. 2001-062, at GAF03-011270; JPTO ¶ 3.V.G.166 at 51.

[17] The true-up was only contained in the 1994 Agreement due to the 70-day holding period requirement.  *See* Joint Ex. 2002-013, at GAF02-001068.

[18] Joint Ex. 2002-013, at GAF02-001069.01.

decline was a real financial exposure.[19]  But if the Treasuries *increased* in value, RPSSLP *could not* reduce the full $48 million cash amount by paying over all of the Treasuries it had purchased; RPSSLP was required to retain Treasuries in excess of $415.8 million.  Thus, RPSSLP was required under the contract to deliver a total "fixed" amount of $463.8 million composed of a "fixed" amount of cash ($48 million) and a "fixed" amount of Treasury bonds ($415.8 million), subject only to necessary adjustment for Treasury bond market fluctuations.

The contractual requirement to pay the full $48 million in cash was consistent with the parties' clear intentions and financial incentives.[20]  GAF wanted to maximize its nontaxable cash at an amount that approximated its basis in its partnership interest, *i.e.*, about $48 million, while RP wanted to maximize its cash and minimize its Treasury bond purchases because it bore the entire risk of value declines during the contractually-required 70-day holding period.[21]  In fact, on February 9, 1999, RPSSLP distributed *almost exactly* (1) $48,000,000 in cash— $47,999,038.13 and (2) $415,826,875 in Treasury bonds— $415,827,680.62.[22]

The drafting history of the 1994 Agreement confirms what the contract, read in full context, shows.  In December 1993, when GAF's tax basis was still $80 million, its V.P. of Taxes reminded GAF's drafting lawyers that GAF expected to receive $80 million in cash and the balance of the distribution in Treasury bonds.[23]  The affidavits of Mr. Heyman, Mr. Leo (RP), and Messrs. Chirite and Nissan (Weil) further confirm that in 1994 the parties intended for the full $48 million in cash (an amount just slightly below GAF's remaining tax basis) to be paid

---

[19] *See* Ex. Y at 1–2 (Bloomberg Screen Information on 30-year Treasury bond fluctuations).

[20] *See* Ex. R ¶ 5; Ex. S ¶ 4.

[21] *See* Ex. S ¶¶ 4–5.

[22] JPTO ¶ 3.IX.A.305 at 82.

[23] *See* Ex. W at 1.

at the liquidation—not some potential range of cash from $0 to $48 million.[24]  The contemporaneous transaction summary memorandum of the Weil drafting team ( the "Roadmap Memo") settles the point, stating that "the distribution is to consist of $48 million of cash (subject to the 'true-up' procedure . . . ) with the balance of the distribution being in Treasury securities."[25]

## II.      The Transition Rule

For forty years before the 1994 legislation, partnership tax law had provided that the only partnership distributions subject to tax were those of cash *to the extent that the cash exceeded the partner's basis.*  I.R.C. § 731(a)(1) (1993).  No other property distributions were taxable.  I.R.C. §§ 731(a)(1), 732 (1993).[26]  Thus, when GAF signed the 1994 Agreement, the entire scheduled 1999 distribution—$48 million in cash and $415.8 million in Treasury bonds—was nontaxable.

On July 15, 1994, less than three months later, the Treasury Department announced, as a revenue-raiser for the pending trade legislation (Uruguay Round Fast Track GATT), a statutory amendment to treat all partnership distributions of marketable securities the same as cash (*i.e.*, taxable to the extent of value in excess of basis).[27]  GAF immediately recognized the adverse impact of this proposal on the anticipated 1999 distribution, which it was contractually bound to accept in the absence of mutual agreement on property.  GAF launched a lobbying campaign for binding contract relief, in which company personnel and outside lobbyists made extensive personal contacts with many officials in Congress and at the Treasury Department between July

---

[24] *See* Ex. R ¶ 5; Ex. S ¶ 5; Ex. T ¶ 8; Ex. U ¶ 9.

[25] Ex. X at 6.

[26] I.R.C. § 731 was originally enacted as part of the Internal Revenue Code of 1954, *see* Pub. L. No. 83-591, § 731, 68A Stat. 245 (1954), and it remained unaltered in any respect until 1992, *see* Pub. L. No. 102-486, § 1937(b)(2), 106 Stat. 2776, 3033 (1992).

[27] *See* Ex. K at 2 ("This proposal would equalize the treatment of distributions of cash and marketable securities by a partnership to its partner . . . .").

21, 1994 and the enactment of the legislation on December 8, 1994.[28]  As the full record now before the Court for the first time indisputably reconfirms, *GAF was the only entity to lobby for this relief*, which was obtained immediately after GAF launched its lobbying effort.[29]

On July 26, 1994, Greg Jenner, an attorney and one of GAF's principal lobbyists, contacted Mark Prater, who had succeeded Mr. Jenner as the Chief Tax Counsel (Minority) for the Senate Committee on Finance ("Finance Committee").  Mr. Jenner explained GAF's contract (which he provided upon request, because the congressional staff "wanted to make sure" that they got it right)[30] and the adverse impact of the proposed legislation.  Mr. Prater's principal staff professional was Brigitta Gulya.  A consensus quickly developed among the congressional tax writing staff that GAF's binding contract transition relief was appropriate.[31]  On the same date, Mr. Jenner contacted Michael Thomson, the person in the Treasury Department's Office of Tax Legislative Counsel responsible for the § 731 revenue-raiser, and gave him the same information that he had given to Mr. Prater.[32]  Mr. Thomson also agreed that binding contract exception relief was appropriate.[33]  During the same time period, in July 1994, Thomas Quinn, a GAF lobbyist, arranged a meeting between Mr. Heyman and House Ways and Means Committee Chair Representative Daniel Rostenkowski, at which GAF explained its threatened position.  Mr. Rostenkowski agreed to consider GAF's request and on two subsequent occasions told Mr.

---

[28] *See generally* Ex. J (chronological summary of Debtors Exs. 534, 537).

[29] *See id.*

[30] *See* Ex. H ¶ 10; Ex. B; Tr. of Dep. of Gregory Jenner, May 19, 2008, at 121:16-17.

[31] *See* Ex. A ¶ 8; Ex. B.

[32] *See* Ex. I ¶ 5.

[33] *See* Ex. A ¶¶ 8–9.

Quinn that the GAF relief would be "taken care of."[34]

On July 28, 1994, two days after Mr. Jenner's meetings with Messrs. Prater and Thomson, the consensus regarding GAF's need for transition relief was reflected in the Senate Finance Committee Chairman's Mark Relating to the Financing Options for Implementing the Uruguay Round Agreement of the GATT.[35] Because this was Fast Track trade legislation, this mark reflected the advance agreement of the Senate, the House, and the Treasury Department.[36] On September 27, § 741(c)(3) of both the House (H.R. 5110) and Senate (S. 2467) bills, essentially tracking the Chairman's Mark, reduced the Transition Rule to statutory language that was carried into the enacted legislation as § 741(c)(3).[37]

The affidavits of both Messrs. Thomson and Jenner and the Finance Committee Staff Statements (submitted under seal) show that the Transition Rule was drafted specifically in order to cover GAF's contract.[38] Indeed, a comparison of the 1994 Agreement and the essential elements of the Transition Rule demonstrates that the Rule contains seven requirements *derived directly from GAF's contract:* (1) only *liquidating distributions* are covered (GAF's contract), although the change to § 731 applied to both liquidating and nonliquidating distributions; (2) the contract must be "binding on July 15, 1994, and at all times thereafter before the distribution" (GAF was bound as of April 1994 and thereafter); (3) the contract requires the distribution to be "not later than a date certain" (GAF had 1999 distribution dates); (4) the contract must establish a "fixed value of marketable securities" that may be distributed (GAF's $415.8 million in

---

[34] *See* Ex. G ¶¶ 4–6; *see also* Ex. E ¶ 5.

[35] *See* Ex. L at 12.

[36] *See* Ex. B; Ex. A ¶ 5; Ex. I ¶ 4.

[37] *Compare* Ex. L at 12, *with* § 741(c)(3) in Exs. M, N, and O.

[38] As explained *infra* p. 15, the Rule was also intended to limit relief to those contracts requiring taxpayers to accept a *minimum* value of securities that also had an established *maximum* value.

Treasury bonds); (5) the contract must specify the type of marketable securities to be distributed (GAF's Treasury bonds); (6) the relief refers to the possible distribution of "other property," although property other than marketable securities was *unaffected* by the new law (GAF's potential mutual agreement); and (7) the liquidated partner may not unilaterally avoid the new rule by electing to receive nontaxable property (GAF's "other property" only by mutual agreement).  It is simply beyond dispute that—based on a side-by-side comparison of the Transition Rule and the 1994 Agreement—the statute was tailored to fit GAF's contract.

## ARGUMENT

The government's *in limine* motion rests *entirely* on a reaffirmation of the arguments it successfully presented to this Court in its motion for partial summary judgment, each of which is demonstrably wrong but both of which the government must maintain to support its motion here, as well as the prior judgment.  The government (without the benefit of oral argument) persuaded this Court to adopt the following syllogisms:

*Premise I.*  The Transition Rule phrase "fixed value of marketable securities" unambiguously means "invariable value."  *Premise II.*  The contract phrase "cash not to exceed $48,000,000" unambiguously means that the cash could vary between $0 and $48,000,000—compelling the conclusion that the Treasury bond amount was not "fixed" within the meaning of the statute.  *Conclusion I.*  The contract does not meet the unambiguous terms of the statute.  *Conclusion II.*  The object and purpose of the statute is irrelevant and may not be consulted.

*Motion in Limine Assertion.*  Accordingly, GAF may not now rebut penalty claims at a trial based on its understanding of and reliance on either its contract or the Transition Rule.

Even if the government's premises and conclusions were valid—and each is wrong in its entirety—the motion *in limine* must still be denied because GAF cannot be precluded from proving reasonable reliance on the very Transition Rule which it sought and obtained.  More

fundamentally, GAF's motion for reconsideration should be granted, because the government's syllogism is completely erroneous and led the Court to commit reversible error.

## I.   The Government's Position Rests on a Clearly Erroneous Interpretation of the Transition Rule

### A.   The Identity of the Transition Rule's Intended Beneficiary May Not Be Ignored

The object and purpose of any legislation is *always* relevant and admissible, regardless of whether a statute is ambiguous or unambiguous.[39]  Indeed, the government has argued in earlier cases that the identity of the beneficiary of a transition rule is *always* relevant and admissible, regardless of whether the statute is ambiguous.  For example, in *Airborne* and *Kjellstrom*, the government argued that a transition rule did not apply to the taxpayers' cases because the evidence showed that another taxpayer—Merrill Lynch— was the sole intended beneficiary of that rule.[40]

### B.   The Government's Reading of the Transition Rule Is Patently Incorrect

The government's interpretation of the Transition Rule (and the Court's summary judgment opinion) reads the single word "fixed" in isolation from "marketable securities", and out of context, to mean "invariable" or "not subject to change or variation"—its third-most common dictionary definition.  *See* American Heritage Dictionary 319 (3d ed. 1994).  But when read in its context—as every philosophy of statutory interpretation requires—the unambiguous

---

[39] *See, e.g.*, *ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 516 (3d Cir. 1998) ("In interpreting a statute, we are charged with the duty to consider the provisions of the whole law, its object, and its policy . . . .  [W]e must construe the statute ' . . . "so that no part will be inoperative or superfluous, void, or insignificant."'" (citations omitted)).

[40] *See* Ex. C at 40–42, 46–47; Ex. D at 11.  The government's *Airborne* brief stated: "[a]s would be expected in the case of [a] transitional provision that was narrowly crafted primarily to provide relief for a different taxpayer, taxpayer does not satisfy important requirements for transitional relief under that provision."  Ex. C at 42.

meaning of the term "fixed" in the statute is its second-most common dictionary definition, namely, "determined" or "established" (here by contract), even if subject to some variation or range.  *Id.*

Modern textualism rejects the government's methodology and confirms that consideration of context is essential to determine plain meaning.[41]  Even so strict a constructionist as Justice Scalia has observed that it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the *context* in which it is used."  *Deal v. United States*, 508 U.S. 129, 132 (1993) (Scalia, J.) (emphasis added).[42]  To read the word "fixed" properly, the Court must consider "the *surrounding words*, the *setting of the enactment*, [and] the *function* a phrase serves."  *Herrmann*, 978 F.2d at 982 (Easterbrook, J.) (emphasis added).  GAF's reading ("established" or "determined") is uniformly supported by all available evidence: (1) the words "marketable securities" adjacent to "fixed value"; (2) "fixed" as a "term of art" in financial matters; and (3) the problem Congress addressed here.

*First*, given the "surrounding words"[43] in the full statutory phrase "fixed value *of marketable securities*," the word "fixed" cannot possibly mean "invariable" in this *context* because marketable securities are, by their very nature, available only in specified denominations and fluctuate in value daily.  *Any* contract that requires delivery of a specified dollar value of "marketable securities" on a future date *must* contemplate fluctuations in value.  For example,

---

[41] *See, e.g.*, *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994) (Thomas, J.); *Herrmann v. Cencom Cable Assocs.*, 978 F. 2d 978, 982 (7th Cir. 1992) (Easterbrook, J.); *see also* John F. Manning, *What Divides Textualists from Purposivists*, 106 Colum. L. Rev. 70, 79–80 (2006).

[42] *See also United States v. Centennial Sav. Bank FSB*, 499 U.S. 573, 580-82 (1991) (interpreting purpose of statute regarding "discharge" of indebtedness, as evidenced by Conference Report, in a common sense manner).

[43] *Herrmann*, 978 F.2d at 982.

the Treasury bonds in question here were available only in $100 denominations and fluctuated in value daily.[44]  If "fixed" cannot mean "invariable" here, then it must mean "established by contract rather than by the market, even if subject to some range or variation."  It is not permissible to read the Transition Rule to apply only to transactions that could never occur.[45]

*Second*, "the setting of the enactment"[46] is a financial matter, and the word "fixed" is a "term of art" to be interpreted accordingly.[47]  "Fixed" is used to describe financial instruments with payment values that are determined or established by contract, rather than left to "float" with market forces, even though those payment values may be subject to some variation or range.  "Fixed-rate" loans are distinct from "floating-" or "adjustable-rate" loans, but routinely may change for different loan periods or upon the occurrence of some contingencies (*e.g.*, an extension of term, a missed or late payment, or additional drawings).  These adjustments are within the contract, rather than changing with the market, so the loan is still known as "fixed."

In still other financial contexts, governments with "fixed" exchange rates typically permit those rates to move between upper and lower bands of value.[48]  Likewise, "fixed-income" investments like mortgage-backed securities may have payment streams that vary due to

---

[44] *See* Ex. Y.  Pages 1 and 2 show 30-year Treasury bonds' value fluctuations over 3 to 4 month periods in 1994 and 1998–99.  Pages 3 and 4 show available denominations of as $100 (*see* "MIN PIECE").

[45] *See, e.g.*, *supra* note 7; *Nat'l State Bank of Elizabeth, N.J. v. Smith*, 591 F.2d 223, 231 (3d Cir. 1979) ("We assume, of course, that Congress intended its enactment to have meaningful effect."); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring) (interpretation must avoid absurd result).

[46] *Herrmann*, 978 F.2d at 982.

[47] *See, e.g., Morissette v. United States*, 342 U.S. 246, 263 (1952) (holding that courts must respect Congress's use of a term of art).

[48] Charm Forex—Help—Forex Dictionary, http://charmforex.com/index.php?pg=forex-dictionary (last visited Apr. 16, 2009) ("[E]ven fixed exchange rates fluctuate between definite upper and lower bands.").

mortgage contract events (defaults, prepayments, prepayment penalties, late fees).  And the dividend on "fixed-rate preferred" stock can vary, depending upon board discretion in declaring dividends, its cumulative or noncumulative terms, and the corporation's financial circumstances. This contrasts with "adjustable-rate" preferred stock, which fluctuates with market indices.[49]

In the tax context, both courts and the IRS have construed "fixed" as a term of art that means "established" or "determined" by contract, even if some variation occurs.  In *American National Insurance Co. v. United States*, 690 F.2d 878, 885-87 (Ct. Cl. 1982), the court held that experience-rating refunds paid by an insurer qualified as "fixed in the contract" under I.R.C. § 809 even though (1) the formula for calculating payments was based on subsequent claims experience, and (2) the contract did not even specify all elements of the formula.

*Third*, the Court must consider the circumstances Congress was addressing, or the *function*, of the Transition Rule.[50]  This is not a resort to the Rule's legislative history but to the objective facts surrounding its enactment, a reference to contextual facts that all judges must consider.  *See United States v. Fausto*, 484 U.S. 439, 448-49 (1988) (Scalia, J.) (interpreting statute by reference to its structure and context); John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 Colum. L. Rev. 673, 733-34 (1997).

In using the word "fixed," Congress addressed three issues.  (1) The recognized policy underlying binding contract transition rules is to protect only taxpayers who entered into binding contracts in reliance on prior tax laws.[51]  Here, GAF was contractually bound to accept a distribution of Treasury bonds that would have been converted from nontaxable to taxable status

---

[49] *Cf.* I.R.C. § 1059(e)(3)(C)(i) ("fixed dividends" not invariable and may be subject to arrearages).

[50] *Herrmann*, 978 F.2d at 982.

[51] *See, e.g.*, *Airborne Freight Corp. v. United States*, 153 F.3d 967, 970 (9th Cir. 1998).

in the absence of relief.[52]  (2) Congress needed to place some *maximum* on the relief to ensure that the nontaxable benefit was capped.[53]  This was against the background that the nature of marketable securities prevents fixing a precise or invariable amount, due to variable denominations and constant market fluctuations.[54]  In that context, all the Transition Rule could do was to (i) require that the contract bind the distributee to receive some *minimum* amount of marketable securities that could not be avoided by opting for substitute nontaxable other property, and (ii) cap the potential distribution value.  The Transition Rule was in this respect similar to other tax provisions that use the term "fixed" to place a cap on benefits.[55]  (3) Congress had before it a *specific* binding contract for a *specific* taxpayer.  As is always the case for binding contract exceptions to tax legislation, the Transition Rule was not drafted in a vacuum but instead used GAF's contract as a template for the Rule.  One need *not* get inside the legislators' heads or examine potentially controversial legislative history to know that Congress drafted and enacted the Transition Rule *specifically* to cover GAF's contract.[56]

Comparing the "other property" provisions of the contract and statute strongly indicates that the statute was drafted *precisely* to cover GAF's contract, as "other property" remained nontaxable and did not require transition relief.  Thus, the government's and the Court's failure to read the "or" as embracing the conjunctive renders the word "or" as surplusage, and conflicts with IRS regulations.  *See* Treas. Reg. § 1.368-2(h) ("As used in section 368, *as well as in other provisions of the Internal Revenue Code*, if the context so requires, the conjunction 'or' denotes

---

[52] *See* Ex. A ¶¶ 6–9.

[53] Ex. A ¶ 9.

[54] *See* Ex. Y at 1–2.

[55] *Cf.* Treas. Reg. § 25.2702-3(b) (using "fixed amount" language to cap tax benefits).

[56] *See* Ex. A at ¶ 9; Ex. B; Ex. I ¶ 5; s*ee also supra* pp. 7-10.

both the conjunctive and the disjunctive, and the singular includes the plural." (emphasis added)).  It is also at odds with the government's own analysis of I.R.C. § 707.  *See* JPTO ¶ 9.I(3) at 221 (applying § 707(a)(2)(B) to 1990 Transactions as disguised sale for cash *and* installment note).

As we have seen, an objective, side-by-side comparison of the statute and the contract confirms that the Transition Rule was to cover *all seven elements* of GAF's contract.[57]  Nor are these seven parallels coincidental.  GAF was the only entity to lobby for the Transition Rule, supplying relevant portions of its contract; and a consensus supporting relief for GAF developed immediately and was carried through into the final legislation.  *See supra* pp. 7-10.  These simple facts—not controversial legislative history—are a "valid" contextual source that even the strictest textualists agree is vital to understanding the background problem that Congress set out to address.  *See, e.g.*, *Fausto*, 484 U.S. at 448.

In sum, the government clearly errs in its reading of the Transition Rule.  Its *in limine* motion should therefore be denied, and GAF's motion for reconsideration and cross-motion for partial summary judgment should be granted.

## II.     The Government's Position Rests on a Clearly Erroneous Interpretation of GAF's Contract

The government contends (and the Court ruled) that the phrase "not to exceed $48,000,000," in isolation, should be interpreted to mean that the cash component of the contract could fluctuate between $0 and $48 million.[58]  That is clear error: (1) even in isolation these words have two potential meanings; (2) when read together with the neighboring reference to the

---

[57] *See United States v. Kjellstrom*, 916 F. Supp. 902, 906–07 (W.D. Wis. 1996) (making a side-by-side comparison of the transition rule and the particular situation of the intended beneficiary), *aff'd*, 100 F.3d 482 (7th Cir. 1996).

[58] *See In re G-I Holdings, Inc.*, 369 B.R. 832, 839, 841 (D.N.J. 2007).

true-up clause, the reading regarding a range is nullified; (3) the manifest financial incentives of the parties prohibited any such range; (4) the parties' prior behavior (and manifest intent) as reflected in the new record contemplated the full cash amount; (5) the contract's drafting history rejects a range; and (6) the actual payouts *were* (save for rounding) the full $48 million in cash and $415.8 in Treasury bonds.

The two potential meanings, even *in isolation*, are: "$48 million and no more" or "any amount between $0 and $48 million."  That alone should have prevented summary judgment in the government's favor, as an ambiguity calling for further evidence.  More fundamentally, these words cannot be isolated from the remainder of clause (i) regarding cash, which includes the parenthetical "(except as provided in the next paragraph)"—*i.e.*, the true-up provision.[59] Delaware law governs this contract and requires the Court to look at the entire contract to determine its meaning and intent.[60]  A proper understanding of the direct reference to the true-up provision shows on its face that the contract contemplates the payment of no less than $48 million in cash.  As explained in detail, *supra* pp. 5-7, the true-up provision required RPSSLP to bear all of the risk of a decline in value of the Treasury bonds during the 70-day holding period by making up any decline with additional cash.  The "except" language only has meaning if the $48 million was to be paid *in all events.*  Moreover, if the Treasury bonds increased in value during the 70-day period, *rather than reduce the $48 million cash payment and transfer all of the bonds*, RPSSLP was required to keep bonds over the target value of $415.8 million.  Thus, the true-up shows the clear contemplation that cash of "$48 million and no more" was intended.

---

[59] Joint Ex. 2002-013, at GAF02-001067.

[60] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("[T]he role of a court is to effectuate the parties' intent.").

All of the parties' financial incentives were aligned with this meaning.  GAF, as a reasonable taxpayer, sought to maximize the nontaxable cash portion of the liquidating distribution at $48 million.[61]  GAF's partnership basis was spread on a *pro rata* basis over the bonds received.[62]  More bonds would impose a high tax cost on obtaining liquidity through bond sales.  Under these circumstances the phrase "not to exceed" merely limited the contracted cash ($48 million) to GAF's basis.  For its part, RPSSLP, as an equally-reasonable economic actor, would have wanted to minimize its exposure to Treasury bond value declines during the 70-day holding period by maximizing the cash payment.  RPSSLP always understood that it was contractually-obligated to pay the full amount of cash in any event.[63]  RPSSLP's conduct[64] in 1992 and 1993 in preparing for a redemption of GAF under the 1990 Agreement's "not to exceed $80 million" (GAF's tax basis at the time) was consistent with an understanding that GAF expected the full $80 million, as it reminded RP in December 1993.[65]  The affidavits of Messrs. Chirite and Nissan (lawyers drafting the contract for GAF) and Messrs. Heyman (GAF's CEO) and Leo (RP's executive) and the Roadmap Memo prepared by Weil attorneys shortly *after* execution of the 1994 Agreement—newly-discovered in Weil's archives—confirm this is the correct reading of the contract.[66]

---

[61] *See* Ex. R ¶ 5.

[62] *See* I.R.C. § 732.

[63] *See* Ex. S ¶ 5.

[64] *See AT&T Corp. v. Lillis*, 953 A.2d 241, 254–55 (Del. 2008) (instructing lower court to consider parties' course of conduct in interpreting ambiguous contract); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc*., 702 A.2d 1228, 1233 (Del. 1997) (considering contemporaneous correspondence, drafts, and notes to ascertain parties' intent); *Beal Bank, SSB v. Lucks*, No. 14896, 2001 WL 220252, at *3 (Del. Ch. Feb. 20, 2001) (emphasizing importance of testimony regarding parties' understandings of contract).

[65] *See* Ex. W at 1.

[66] *See* Exs. R, S, T, U, W, X.

Finally, the evidence of the parties' post-contract conduct clinches the issue: the cash delivery of $47,999,038.13 was just *two one-thousandths of one percent* (0.002%) shy of the $48 million cash target, and the Treasury bond delivery of $415,827,680.62 was just *two ten-thousandths of one percent* (0.0002%) over the securities target of $415,826,718.75. These miniscule rounding differences are to be expected in any transaction involving securities—like $100 Treasury bonds—that trade in "round lots."

The Court must keep in mind that the contract was drafted before the tax law changed, and before congressional staff drafted the Transition Rule language. At the summary judgment stage, the record was lamentably incomplete, and the three contract words "not to exceed" were improperly viewed in total isolation. The foregoing, however, demonstrates that the government's interpretation of the contract, adopted by the Court and the linchpin for the government's *in limine* motion, must be rejected. The government's motion should thus be denied, and the Court should instead reconsider and vacate its prior order.

### III.    GAF Must Be Permitted To Present Evidence Regarding its Reliance on the Transition Rule To Avoid Penalties

Based on its summary judgment success, the government asserts penalties under I.R.C. § 6662 for either negligence or substantial understatement of tax for failing to report GAF's receipt of Treasury bonds as a taxable distribution, notwithstanding its reliance on the Transition Rule.[67] Worse yet, its motion seeks to deprive GAF of the opportunity to present evidence to support its reliance on the Transition Rule for both the substantial authority defense (I.R.C. § 6662(d)(2)(B)(i)), and the reasonable cause defense (I.R.C. § 6664(c)(1)), on the theory that

---

[67] *See* Br. in Supp. of United States' Mot. in Limine to Exclude Test. Regarding GAF's Lobbying Efforts in Connection with Enactment of § 731 Transaction Rule, & Any Other Evidence the Debtors May Seek to Introduce Regarding Reliance on Advice of Lobbyists ("Gov't Br.") at 1, 11 (Feb. 17, 2009).

the combined interpretation of the contract and the statute reflected in the summary judgment decision is so clear that GAF *could not possibly* have reasonably believed that its contract satisfied the statute.[68]  Given that GAF's interpretations of both its contract and the statute were (and are) *patently correct*—and that GAF would qualify for tax relief under a correct reading of *either* the contract *or* the statute—the government's argument that GAF has neither "substantial authority" nor "reasonable cause" for its 1999 filing position is preposterous.  In any event, the Offer of Proof and analysis in this memorandum demonstrates that GAF had both "substantial authority" and "reasonable cause" for its tax return position that receipt of the Treasury bonds was nontaxable.

GAF had substantial authority for its filing position, because a well-reasoned interpretation of a statute constitutes substantial authority under the applicable regulations.[69] The Court's 2007 opinion on partial summary judgment cannot possibly mean *as a matter of law* that GAF's interpretation of the statute in 2000 was not "well-reasoned."

GAF had reasonable cause under I.R.C. § 6664(c)(1), which is distinct from the "substantial authority" defense, because it had reasonable cause for its position and acted in good faith.  These determinations are made "on a case-by-case basis, taking into account *all* pertinent facts and circumstances."  Treas. Reg. § 1.6664-4(b) (emphasis added).  These circumstances include "an honest misunderstanding of fact or law that is reasonable in light of *all* of the facts and circumstances."  *Id*. (emphasis added).  The government's motion ignores this regulation test and stands the reasonable cause issue on its head by trying to use the Court's 2007 opinion to convert a "facts and circumstances" test into a legal test, and ignores GAF's understandings and

---

[68] The government claims that "[n]o reasonable person could read the distribution language in Section 3.3(b) of the 1994 Agreement to the RPSSLP partnership agreement . . . as meeting the plain requirements of the § 731 Transition Rule."  Gov't Br. at 2 n.3*; see also id.* at 13–14.

[69] *See* Treas. Reg. § 1.6662-4(d)(3)(ii), (iii).

motivations when it filed its 2000 tax return.

The government's case "authorities" are patently inapposite, and none of them supports its motion.  First the government states that, for purposes of the motion, it does not assert negligence or challenge GAF's transactions as tax shelters,[70] but eleven of its seventeen cases on reasonable cause involved alleged tax shelters.  *This* case does not involve tax shelters.

The government's motion also (1) repeatedly challenges GAF's reliance on outside advisors, (2) criticizes a lack of written or second opinions, and (3) erroneously asserts that, because lobbyists' advice does not constitute legislative history for purposes of the Court's statutory analysis, that advice cannot be used to support reasonable cause.[71]  None of these criticisms is valid or supportable, and not one of the government's cited authorities involves a situation in which the taxpayer was prohibited from *introducing evidence* on its penalty defenses.

The government's own regulations make clear that written or second opinions are *not* a prerequisite to finding reasonable cause, as "advice" can mean "any communication."[72]  And it is undeniable that GAF received communications not only from its lobbyists, but also from members of Congress, congressional staffers, Treasury officials, and internal lawyers.  It is incontestable that taxpayers may reasonably rely on the advice of tax professionals to avoid penalties without first challenging the substantive advice or seeking second opinions.[73]

---

[70] Gov't Br. at 11 n.12, 15 n.16.

[71] Gov't Br. at 6–10, 11–16, 22–27.  The government's irrelevant case law also includes cases cited for the proposition that reliance on an advisor is not reasonable if the tax result is "too good to be true."  Gov't Br. at 21.  Nothing about seeking and obtaining binding contract transition relief from a change in the tax treatment of a forty-year-old rule can reasonably be described as "too good to be true."

[72] *See* Treas. Reg. § 1.6664-4(c)(2).

[73] *United States v. Boyle*, 469 U.S. 241, 251 (1985); *see also Durrett v. Comm'r*, 71 F.3d 515, 518 (5th Cir. 1996) (reversing penalties based on evidence that taxpayer's reliance on attorneys and advisors was reasonable); *Betson v. Comm'r*, 802 F.2d 365, 372 (9th Cir. 1986) (reversing

The government's other citations are either misplaced or distortive.[74]  The only case even superficially relevant is *Bizcap, Inc. v. Olive*, 892 F.2d 1163 (3d Cir. 1989), but on a closer reading it too is totally inapposite.  *Bizcap* involved a transition rule that unquestionably applied to the taxpayer—who sought to *misuse* the rule by claiming that it allowed the taxpayer to avoid *all tax*, both U.S. *and* Virgin Islands, on its United States source income.  *Id.* at 1167-68.  The Third Circuit appropriately rejected the taxpayer's *post hoc* effort to expand the transition rule to obtain even *better* tax treatment than it was entitled to under the prior law on which it allegedly had relied.  *Id.*  Here, GAF sought and relied upon the Transition Rule merely to *preserve*—not to expand—the preexisting tax treatment of the 1999 Distribution.

Given the factual and legal circumstances underlying both the 1994 Agreement and the

---

penalty based on taxpayer's good faith reliance on substantive advice of accountant and was unaware legal position was erroneous); *Estate of La Meres v. Comm'r*, 98 T.C. 294, 318-24 (1992) (holding that taxpayer relied in good faith on erroneous legal advice regarding a filing date).

[74] In *Benham v. Comm'r*, T.C. Memo. 2000-165, 79 T.C.M. (CCH) 2054 (2000), a lawyer lacked reasonable cause because without advice he ignored well-established authority in reading I.R.C. § 212 to authorize the deduction of fees paid to his divorce attorney as amounts paid "for the production or collection of income," and deducted them in the wrong tax year.

In citing *Butler v. Comm'r*, T.C. Memo. 2002-314, 84 T.C.M. (CCH) 681 (2002), for the proposition that an advisor's erroneous advice cannot support reasonable cause, the government fails to point out that the taxpayer there committed fraud and failed to disclose the relevant facts to its advisor.  GAF has committed no fraud, and the government has alleged none.

The government also cites the concurring opinion of Judge Cabranes in *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 219, 225 (2d Cir. 2003)—criticizing the district court and appellate majority for permitting the United States to introduce a lobbyist's letter as a basis for finding reasonable cause—but fails to alert the Court to the fact that, *in that case*, the appellate majority found reasonable cause *based on that very same letter*.  *See id.* at 215.

Finally, the government's reliance on *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567–68 (2005) (questioning judicial reliance on committee reports in the face of an unambiguous statute), is tenuous and hardly justifies the *outright exclusion* of GAF's reliance evidence here, given that two dissenting Justices argued that consultation of the statute's legislative history was essential in determining whether the statute was ambiguous, *id.* at 575-76 (Stevens, J., dissenting).  A split decision based on particular facts cannot, *as a matter of law*, preclude GAF from introducing evidence of its reasonable reliance on a reasonable reading of a statute.

Transition Rule, the government's motion *in limine* to exclude all trial evidence regarding GAF's reliance on the Transition Rule must be denied.

### IV.     This Record Compels Reconsideration and Vacation of the Partial Summary Judgment Order, Based on Multiple Factors the Caselaw Treats as Grounds for Reconsideration

Because no *final* judgment has been entered in this case, this Court has full discretion under Fed. R. Civ. P. Rule 54(b) and D.N.J. Local Civ. Rule 83.2(b)[75] to reconsider and vacate its prior interlocutory partial summary judgment ruling.[76]  In light of the new and newly-developed evidence, reconsideration is the only means to avoid a manifest injustice.

This case meets the traditional tests for reconsideration: (1) newly-discovered evidence has become available;[77] (2) the court committed a clear error of law or fact;[78] and (3) failure to reconsider would result in a manifest injustice.[79]  GAF is not merely seeking a second bite at the apple; instead, it is presenting new and material evidence, interpretations, and arguments that have not yet been considered by the Court, and which, if considered during the prior

---

[75] *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a [final] judgment . . . ."); D.N.J. Local Civ. R. 83.2(b) ("[A]ny Rule may be relaxed or dispensed with by the Court if adherence would result in surprise or injustice.").

[76] *See Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 401 (D.N.J. 2000) (citing Rule 83.2(b)—reconsideration is "not necessarily barred" by 10-day rule in Local Civil Rule 7.1(*i*) (then Rule 7.1(g)); *see also Panna v. Firstrust Sav. Bank*, 760 F. Supp. 432, 435 (D.N.J. 1991) ("There is nothing to prevent the court from examining new facts or evidence that might lead to a different result.").

[77] *See Bridge v. U.S. Parole Comm'n*, 981 F.2d 97, 103 (3d Cir. 1992) ("When new evidence is available, 'the question has not really been decided earlier and is posed for the first time.'" (quoting *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169–70 (3d Cir. 1982))).

[78] *See Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 679 (3d Cir. 1999).

[79] *See id.*

proceedings, would likely have substantially affected the outcome.[80]  Courts have granted

reconsideration, particularly of interlocutory orders, in at least eleven circumstances, *each of*

*which is  present in this case.*

1. **New Deposition and Affidavit Testimony.**  Reconsideration is frequently granted in

light of new or additional deposition and affidavit testimony.  *See Crown Castle USA Inc. v.*

*Fred A. Nudd Corp.*, No. 05-6163, 2008 WL 3841298, at *2-5, *7 (W.D.N.Y. Aug. 13, 2008)

(affidavits not fully developed until after summary judgment); *Gallant*, 35 F. Supp. 2d at 400 &

n.21; *Gridley v. Cleveland Pneumatic Co.*, 127 F.R.D. 102, 104-05 (M.D. Pa. 1989) (considering

new evidence discovered during a deposition).[81]  GAF offers four *post-summary judgment*

depositions, six affidavits, and the statements of the Senate Finance Committee Staff showing

that GAF was the object of the Transition Rule.[82]

2. **New or Supplemental Evidence or Interpretation Regarding Contract Terms.**

Reconsideration is routinely granted in light of new or additional evidence regarding the

meaning or interpretation of relevant contract terms.  *See Holbrook v. Woodham*, No. 05-304,

2009 WL 365681, at *12–13 (W.D. Pa. Feb. 13, 2009) (granting reconsideration due to court's

---

[80] *See Gallant v. Telebrands Corp.*, 35 F. Supp. 2d 378, 395 (D.N.J. 1998) (granting reconsideration in light of movant's receipt of "newly discovered [documentary] evidence which, if previously presented to the court on summary judgment, may have influenced, if not altered, the [prior order]").

[81] *See also Raya-Rodriguez v. Sears Roebuck Co.*, 389 F. Supp. 2d 275, 277 (D.P.R. 2005) (granting reconsideration in light of new deposition evidence sufficient to change "landscape" of case); *Brooks v. FDIC*, No. 92-418, 1994 WL 258744, at *3-4 (D.N.H. Mar. 3, 1994) (granting reconsideration in part in light of new affidavits supporting movant's interpretation of contract); *Hill v. Tammac Corp.*, No. 05-1148, 2006 WL 529044, at *3-4 (M.D. Pa. Mar. 3, 2006) (factual allegations); *Danforth v. Powell*, No. 92-396, 1993 WL 666623, at *1 (D.N.H. Mar. 10, 1993); *In re Dow Jones & Co., Inc. v. Irwin & Leighton, Inc.*, No. 89-3641, 1990 WL 8733, at *2–4 (D.N.J. Jan. 29, 1990) (contract), *aff'd*, 941 F.2d 1200 (3d Cir. 1991); *Triax Co. v. United States*, 20 Cl. Ct. 507, 513–14 (1990) (factual allegations and interpretation of statute).

[82] *See* Exs. A, B, E, H, I, R, S, T, U.

misinterpretation of contract).[83]  GAF offers the following under this factor: (i) the contract true-up provisions; (ii) the economic motives and intentions of the parties; (iii) bond market information; (iv) exhibits showing the parties' prior behavior consistent with a full cash payment within basis; (iv) affidavits of Messrs. Heyman, Leo, Nissan, and Chirite (full cash amount— equivalent to tax basis); and (v) the Roadmap Memo.[84]

3.  **New Evidence and Interpretation Regarding Meaning or Purpose of Statute.**

Reconsideration is routinely granted in light of new or additional evidence or interpretations regarding the meaning or purpose of a statute.  *See State Farm Mut. Auto. Ins. Co. v. All-Care Chiropractic*, No. 04-175, 2004 WL 1446033, at \*1–5 (E.D. Pa. June 28, 2004) (granting reconsideration to correct misreading of statute in light of relevant legislative history, drafting record, and lobbying efforts by party whom statute was intended to benefit).[85]  GAF offers the following under this factor: (i) the statutory language and context; (ii) alternative definitions of "fixed" (*viz.*, "established"); (iii) four post-summary-judgment depositions regarding GAF's successful lobbying; (iv) affidavits of Thomson (Treasury) and Jenner and statements of Senate Finance Committee Staff (detailing the development of the Transition Rule for GAF); (v) details of the lobbying and legislative chronologies; and (vi) the government's prior inconsistent

---

[83] *See also Klee v. Lehigh Valley Hosp.*, No. 97-4642, 1998 WL 966011, at \*2-3 (E.D. Pa. Nov. 30, 1998), *aff'd*, 203 F.3d 817 (3d Cir. 1999); *Gridley*, 127 F.R.D. at 103–04; *cf. Amersham Biosciences Corp. v. PerkinElmer, Inc.*, No. 03-4901, 2006 WL 3485918, at \*1, \*3–5 (D.N.J. Nov. 30, 2006); *Oak Sys., Inc. v. Francotyp-Postalia, Inc.*, No. 01-2794, 2002 WL 442104, at \*1–3 (E.D. Pa. Feb. 5, 2002).

[84] *See* Joint Ex. 2002-13, at GAF02-001069.01; Joint Ex. 2001-062; Exs. R - X.

[85] *See also Shrader v. CSX Transp.*, No. 94-34, 1994 WL 721364, at \*1 (W.D.N.Y. Dec. 7, 1994) (granting reconsideration to correct misreading of statute in light of relevant and dispositive legislative history), *aff'd*, 70 F.3d 255 (2d Cir. 1995); *United States ex rel. Haskins v. Omega Inst., Inc.*, 25 F. Supp. 2d 510, 514–15 (D.N.J. 1998) (granting reconsideration of order limiting scope of issues for *qui tam* prosecution, because refusing to do so would undermine congressional purpose); *Panna*, 760 F. Supp. at 438 (granting reconsideration in light of congressional policy encouraging civil RICO suits).

litigation stances.[86]

4. **New, Potentially Dispositive Documentary Evidence.**  Reconsideration has been

granted in light of new, potentially-dispositive documentary evidence.  *See Dow Jones*, 1990 WL

8733, at *4 (granting reconsideration in part in light of additional "documented facts"); *Gallant*,

35 F. Supp. 2d at 395.  GAF offers the following under this factor: (i) the contract language; (ii)

the Roadmap Memo; (iii) December 23, 1993, Weil memo; and (iv) proposed implementation of

liquidating distribution under the 1990 Agreement.[87]

5. **Movant's Limited Resources.**  Reconsideration has been granted in light of

additional evidence and arguments, where the movant had limited resources to devote toward

developing its case.  *See Hill*, 2006 WL 529044, at *3 (reconsideration granted where limited

resources have been devoted  to developing other issues because there was no credible reason to

believe that issue for which evidence was needed would ever become a "serious evidentiary

issue," and where movant's additional evidence went directly to "central evidentiary dispute" in

case).  GAF's bankruptcy has strained its resources considerably, and it did not believe that

application of its own Transition Rule would be denied to it.  *See infra* p. 27.

6. **Performance of Counsel.**  Reconsideration has been granted in light of poor

performance or strategic errors by counsel.  *See Klee*, 1998 WL 966011, at *2 (granting

reconsideration despite counsel having been "less than careful in filing sufficient evidence with

the initial summary judgment motion").[88]  Certain in the knowledge that the Transition Rule

was drafted at GAF's behest and based on GAF's contract, GAF's counsel did not focus on the

---

[86] *See* Exs. A - Q; Ex. 540.

[87] *See* Joint Ex. 2001-062; Joint Ex. 2002-013; Exs. V, W, X.

[88] *See also Gridley*, 127 F.R.D. at 106 (granting reconsideration in part "because the facts presented to [the court] indicate mistake, inadvertence, or excusable neglect on the part of [movant's] counsel").

language of the 1994 Agreement or the statutory context of the rule in briefing the prior summary judgment motions.[89]

      7.  **Excusable Omission or Neglect.**  Reconsideration has been granted in light of excusable omission or neglect to introduce existing information before the court's prior order. *See Garrett v. Firestone Tire & Rubber Co*., No. 88-0708, 1989 WL 21778, at *2 (D.N.J. Mar. 7, 1989) (granting reconsideration in part in light of evidence previously in movant's possession that raised genuine issue of material fact; relief from interlocutory order should not be denied merely because of omission).[90] For the last eight years, GAF has been mired in a massive bankruptcy proceeding (from which it is about to emerge) involving hundreds of thousands of asbestos claims that has strained GAF's resources, distracted its executives, and resulted in substantial turnover of key internal tax, legal, financial and treasury personnel and a loss of institutional memory—causing it to rely, perhaps excessively, on the knowledge that the Transition Rule was drafted specifically for GAF.

      8.  **Interlocutory Nature of Prior Order.**  Reconsideration is appropriate when the prior order is interlocutory and remains subject to the court's jurisdiction. *See Crown Castle*, 2008 WL 3841298, at *7 (granting untimely pre-trial motion for reconsideration in "the interests of justice," in part because opposing party could respond with full briefing and argument).[91]

---

[89] *See* Debtors' Mem. in Opp'n to United States' Mot. for Partial Summ. J. and in Supp. of Debtors' Cross-Mot. for Partial Summ. J. Regarding Debtors' Cl. for Binding Contract Transitional Relief from Section 731(c) of the Internal Revenue Code at 5–16, 20–22, 24 (Nov. 9, 2005).

[90] *See also Klee*, 1998 WL 966011, at *2; *Haskins*, 25 F. Supp. 2d at 514–15; *Gridley*, 127 F.R.D. at 106.

[91] *See also Garrett*, 1989 WL 21778, at *2; *Gallant*, 35 F. Supp. 2d at 393-94; *Gridley*, 127 F.R.D. at 106 (granting reconsideration in part because motion was interlocutory in nature, noting that opposing party "will suffer no unfair prejudice as a result," and that if motion had been filed after trial, court "would be inclined to deny it").

Given the interlocutory nature of the Court's prior ruling, there is little danger of prejudice to the government, particularly in light of the hotly-contested nature of this litigation and the fact that, whatever the outcome here, all of these issues are certain to come up again on appeal.

9. **Clear Error of Fact.** Reconsideration is routinely granted to correct a clear error of fact, particularly when the court overlooked or failed to consider information in the record at the time of its prior order. *See Holbrook*, 2009 WL 365681, at *12–13 (granting reconsideration in light of evidence that Court had misread contract indemnification clause and key terms in worker's compensation statute).[92] The prior decision disregarded the facts surrounding the contractual provisions at issue. *See* discussion *supra* Parts I & II.

10. **Clear Error of Law.** Reconsideration is routinely granted to correct a clear error of law. *See State Farm*, 2004 WL 1446033, at *1–5.[93] The prior decision clearly misinterpreted both the Transition Rule statute and GAF's contract. *See* discussion *supra* Parts I & II.

11. **Manifest Injustice.** Reconsideration is routinely granted when failure to do so would be manifestly unjust. *See Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, No. 08-4369, 2008 WL 4951239, at *2–3 (D.N.J. Nov. 18, 2008) (granting reconsideration where additional declarations were offered to correct deficient factual record, because issues were of "fundamental

---

[92] *See also Amersham Biosciences*, 2006 WL 3485918, at *1, *3–5 (granting reconsideration where court had failed to consider other relevant language in patent claim); *Nat'l Recovery Agency, Inc. v. AIG Tech. Servs., Inc.*, No. 05-0033, 2005 WL 2100702, at *2 (M.D. Pa. Aug. 26, 2005) (granting reconsideration in part because movant established absence of factual dispute regarding insurance policy provisions).

[93] *See also Shrader*, 1994 WL 721364, at *1; *Oak Sys.*, 2002 WL 442104, at *1 & n.3 (granting reconsideration in light of additional interpretive arguments regarding contract's forum-selection clause); *Holbrook*, 2009 WL 365681, at *12–13 (granting reconsideration in light of evidence that Court had misread contract indemnification clause and key terms in worker's compensation statute); *Gridley*, 127 F.R.D. at 103–04 (granting reconsideration and vacating partial summary judgment in light of "objective" extrinsic evidence establishing meaning of key phrase in insurance policy).

importance").[94]  Sustaining the Court's prior judgment, in light of the additional information and interpretation presented throughout this brief with respect to both the contract and the Transition Rule, would be manifestly unjust.

*     *     *

The foregoing authorities support the exercise of the Court's discretion to grant reconsideration now.  While some of the additional information now presented potentially was available to GAF at the time of the original briefing of these issues, its failure to develop fully the original record is explainable and in many respects excusable.  *See supra* pp. 1-4.  The government's astounding temerity in what appears to be a first in the entire history of the tax laws has stimulated GAF to uncover additional information not previously developed or available.[95]  The resulting comprehensive factual and legal review of the origin and the history of both the contract and the statute has produced a wealth of new evidence reflected in the Offer of Proof and substantial new interpretive analysis of both the contract and the Transition Rule. This new information compels reconsideration and reversal of the summary judgment decision.

---

[94] *See also Klee*, 1998 WL 966011, at *2 (granting reconsideration "in the interest of justice" in light of additional evidence regarding parties' intent regarding meaning of key contract term, despite counsel having been "less than careful in filing sufficient evidence with the initial summary judgment motion"); *Crown Castle*, 2008 WL 3841298, at *7 (granting untimely pre-trial motion for reconsideration in "the interests of justice" in light of additional affidavits; opponent not prejudiced because it could respond with full briefing and argument); *Holbrook*, 2009 WL 365681, at *1 (granting reconsideration in part "in pursuit of the goal of disseminating the most accurate legal decisions possible"); *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, No. 91-3423, 1992 WL 80951, at *4 (D.N.J. Apr. 13, 1992) (granting reconsideration because "a more complete development of the record would better have served the public's interest and the interests of justice in seeing that cases are resolved on the merits when possible").

[95] *Cf. Hill*, 2006 WL 529044, at *3.

## CONCLUSION

The government's motion *in limine* should be denied, and the Court should reconsider and vacate its earlier summary judgment decisions and grant summary judgment in GAF's favor. At the very least, the Court should reserve for trial any factual issues it believes remain regarding the treatment of GAF's contract under the Transition Rule.

Dated:  April 17, 2009

Respectfully submitted,

_____s/ Dennis O'Grady_____
Dennis O'Grady (DO 7430)
Mark Hall (MH 9621)
RIKER, DANZIG, SCHERER,
    HYLAND & PERRETTI LLP
One Speedwell Avenue
Morristown, N.J.  07962
(973) 538-0800

Albert H. Turkus (AHT 7000)
Julia M. Kazaks (JMK 7504)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue N.W.
Washington, D.C.  20005
(202) 371-7000

Counsel for Debtors

Jonathan T. Molot
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C.  20001-2075

Special Counsel

John B. Magee (JBM 0787)
Sanford W. Stark (SWS 8984)
MCKEE NELSON LLP
1919 M Street N.W., Suite 200
Washington, D.C.  20036
(202) 775-1880

Max Gitter
CLEARY, GOTTLIEB,
STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006

Special Counsel
(Admission Pending)