NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>G-I HOLDINGS INC., et al.,<br><br>　　　　　Debtors. | Civil Action No. 02-3082 (SRC) |
| UNITED STATES,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>G-I HOLDINGS INC., et al.,<br><br>　　　　　Defendants. | Bankr. Case Nos.<br>01-30135 (RG)<br>01-38790 (RG)<br>(Jointly Administered)<br><br>**OPINION** |

## CHESLER, District Judge

### INTRODUCTION

This matter arises from a dispute between Plaintiff United States of America (the "Government") and Defendants and Debtors G-I Holdings Inc. and ACI Inc.[1] (collectively, "Debtors" or "GAF") over a 1990 tax return. A 10-day bench trial was held, beginning on June 8, 2009 and concluding on June 19, 2009. Upon hearing the evidence presented at trial, this Court finds that the claims of the Government are barred by the statute of limitations, and

---

[1] Debtors G-I Holdings Inc. and ACI Inc. are the successors in interest to GAF Chemicals Corporation and Alkaril Chemicals, respectively, both of which were subsidiaries of GAF Corporation, the entity whose return is at issue in this case. In this Opinion, for convenience, "GAF" is used to refer to all of these entities.

Judgment will be entered accordingly.

## BACKGROUND

This adversary proceeding, stemming from the massive bankruptcy of G-I Holdings, Inc., arises out of a dispute regarding the proper characterization for tax purposes of a February 1990 transfer of property from GAF Chemicals Corporation and Alkaril Chemicals, Inc. to Rhone-Poulenc Surfactants & Specialties, L.P. ("RPSSLP") and a February 1999 distribution of property (the "1999 Transaction") that GAF received from RPSSLP.  The present trial concerns only the 1990 transaction.[2]  In relation to the 1990 transaction, the Government is seeking to recover unpaid tax liabilities from the Debtors, arguing that GAF's transfer of property in the 1990 transaction was actually a taxable disguised sale of property under § 707(a) of the Internal Revenue Code ("the Code").  GAF, however, contends that RPSSLP was a partnership for federal income tax purposes and that GAF's transfer of property to RPSSLP in 1990 was a non-taxable contribution to the capital of the partnership under § 721(a) of the Code.

What follows is only a brief description of the transactions of interest in 1990.  The parties have stipulated to this definition: the "1990 Transactions" are a set of transactions conducted on February 12, 1990, "including the formation of RPSSLP, the Credit Suisse Loan, the Guarantee Agreements, and the Put Agreement."  (Final Pretrial Order Stip. Def. I. B.)  On February 12, 1990, GAF and RP entered into a partnership agreement (the "Partnership Agreement"), forming RPSSLP, with GAF as a limited partner and Rhone-Poulenc Speciality Chemicals Inc ("RPSC") as the general partner.  GAF transferred the assets of its surfactants

---

[2] On May 26, 2009, this Court granted GAF's motion *in limine* to bifurcate the issues for trial, excluding the issues concerning the 1999 Repo and Swap Transactions from the scheduled bench trial.

chemicals business, valued at $480 million, to RPSSLP, purportedly as a contribution to the partnership.  In return, GAF, through two trusts (the "GAF Trusts"), received a Class A limited partnership interest, representing a 49% interest in RPSSLP and an initial capital account valued at $480 million.  The GAF Trusts, along with a Citibank subsidiary, assigned their Class A interests in RPSSLP to CHC Capital Trust ("CHC").  CHC Capital Trust pledged its Class A partnership interest as collateral for a Credit Suisse loan of approximately $460 million, the proceeds of which were required by the CHC Trust Agreement to be distributed to the GAF Trusts and the Citibank subsidiary.  The GAF Trusts received $450 million of the Credit Suisse loan proceeds, and distributed this, in cash, to GAF on February 12, 1990.

The Credit Suisse loan was a nonrecourse loan secured only by the CHC Capital Trust's partnership interest in RPSSLP.  The loan called for monthly interest payments.  Pursuant to the agreement between GAF and RPSSLP, GAF and CHC Capital Trust were entitled to a Class A Priority Return distribution (the "Priority Return") that would first be used to pay any interest due on the Credit Suisse loan, with any surplus proceeds then distributed to GAF.  Under the Partnership Agreement, RPSC was required to cause RPSSLP to pay the Class A Priority Return each month, regardless of RPSSLP's profit or loss.  By written agreement, Rhone-Poulenc S.A. ("RPSA" or "RP"), the French parent company of RPSC, guaranteed the financial obligations of RPSC and RPSSLP under the Partnership Agreement.

The Final Pretrial Order ("FPO") summarizes the issues to be resolved at trial as follows:

- The first issue for trial relates to the federal income tax consequences of the 1990 Transactions.  Debtors contend that their contribution of assets to RPSSLP in the 1990 Transactions did not result in taxable gain or loss to Debtors under applicable federal income tax laws.  The United States contends that the 1990 Transactions were a taxable disposition of the

transferred assets because either (i) the 1990 Transactions constituted a disguised sale under § 707(a)(2)(B), or, alternatively, (ii) because RPSSLP was not a valid partnership for federal income tax purposes, or, if RPSSLP was a partnership, Debtors were not partners in such partnership.

• The second issue for trial, which arises only if the United States prevails on the first issue, is whether Debtors are subject to penalties under § 6662 as a result of the tax reporting position taken by Debtors in 1990. The United States' proofs of claim seek to impose penalties in 1990, but Debtors contend that penalties may not be imposed because, even if the United States prevails on the first issue, Debtors' tax reporting in 1990 was (i) based upon substantial authority, (ii) supported by reasonable cause, and (iii) made in good faith.

• The third issue for trial, also concerning the 1990 Transactions, is whether the United States' claims with regard to the 1990 Transactions are time barred under the three-year statute of limitations in § 6501. Debtors contend that the omitted income alleged by the IRS is less than 25% of the gross income stated on Debtors' 1990 return. The United States contends that a six-year statute of limitations applies to its 1990 claims because the allegedly omitted gross income is more than 25% of the gross income stated on Debtors' 1990 tax return. The parties agree that the United States' claims in 1990 are time barred if the three-year statute of limitations applies.

(FPO 12-13.)

## SELECTED STIPULATED FACTS

The Final Pretrial Order contains a stipulated facts section that is over 90 pages long, containing definitions and 389 numbered paragraphs. This Opinion incorporates by reference all of these factual stipulations, which will be referenced by paragraph number. Only selected key stipulations, useful for establishing the factual background to the issues decided at trial, are included here:

(47) In 1989, GCC's specialty chemicals business included GAF SSC, which manufactured and sold a broad line of surfactants (surface active agents) and specialty phosphate esters for use in numerous other chemical products.

(106)   GAF, RP, and Citibank formed RPSSLP on February 12, 1990, at which time each party transferred certain assets to RPSSLP.

(107)   GAF transferred the assets of GAF SSC to RPSSLP.  Those assets included manufacturing facilities in Winder, Georgia; Spartanburg, South Carolina; and Toronto, Canada.  GAF, RP, and Citibank agreed that the value of the assets transferred to RPSSLP by GAF was $480 million.

(109)   In transferring the GAF SSC assets to RPSSLP, GAF first sold the GAF SSC assets to two grantor trusts, Chemicals Trust I and Chemicals Trust II, pursuant to the Asset Sale Agreement dated February 12, 1990.  Specifically, the GAF SSC assets owned by GAF Chemicals were sold to Chemicals Trust I, and the GAF SSC assets owned by Alkaril were sold to Chemicals Trust II, for a combined cash price of $450,000,000.  GAF was the sole beneficiary of both Chemicals Trust I and Chemicals Trust II.

(119)   The following chart summarizes the initial capital contributions by the partners in RPSSLP, as well as the resulting initial percentage interests in RPSSLP, as stated in the Partnership Agreement:

| Contributing Entity | Contribution | Percentage Interest |
|---|---|---|
| Chemicals Trust I (GAF) | $453,400,000 (assets and cash) | 46.265306% (Class A limited p'ship interest) |
| Chemicals Trust II (GAF) | $26,600,000 (assets and cash) | 2.714286% (Class A limited p'ship interest) |
| ESSL-RP (Citibank) | $9,850,000 (cash) | 1.005102% (Class A limited p'ship interest) |
| RPHI | $480,350,000 (assets and cash) | 49.015306% (Class B limited p'ship interest) |
| RPSC (general partner) | $9,800,000 (cash) | 1.0000% (General Partner p'ship interest) |

(120)   In addition to the investment made by RPSC, RP transferred assets that GAF, RP, and Citibank agreed were valued at $480,350,000 to RPSSLP in exchange for a Class B limited partnership interest in RPSSLP.  This transfer by RP was made through RPHI, a wholly owned subsidiary of RPI.  RPSC therefore held a 1% interest in RPSSLP and RPHI held a 49.015306% interest in RPSSLP.

(219)   Pursuant to a loan agreement dated February 12, 1990, CHC Capital Trust borrowed $459,234,375 from Credit Suisse.  The CHC Capital Trust Agreement,

- 5 -

dated February 12, 1990, required CHC Capital Trust to distribute the funds received from Credit Suisse to the Chemicals Trust I Trustee, the Chemicals Trust II Trustee, and ESSL-RP, Inc., in accordance with the percentage interest of these entities in CHC Capital Trust.  The collective percentage interest of the Chemicals Trust I Trustee and Chemicals Trust II Trustee in CHC Capital Trust was 97.98918%, which resulted in a distribution to these entities by CHC Capital Trust of approximately $450,000,000 of the $459,234,375 Credit Suisse funds.  In turn, GAF received $450,000,000 from Chemicals Trust I and Chemicals Trust II on February 12, 1990, which GAF used to pay down its LBO debt, including the Increasing Rate Notes.

(220)   Periodic interest payments were due monthly on the Credit Suisse Loan at a rate of LIBOR plus .375%.

(221)   Under the terms of the Citibank Swap, which had a notional principal amount equal to the principal amount of the Credit Suisse Loan, CHC Capital Trust made monthly payments to Citibank at a fixed rate of 8.766% per year, and in exchange received monthly floating payments at a rate of LIBOR.  CHC Capital Trust was obligated to pay LIBOR plus .375% on the Credit Suisse Loan.  Because the notional amount of the Citibank Swap was equal to the principal amount of the Credit Suisse Loan, CHC Capital Trust's LIBOR payments on the Credit Suisse Loan were matched by its receipt of LIBOR on the Citibank Swap, thereby effectively fixing its payments on the Credit Suisse Loan at 9.141%, which is 8.766% (the fixed payment on the Citibank Swap) plus .375% (the premium over LIBOR due on the Credit Suisse Loan).

(228)   The Credit Suisse Loan was secured by GAF's and Citibank's interests in RPSSLP, but was otherwise nonrecourse to GAF and Citibank.

(229)   Because the Credit Suisse Loan was secured by GAF's and Citibank's interests in RPSSLP, but was otherwise nonrecourse to CHC Capital Trust, GAF, and Citibank, Credit Suisse's recourse for the repayment of the loan was to GAF's and Citibank's investments in RPSSLP, represented by the Class A limited partnership interest held by CHC Capital Trust.

(230)   Pursuant to a Pledge, Assignment and Security Agreement, dated February 12, 1990, CHC Capital Trust pledged its Class A interest in RPSSLP as collateral for the Credit Suisse Loan.  Citibank, as Security Agent for CHC Capital Trust, Credit Suisse, and itself, held and controlled the collateral pledged by CHC Capital Trust.  Citibank also acted as Security Agent on its own behalf with respect to the Citibank Swap.

(231)   Citibank, as security agent, managed an operating account through which it

received payments due to CHC Capital Trust under the terms of the Partnership Agreement and the Citibank Swap, and made payments due from CHC Capital Trust under the Credit Suisse Loan and the Citibank Swap.

(232) The monthly Class A Priority Return distributions that CHC Capital Trust received from RPSSLP were first used to pay any interest due on the Credit Suisse Loan as fixed by the Citibank Swap. Any surplus proceeds from the Class A Priority Return could then be distributed to GAF and Citibank as beneficiaries of CHC Capital Trust.

(240) Under the terms of the Put Agreement, RPSA agreed to purchase GAF's and Citibank's interests in RPSSLP for the then-current value of their respective capital accounts in the event of a default by CHC Capital Trust under the Credit Suisse Loan. The Put Agreement did not require Citibank to sell GAF's and Citibank's interests in RPSSLP to RPSA in the event of default. Citibank, as security agent, could sell the interests in RPSSLP to anyone under the terms of the Security Agreement; however, RPSA was required to purchase the interests at Citibank's option.

## THRESHOLD LEGAL ISSUES

As to the taxation of the 1990 Transactions, GAF[3] relies primarily on the argument that the $480M[4] investment in RPSSLP was a nontaxable contribution to a partnership, protected by the shield of 26 U.S.C. § 721(a): "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership." GAF contends that it contributed assets to RPSSLP in exchange for a limited partnership interest in RPSSLP, that this exchange was not taxable, that it then pledged the partnership interest as collateral for a nonrecourse loan from Credit Suisse, and that the

---

[3] During the trial, the parties generally used "GAF" as a shorthand expression for the Class A limited partnership shares, in which Citibank had a very small participation. Neither party contends that the fact that Citibank had a small participation in the Class A shares has a material impact on the issues tried, nor that the use of "GAF" as an expression for the Class A shareholders is misleading, and so, for convenience, the Court uses "GAF" to refer to both the Debtors and the Class A shareholders.

[4] In this Opinion, the "$M" notation signifies millions of dollars.

proceeds of the loan are not taxable income.

The Government, on the other hand, primarily wields the sword of the disguised sale statute, 26 U.S.C. § 707(a)(2)(B),[5] contending that, when the contribution and loan transactions

---

[5] In the Final Pretrial Order, the Government offered four alternative disguised sale theories:

(2) More specifically, the United States contends that under § 707(a)(2)(B) and judicially created substance over form principles, GAF sold the GAF SSC assets to RPSSLP and/or RP for an interest in RPSSLP that was not a partnership interest, but the legal and substantive equivalent of an installment note, which GAF immediately pledged to Credit Suisse as collateral for a $450,000,000 loan. The United States contends that under the pledge rules of § 453A(d) (governing installment sales), GAF recognized immediate taxable gain upon receiving the $450,000,000 of cash loan proceeds. To the extent that § 453A(d) did not trigger immediate taxable gain, the United States contends that GAF's gain recognition in 1990 is governed by Temp. Treas. Reg. § 15a.453-1(c)(3)(I).

(3) Alternatively, the United States contends that under § 707(a)(2)(B) and judicially created substance over form principles, GAF sold the GAF SSC assets to RP for $450,000,000 in cash and the legal and substantive equivalent of an installment note for a contingent portion of the purchase price, based upon the performance of the GAF SSC assets over a three to five year period. Under this analysis, the $450,000,000 Credit Suisse Loan was a debt of RP, not GAF. The United States contends that GAF's recognition of taxable gain in 1990 is governed by Temp. Treas. Reg. § 15a.453-1(c)(3)(I).

(4) Alternatively, the United States contends that under § 707(a)(2)(B) and judicially created substance over form principles, GAF sold the GAF SSC assets by GAF either to RPSSLP or RP for $450,000,000 cash, plus the receipt of a partnership interest valued at $30,000,000, representing GAF's share of any future appreciation in the assets. Under this analysis, the $450,000,000 Credit Suisse Loan was a debt of RP, not GAF. Further, under this analysis, GAF's receipt of a partnership interest valued at $30,000,000 was a fully and immediately taxable event under § 1001 because GAF did not receive that partnership interest in a transaction described in § 721(a). Alternatively, to the extent the Court determines that GAF's receipt of a partnership interest valued at $30,000,000 was not

are viewed together, they should be "properly characterized as a sale or exchange of property," pursuant to § 707(a)(2)(B)(iii), and the contribution transaction should not be considered to be a transaction between two partners.  In the alternative, the Government contends that the 1990 Transactions were taxable because the nonrecognition provisions of § 721(a) did not apply to the 1990 Transactions.

"An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes.  It is well established in the tax law that an assessment is entitled to a legal presumption of correctness."  United States v. Fior D'Italia, 536 U.S. 238, 243 (2002).  "Assessments are presumed to be valid, and establish a prima facie case of liability against a taxpayer."  United States v. Green, 201 F.3d 251, 253 (3d Cir. 2000).  The taxpayer bears the burden of proving that the IRS determination is in error.  Welch v. Helvering, 290 U.S. 111, 115 (1933).  The parties do not dispute that the Government has made an assessment against GAF, that the assessment is presumed to establish a prima facie case of

---

was a fully and immediately taxable event, the United States contends that GAF's gain recognition in 1990 is governed by Temp. Treas. Reg. § 15a.453-1(c)(3)(I).

(5)     Alternatively, the United States contends that under § 707(a)(2)(B) and judicially created substance over form principles, GAF sold most of the GAF SSC assets to RP for $450,000,000 cash, and contributed the remaining $30,000,000 of GAF SSC assets to RPSSLP pursuant to § 721(a).  Under this analysis, the $450,000,000 Credit Suisse Loan was a debt of RP, not GAF.  For purposes of determining GAF's recognition of taxable gain in 1990, the United States contends that the adjusted basis of the GAF SSC assets in GAF's hands must be allocated ratably between the $450,000,000 of cash sale proceeds and GAF's $30,000,000 capital contribution to RPSSLP.

(FPO 221-22.)

- 9 -

liability, and that GAF bears the burden of proving that the assessment is incorrect.

GAF pursues two basic strategies in attempting to prove that the assessment is incorrect: 1) persuading that the $480M transaction was a bona fide equity contribution to a valid partnership and therefore is nontaxable under § 721(a); 2) persuading that the Court may not bifurcate or collapse the 1990 Transactions, as the Government's theories would require.

In TIFD III-E, Inc. v. United States, 459 F.3d 220, 231 (2d Cir. 2006) ("Castle Harbor"), the Second Circuit held that, to determine whether an interest is a bona fide equity partnership participation, a court must conduct an analysis under the "all-facts-and-circumstances test" of Culbertson. In Culbertson, the Supreme Court stated:

> The question is . . . whether, considering all the facts – the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent – the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

Comm'r v. Culbertson, 337 U.S. 733, 743 (1949). Application of this standard "determines the nature of the interest based on a realistic appraisal of the totality of the circumstances." Castle Harbor, 459 F.3d at 231. This analysis should not be based on the labels used by the partnership but on the true facts and economic circumstances. Id. at 241.

The Government defends its assessment as proper primarily based on the disguised sale statute, § 707(a)(2)(B), which states:

> (B) Treatment of certain property transfers. If –
>     (i) there is a direct or indirect transfer of money or other property by a partner to a partnership,
>     (ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and

- 10 -

> (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,
> such transfers shall be treated either as a transaction described in paragraph (1) or as a transaction between 2 or more partners acting other than their capacity as members of the partnership.

No district court has cited to § 707(a)(2)(B) in any case available on LEXIS, other than the present Court in the present case. Three Tax Court decisions reference § 707(a)(2)(B), but none applies the provision. The application of the disguised sale statute is a matter of first impression.

To defeat the application of the disguised sale statute, GAF contends that the Government seeks to "collapse" the partnership contribution transaction and the Credit Suisse loan, and then to "bifurcate[] the collapsed interest into two pieces," and that both actions conflict with existing law. (GAF's Post-Trial Br. 29.) This Court rejects this argument as a matter of law.

GAF first argues that Frank Lyon Co. v. United States, 435 U.S. 561 (1978), prohibits "collapsing" the transactions. This argument fails from the start. Even if it were true that, in 1978, the Frank Lyon Court held what GAF contends it did, the key question before this Court is whether Congress, when it enacted 26 U.S.C. § 707(a)(2)(B), authorized this Court to "collapse" the transactions, thus overruling by statute any such holding in Frank Lyon.[6]

The unambiguous language of § 707(a)(2)(B) clearly authorizes this Court to collapse the contribution and loan transactions. Given that the statute expressly refers to determining that two separate transfers of property, when viewed together, should be characterized as a sale, Congress

_____

[6] As a purely academic footnote, this Court notes that Frank Lyon does not, as GAF contends, stand for the proposition that the IRS may not view together two transactions with two separate parties. Rather, Frank Lyon clearly states the "doctrine of substance over form." 435 U.S. at 573. The Supreme Court found that the facts of that case justified the conclusion that the IRS' view of the transaction was "incompatible" with the economic reality of the transaction. Id. at 582. In any case, this Court's decision in the instant case relies on the authority of § 707(a)(2)(B), not on Frank Lyon.

unambiguously authorized this Court to view separate transactions together when considering whether they should be properly characterized as a sale.  GAF does not argue that this statutory provision can be construed to have any other meaning.

GAF also contends that the Government lacks the authority to "bifurcate" an indivisible investment.  GAF argues that tax law is applied to "instruments in their entirety."  (GAF's Post-Trial Br. 32.)  To support its position, GAF offers little more than smoke.  GAF contends that the Government has not identified any authority empowering it to "bifurcate" – to recharacterize a part of the contribution transaction for tax purposes.  This entirely overlooks the statutory basis for the Government's position: the Government contends that 26 U.S.C. § 707(a)(2)(B) authorizes this Court to make the recharacterization.  Had GAF argued that § 707(a)(2)(B) expressly prohibited "bifurcation," or that, while the language of the provision was silent on the issue of "bifurcation," examination of the legislative history indicated that such an approach would frustrate the purpose of Congress in enacting the statute, that would at least have the potential to be a relevant objection.  Because GAF has largely chosen to ignore 26 U.S.C. § 707(a)(2)(B), its arguments fail to show that the disguised sale statute does not authorize this Court to recharacterize the contribution transaction in part.

Application of the disguised sale provision requires this Court to look beyond the form of the transactions to ascertain their economic substance.  In Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945), the Supreme Court held:

> The incidence of taxation depends upon the substance of a transaction. . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

When a Court disregards the form of a transaction and bases taxation on the underlying economic substance, it employs the "substance over form" doctrine:

> The substance-over-form doctrine is applicable to instances where the 'substance' of a particular transaction produces tax results inconsistent with the 'form' embodied in the underlying documentation, permitting a court to recharacterize the transaction in accordance with its substance.

Neonatology Assocs., P.A. v. Comm'r, 299 F.3d 221, 231 n.12 (3d Cir. 2002). See also 26 C.F.R. § 1.707-1(a) ("In all cases, the substance of the transaction will govern rather than its form.")[7]

## DISCUSSION

**I.      GAF has proven only in part that the Government's tax assessment is in error.**

On September 12, 1997, the IRS issued notices of deficiency against GAF with respect to the 1990 Transactions.  (Stip. No. 12.)  "The taxpayer bears the burden of proving the error in the deficiency assessed against him."  Geftman v. Comm'r, 154 F.3d 61, 68 (3d Cir. 1998).  GAF attempts to prove this largely by arguing that the $480M investment in RPSSLP was a nontaxable contribution to a partnership, protected by the shield of 26 U.S.C. § 721(a).

**A.      The validity of the partnership and the partnership contribution**

As the Government contends, the $480M transaction cannot be a bona fide equity contribution to a partnership if RPSSLP was not a valid partnership.  This Court must thus first determine whether RPSSLP was a valid partnership for tax purposes.

Although the parties offered a considerable amount of evidence and testimony on this question, this Court places greatest weight on the fact that GAF's expert, Dr. Myers, and the

---

[7] This regulation, in force in 1990 and unchanged since 1983, predates the enactment of 26 U.S.C. § 707(a)(2)(B).

Government's primary expert, Dr. Loos, agreed that RPSSLP was a valid partnership.  The

Government's attempt to prove that there was no valid partnership was seriously damaged when

its expert, Dr. Loos, conceded on cross-examination that "GAF was a partner in a valid

partnership." (6/18/09 Tr. 126:17-25.)  This is consistent with Dr. Loos' principal conclusion

that "the transaction constituted a sale of GAFs business to Rhone-Poulenc for 450 million in

cash and a $30 million interest in the partnership." (6/18/09 Tr. 57:1-4.)

Despite Dr. Loos' testimony, the Government continued, post-trial, to argue that not even

the $30M transaction was a bona fide equity contribution because GAF and RP had a side

agreement which eliminated all risk of loss for GAF.  The parties do not dispute that, under the

terms of the Partnership Agreement, GAF did face a potential loss associated with GAF's limited

partnership interest in RPSSLP, and that the loss was capped at $26.3 million. (Stip. No. 153.)

The Government contends, however, that the parties entered into a side agreement which

eliminated even this risk, on the basis of the following evidence:

- Lois Fuchs testified that she had been an employee of RP and that she had attended a

  meeting on November 2, 1992 relating to the GAF partnership, at which she had taken

  notes. (6/17/09 Tr. 5:13-6:6; 7:6-11.)  The notes indicate that Carl Eckardt expressed the

  understanding that GAF was neither to gain nor lose anything from the partnership (id. at

  18:17-19) and expected to have no risk (id. at 19:7).

- Michael Leo testified that he had been an employee of RP and that Carl Eckhardt had told

  him that $30 million was never at risk in the partnership, despite what the Partnership

  Agreement said. (6/9/09 Tr. 14:2-24; 54:20-55:10.)  Leo testified that Eckhardt had

  referred to an agreement between Mr. Fortou and Mr. Heyman as to that understanding.

- 14 -

(id. at 56:18-22.)

- In the end, in fact, GAF sustained no loss from the partnership transaction.

This Court does not find that this evidence establishes the existence of a side agreement. This Court finds that this testimony is evidence that Eckhardt on several occasions expressed his expectation that GAF would likely sustain no losses. The fact that, in the end, GAF sustained no loss from the partnership, is only weakly probative of the existence of a side agreement. The evidence offered by the Government does not suffice to raise the inference that the parties entered into a side agreement which protected GAF from all loss.

Indeed, as noted above, the Government's own expert, Dr. Loos, was obviously not persuaded, as he nonetheless concluded that the $30M was a bona fide equity contribution. This Court finds that GAF placed $26.3M truly at risk, and that the $30M contribution transaction was a bona fide equity contribution.

Because the experts agreed on the question of the validity of the partnership, this Court finds no need to articulate an analysis of this question under the Culbertson standard. Based on the testimony of the experts, this Court concludes that GAF has proven by a preponderance of the evidence that RPSSLP was a valid partnership for tax purposes, and that, to some extent, GAF made a bona fide equity contribution to the partnership as part of the 1990 Transactions. As to the partnership contribution, the sole remaining question is whether all or only part of the $480M asset transfer was a valid contribution to a partnership, in exchange for a partnership interest, that would be nontaxable under § 721(a).

This inquiry requires this Court to examine all the facts and circumstances pertaining to the $480M transaction and ascertain whether, as to all or only part, "the parties in good faith and

acting with a business purpose intended to join together in the present conduct of the enterprise."
Culbertson, 337 U.S. at 743.  This Court concludes that GAF has failed to prove that, under
Culbertson, the entire $480M transaction was a bona fide equity contribution to the partnership.
Rather, this Court finds that only $30M of the $480M was a bona fide equity contribution in
exchange for a partnership interest.

Under Culbertson, the key question is whether the true intent of the parties was "to join
together in the present conduct of the enterprise."  337 U.S. at 743.  GAF presented considerable
evidence to make its case that "GAF and RP had strong business reasons . . . for entering into *the*
specific partnership transaction they executed."  (GAF's Post-Trial Br. 14.)  GAF offered
evidence that RP had a "non-tax business objective of avoiding additional on-balance sheet
debt," while GAF sought:

> to refinance its surfactants assets, saving more than $70 million in interest
> payments and eliminating refinancing risk, while at the same time retaining an
> ownership interest in an attractive business that was expected, conservatively, to
> generate an additional $8 to $27 million in profits for GAF and to provide GAF
> with the chance to partner with a major international chemicals company.

(Id. at 14-15.)

Having heard the evidence, this Court is not persuaded that, as to $450M of the $480M
asset transfer, the true intent of the parties was to join together in the present conduct of the
RPSSLP enterprise.  Rather, this Court concludes that, in engaging in the $450M transaction,
GAF's true intent was to disguise an asset sale so as to minimize taxation.  In arriving at this
conclusion, this Court weighs most heavily four considerations: 1) the risk of loss; 2) the
potential profits; 3) the historical context in which the transaction occurred; and 4) the disguised
sale analysis of the transactions themselves.

- 16 -

1.    *The risk of loss*

The parties stipulated that GAF's potential loss was capped at $26.3M.  (Stip. No. 153.) This fact alone leads to the conclusion that GAF was at risk of losing $26.3M of its $30M bona fide equity investment, and that it had no risk of loss on the transfer of the other $450M of assets to RPSSLP.  GAF argues, by way of rebuttal, that there is a line of Tax Court cases in which limited partners insulated from losses were treated as partners for tax purposes, and that Revenue Ruling 54-84 reflects this.  Yet these cases do not show that insulation from losses is irrelevant to the partnership determination.  Rather, as the Tax Court recognized in Wheeler, the principle which these cases demonstrate is this: "characteristics such as . . . bearing all the losses have been specifically recognized by [the IRS] as insufficient to negate the existence of a joint venture."  Wheeler v. Commissioner, T.C. Memo 1978-208 (T.C. 1978).  Thus, the most that can be asserted from the Tax Court cases GAF cites is that GAF's having no risk of loss of the $450M is insufficient to negate the existence of a partnership.  The larger picture is that the Tax Court, in determining partnership under the Culbertson standard, has long weighed all the factors set forth in Luna v. Commissioner, 42 T.C. 1067, 1078 (T.C. 1964), which include "having an obligation to share losses."  Having no obligation to share any loss is not determinative of whether the $450M was a bona fide equity contribution, but nonetheless it is one factor to be weighed.

2.    *The potential profits*

The parties dispute the amount of profit GAF expected to make from the partnership at the time the 1990 Transactions were planned, but their figures differ relatively little.  The Government points to Presto's testimony that, at budget, GAF's final excess distribution was

expected to be $2.09M.[8]  (6/17/09 Tr. 34:24-35:3.)  Dr. Loos, however, testified that he estimated

that, based on a range of performance from 65% to 105% of budget, GAF would have expected a

final return in the range of $6M to $9M.  (6/18/09 Tr. 97:11-98:14.)  GAF points to Dr. Myers'

testimony that, at budget, GAF's total expected gain from the partnership, not including the

Priority Return, was $8.3M.  (6/12/09 Tr. 25:5-13.)  The experts are thus substantially in

agreement that GAF's total expected gain at budget was about $8M.  This means that GAF spent

$11.8M in transaction costs while expecting an increase in final return of $8M.[9]  In light of this

bottom-line reality, GAF's assertion that it sought a partnership structure based on a good faith

intent to join together with RP in the conduct of an enterprise for profit is not credible.

The economic reality is that the restructuring of the asset sale transaction resulted in GAF

receiving $30M less cash ($450M instead of $480M), and required an expenditure in increased

transaction costs that exceeded the expected partnership profits.  Restructuring the asset sale

agreement into a partnership only made economic sense as a strategy for reducing taxation.  GAF

did not engage in the $450M transaction based on a good faith intent to join together with RP in

the conduct of an enterprise for profit.

>    3.    *The historical context in which the transaction occurred*

The following stipulations set forth some of the relevant fundamental facts about the

---

[8] The evidence shows that, prior to closing on the transactions on February 12, 1990, GAF knew that the financial models that gave rise to the "budget" in the Partnership Agreement assumed better financial results for 1989 than GAF's surfactants business actually attained. (6/15/09 Tr. 110:9-112:14.)  The discrepancy amounted to a 15% shortfall.  (Id.)  There is therefore reason to question whether, at the time of the 1990 Transactions, the "budget" overstated GAF's true expectations for the performance of the partnership.

[9] In restructuring the asset sale agreement and in preparation for the 1990 Transactions, GAF incurred costs of approximately $11.8M.  (Stip. No. 128.)

historical context in which the transaction occurred:

(70)     By letter dated September 15, 1989, RP submitted two alternative bids for GAF SSC.  First, RP offered $435 million for GAF SSC under a joint venture option.  Second, RP offered $465 million for GAF SSC under an asset purchase option.  The price for each option included a $40 million payment to GAF for a separate agreement that GAF would not compete with RP in the surfactants business for a period of 10 years.

(71)     After receiving the September 15, 1989 offer letter, GAF and RP negotiated the terms of an Asset Sale Agreement, by which RP would purchase GAF SSC for cash.  Simultaneous with their negotiation of the Asset Sale Agreement, GAF and RP also negotiated over the terms of a potential joint venture as an alternative to the Asset Sale Agreement.

(73)     The purchase price in the Asset Sale Agreement was initially $465 million.  However, this price was subsequently increased to $480 million between September 15 and September 19, 1989.

(200)    One of GAF's objectives in seeking transactions involving GAF SSC was to pay down some of the approximately $1.4 billion debt incurred in the 1989 LBO, including the Increasing Rate Notes.  Completing the Asset Sale Agreement initially signed by RP and GAF would have generated cash that GAF could have used to pay down some of that debt.  Contributing assets to RPSSLP in exchange for an interest in RPSSLP, standing alone, would not have generated cash to pay down the LBO debt or Increasing Rate Notes.

(201)    Although investing in RPSSLP or another joint venture would not by itself generate cash, GAF understood that it might be possible to pledge its interest in a joint venture for a loan that would generate cash to pay down debt.  Mr. Heyman presented this concept to GAF's board of directors in June 1989, when he initially sought approval to pursue transactions involving GAF SSC.

(202)    GAF would not have entered into the 1990 Transactions if they had not created an opportunity to raise funds to pay off some of the debt incurred in GAF's March 1989 LBO.

(203)    If the September 19, 1989 Asset Sale Agreement between GAF and Rhone-Poulenc had been consummated, GAF would have recognized an immediate taxable gain of at least $390 million, in approximate terms, on the transaction and paid income taxes accordingly.

(167)   By entering into the 1990 Transactions, GAF believed that it could defer an income tax of approximately $120 million that could have resulted from the consummation of the Asset Sale Agreement.

This history shows that, on September 15, 1989, RP made alternative proposals to GAF involving either an asset sale or a joint venture. GAF and RP negotiated a sale of GAF's surfactants assets to RP for $480M, as reflected in the Asset Sale Agreement dated September 19, 1989. The evidence also shows that, after executing the 1990 Transactions on February 12, 1990, GAF walked away with $450M cash, and that, in changing the structure of the transactions from the asset sale, GAF incurred costs of roughly $12M. GAF does not dispute that it expected the change in the transaction structure to result in a tax savings of at least $70M.[10]

Thus, GAF and RP considered both a joint venture and an asset sale, and agreed to engage in an asset sale for $480M. GAF then agreed to restructure the transaction in a way that would give it $30M less cash, and increase transaction costs by roughly $12M, but which was expected to yield tax savings of at least $70M. The historical circumstances do not support finding that GAF's true intent in restructuring the asset sale transaction was to join together in the present conduct of the RPSSLP enterprise. Rather, the historical circumstances strongly suggest that GAF's true intent in restructuring the asset sale transaction was to sell its assets using a structure that would minimize taxation.

---

[10] The parties dispute the exact value of the tax benefits anticipated from restructuring the transactions, with the Government contending that the preservation of losses and foreign tax credits resulted in total tax benefits as high as $345M. Because, for present purposes, the difference is not material, the Court need not ascertain precisely the amount of anticipated tax benefits; it is sufficient that the parties have agreed that the anticipated tax benefits were very large, at least $70M.

4.      *The disguised sale analysis of the transactions*

In making its determination that GAF did not truly intend that the $450M transfer of

assets to RPSSLP be a bona fide equity contribution but, instead, intended it to be a disguised

sale, the evidence that this Court weighs most heavily is the body of evidence, discussed <u>infra</u>,

showing that this was a disguised sale, pursuant to § 707(a)(2)(B).  As to the $450M transaction,

the absence of a risk of loss, the absence of an expectation of profits that exceeded the increased

transaction costs, the historical context in which the transaction occurred, and the evidence from

the disguised sale analysis all support the conclusion that it was not a bona fide equity

contribution to the partnership.

The <u>Culbertson</u> test requires an inquiry into GAF's business purpose in performing the

partnership transactions, in order to determine whether "the parties in good faith and acting with

a business purpose intended to join together in the present conduct of the enterprise."  337 U.S.

at 743.  Nelson, the legal expert who was instrumental in structuring the 1990 Transactions for

GAF, stated that "GAF's principal purpose was to get money . . . at the lowest taxable price at

the time."  (6/10/09 Tr. 74:12-14.)  This appears to be the simple truth about GAF's principal

purpose in effecting the 1990 Transactions.  GAF argues that this satisfies the business purpose

requirement of <u>Culbertson</u>.  This Court disagrees.  Not any business purpose will satisfy

<u>Culbertson</u>:[11] it must be a purpose reflecting a good faith intent to join together in the present

conduct of the enterprise.  Businesses always want to get money at the lowest taxable price.  The

fact that GAF wanted to get money at the lowest taxable price is, at most, only weakly probative

---

[11] "The IRS's challenge to the taxpayer's characterization is not foreclosed merely
because the taxpayer can point to the existence of some business purpose or objective reality in
addition to its tax-avoidance objective."  <u>Castle Harbor</u>, 459 F.3d at 232.

of its having a business purpose reflecting an intent to join together with RP in the conduct of RPSSLP. GAF has failed to prove, by a preponderance of the evidence, that GAF had a business purpose for the $450M transaction that meets the Culbertson requirement.[12]

GAF makes a variety of arguments to support finding that the entire $480M was a bona fide equity contribution, but none are unpersuasive. Some of them go to form: GAF points to the many ways in which the form reflected a $480M equity contribution. There is no dispute that, as to the form of the contribution transaction, GAF made a $480M equity investment in RPSSLP: it contributed assets valued at $480M and received a corresponding partnership interest in return. The appearance of a $480M equity contribution was elaborately constructed.

Specifically, GAF points to the evidence that its $480M equity interest was represented by a $480M capital account. Again, this is not disputed: it is clear that, on the books of RPSSLP, GAF had made a $480M contribution to the partnership.[13] This goes to appearance, not to economic reality. In a substance-over-form analysis, evidence of form is not evidence of substance. As the Second Circuit stated in Castle Harbor, 459 F.3d at 231, when it reversed the decision below, "the court erred . . . primarily by accepting at face value the appearances and labels created by the partnership, rather than assessing the underlying economic realities." GAF here encourages the Court to rely on the label created by the partnership. GAF does not explain how this is evidence that the $480M was entirely a bona fide equity contribution. This Court

_____

[12] As explained in detail infra, the evidence of GAF's business purpose is much more strongly probative of its having engaged in a disguised sale of assets.

[13] Thus, the testimonial evidence that GAF points to (from Leo and Valla, who confirmed that RPSSLP's accounting reflected that GAF held a $480M capital account) speaks to the form of the transaction, not the substance.

- 22 -

finds that, to the extent that GAF's arguments merely point out that the parties labeled the $480M transaction as a bona fide equity contribution in its entirety, these arguments do not persuade as to the economic substance of the transactions.

In a similar vein, GAF argues that the parties to the transactions intended that GAF's interest be equity. Again, this argument carries little weight because it is undisputed that the partners intended that the transactions have this appearance. This is not probative that the $450M component was an equity investment in substance.

GAF also points to the fact that, under the Partnership Agreement, the preferred return was interest computed on a $480M capital account. This might weigh slightly in favor of viewing the $480M in the capital account as having real economic substance – were it not for the fact that, as a matter of substance, these interest payments largely went into the pockets of Credit Suisse as loan payments. The interest payments that appeared to comprise the Priority Return had little real economic substance as interest payments to GAF.

GAF also points to the fact that, had it sold its partnership interest, the sales price would have reflected the $480M capital account, not a $30M interest. This is true, but only shows how leaving the Credit Suisse loan out of the picture results in a very distorted view. While a sale of GAF's partnership interest might well have reflected a $480M capital account, a complete view of economic reality would need to incorporate the fact that GAF's partnership interest served as collateral for a $450M nonrecourse loan. Presumably, the hypothetical buyer of GAF's partnership interest would purchase it subject to the loan. The level in GAF's capital account provides a misleading and inflated indication of the true value of GAF's interest in RPSSLP.

Much of GAF's case in support of finding a $480M bona fide equity contribution asks

- 23 -

this Court, in effect, to forget about the fact that the contribution and loan transactions were a package deal: integral to the contribution transaction was the use of the partnership interest as collateral for the nonrecourse $450M loan.  Even if it were true – and it is not – that, absent the loan, the entire $480M would look like a bona fide equity contribution, the existence of the loan and the related arrangements markedly change the picture.  There is no question that the $450M component bore some indicia of an equity contribution to a partnership.  The Government's case rests on the proposition that, when one views the $480M contribution in the context of the loan transaction, the true economic substance of what appears in form to be a $480M partnership contribution is revealed.  This Court agrees.  It is not sufficient for GAF to show that the $480M transfer bears some indicia of a bona fide equity contribution.  To prevail, GAF would need to show that the fact that, as part of the 1990 Transactions, GAF pledged its partnership interest as collateral for the loan should not impact the analysis of the underlying economic reality.  It has not attempted to make such a case.

Similarly, GAF's arguments that the $480M transaction does not resemble debt miss the point.  For the sake of discussion, even if this Court agreed that the transaction did not resemble debt, it would have no impact on this Court's analysis under <u>Culbertson</u>, as it has no impact on its assessment of the risk of loss, GAF's profit expectations, GAF's business purpose, or the disguised sale analysis.

GAF's case is greatly weakened by its failure to come to grips with the reality of the disguised sale statute.  The disguised sale statute allows a transfer to be recharacterized based on a larger picture which includes other transfers.  GAF's argument relies on the Court's restricting its view to only the initial transfer, the alleged contribution of assets.  GAF has failed to persuade

this Court that the law mandates this narrow focus.

As a corollary, GAF's case is also weakened by its narrow emphasis on the categorization of GAF's interest in RPSSLP as debt or equity.  It is true that, in <u>Castle Harbor</u>, the Second Circuit discussed the role of the debt/equity inquiry in the <u>Culbertson</u> analysis and stated: "Consideration whether an interest has the prevailing character of debt or equity can be helpful in analyzing whether, for tax purposes, the interest should be deemed a bona fide equity participation in a partnership."  459 F.3d at 232.  In the present case, however, this Court does not find such consideration any more than slightly helpful.  Because the essence of the disguised sale statute is recharacterization of a transfer of assets from a partner to a partnership based on a larger picture which includes a transfer back from the partnership, the categorization of the interest created by the initial transfer as debt or equity – at least in this case – appears to be largely academic.  GAF has not even attempted to argue that categorizing the interest as debt or equity has a material impact on the disguised sale analysis (since, as noted, GAF has largely ignored the disguised sale analysis).  As a result, GAF's arguments that the interest created by the initial transfer resembles equity more than debt do nothing to offset the view that comes from seeing the bigger picture.  The debate over whether or not the initial transfer, viewed in isolation, appears to have created an interest that should be labeled equity or debt misses the real issue in this case: whether, when the 1990 transactions are viewed as a whole, the $450M transaction is properly characterized as a sale.

Thus, the Court found the testimony of GAF's expert, Dr. Myers, unhelpful.  Dr. Myers testified that "GAF's interest in the Partnership was clearly equity, not debt in disguise." (6/12/09 Tr. 8:16-17.)  Dr. Myers distinguished debt and equity as follows: "The most important

distinction between debt and equity . . . is that equity is a residual claim and debt isn't.  Now, by

'residual claim' I mean a claim . . . that participates in the profits of the venture."  (6/12/09 Tr.

12:13-19.)  Dr. Myers explained his reasoning as follows:

> [T]here are some equities which don't have a significant residual claim,
> significant participation. . . But in this case there clearly was participation and
> upside for GAF and therefore . . . once I found that participation and once I found
> the upside, the conclusion was inevitable; its equity.

(6/12/09 Tr. 13:3-13.)  Thus, Dr. Myers' opinion that GAF's interest was equity may be reduced

to the observation that GAF participated in the profits of the partnership, which is undisputed.

See Stip. No. 146.

While this supports the conclusion this Court has already arrived at – that GAF was, in

some measure, a true equity partner – it does not help to answer the current question: was the

$480M contribution a bona fide equity contribution in its entirety?  Dr. Myers did not provide

any opinion or analysis useful to this inquiry.  Nor, in fact, despite considerable testimony from

Dr. Myers, Dr. Loos, and the Government's second expert, Dr. Horst, regarding analysis of

GAF's profit participation, did either side persuade that inferences about the size of GAF's bona

fide equity contribution could be drawn from the facts pertaining to GAF's profit participation.[14]

---

[14] At trial, the parties at length disputed the meaning of payoff diagrams created by Dr.
Myers.  It is undisputed that the Partnership Agreement gave GAF an uncapped share of the
profits of the partnership.  Because Dr. Myers saw participation in profits as the defining
characteristic of equity, he looked at GAF's profit participation and concluded that the $480M
was an equity investment, rather than debt.  Dr. Myers' testimony on this point, however, does
not persuade the Court that the entire $480M was a bona fide contribution of equity to the
partnership.  Notably, Dr. Myers was not asked to distinguish the $30M and $450M contribution
components or to analyze the attributes of each.  Nor does the evidentiary record allow for any
clear inference about whether the profit-sharing arrangement weighed for or against the view that
the $450M component was a bona fide equity contribution – or perhaps weighed neither for nor
against this view.  Much testimony was elicited from the experts about the slopes of graphs of
projected returns, but none of this appeared helpful in determining whether the $450M

This Court concludes that GAF has met its burden of proof only as to $30M of the

contribution transaction, which is a bona fide equity contribution to a partnership, and, as such, is

nontaxable pursuant to § 721(a).  GAF has not persuaded this Court that this conclusion compels

a determination that the entire $480M transaction was a bona fide equity contribution.  Rather, in

view of the disguised sale statute, this Court finds that ascertaining the substance of the

transaction requires it to distinguish a $30M contribution component of the transactions from a

$450M sale component of the transactions.

In the section that follows, this Court will explain the reasons for the conclusion that the

$450M component is properly characterized as a sale, pursuant to § 707(a)(2)(B).  Those reasons,

together with the risk of loss in the 1990 transactions, GAF's expectation of profit, and the

evidence of GAF's business purpose, receive the greatest weight in this Court's assessment of the

substance of the $450M transaction.  Having considered all the facts and circumstances, this

Court concludes that GAF has failed to persuade that, in substance, $450M of the asset transfer

was a bona fide equity contribution to a partnership.  Rather, as explained <u>infra</u>, the Government

---

component was a bona fide equity contribution.  GAF did not present evidence to support the
view that the profit-sharing arrangement was more consistent with a $480M bona fide equity
contribution than with a $30M bona fide equity contribution.

Although the payoff diagram and profit-sharing arrangement evidence was not probative
of the size of the bona fide equity contribution, the evidence about GAF's "budget" – its
expectations for the performance of the partnership prior to its creation – was informative and
weighed in favor of finding that GAF did not expect substantial profits from the partnership.  As
already noted, the evidence showed that GAF spent about $12M in extra transaction costs to
transform the asset sale transaction into a partnership transaction, with an expectation that the
partnership would return not more than about $8M in profits.  Thus, while it is undisputed that
the Partnership Agreement put no limit on GAF's profit participation, GAF actually expected
relatively little profit.  This suggests that, as a matter of substance rather than appearance, GAF
had no substantial stake in the success of the venture, which weighs against finding that the entire
$480M transaction was a bona fide equity contribution.

- 27 -

has shown by a preponderance of the evidence that $450M of the 1990 Transactions is properly characterized as a sale.

     B.     Application of § 707(a)(2)(B), the disguised sale statute

The Government contends that the 1990 Transactions constitute a disguised sale, pursuant to § 707(a)(2)(B).[15]  The elements of § 707(a)(2)(B) are:

> (i)     there is a direct or indirect transfer of money or other property by a partner to a partnership,
>
> (ii)     there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and
>
> (iii)     the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property . . .

     (i).     <u>The direct transfer of property to the partnership</u>

The factual basis for finding the first element is undisputed and quite straightforward: on February 12, 1990, GAF entered into a partnership, RPSSLP, and directly transferred $480M in property to the partnership.

     (ii).     <u>The indirect transfer of money from the partnership to the partner</u>

The Government contends that the Credit Suisse loan constitutes an indirect transfer of money from the partnership to the partner.  In support, the Government points to this language in the legislative history:

> The disguised sale provision also will apply to the extent (1) the transferor partner receives the proceeds of a loan related to the property to the extent responsibility for the repayment of the loan rests, directly or indirectly, with the partnership (or its assets) or the other partners, or (2) the partner has received a loan related to the

_____

[15] In its opening post-trial briefs, GAF presented no rebuttal case on this point, asserting simply that the disguised sale statute was "irrelevant."  (GAF's Post-Trial Br. 35 n. 139.)

property in anticipation of the transaction and responsibility for repayment of the
loan is transferred, directly or indirectly, to the partnership (or its assets) or the
other partners.

S. Rep. No. 98-169, Vol. I, at 231.  The evidence shows that, on February 12, 1990, GAF

received the proceeds of a $450M loan related to the property it had transferred to RPSSLP.

GAF admits that it worked to structure the partnership deal so that the partnership interest could

serve as collateral for a loan.  (Stip. No. 204).  GAF pledged the partnership interest as collateral

for the loan.  (Stip. No. 230.)

        This Court concludes that responsibility for repayment of the loan rested indirectly with

the partnership or the other partners.  On the surface, CHC Capital Trust paid the interest on the

loan.  The economic reality, however, is that, while the transactions were carefully structured to

create the appearance that CHC repaid the loan, all repayment came from the partnership or the

other partners.

        First and foremost, the loan was nonrecourse and, in the event of default, Credit Suisse's

only recourse was to the collateral that had been pledged.  (Stip. No. 229.)  The $450M in loan

proceeds that GAF received could not, under any circumstances, be reached by Credit Suisse.

        Although CHC was obligated to make the monthly loan payments to Credit Suisse,

responsibility for making these payments rested indirectly with the partnership or the other

partners.  The transactions had been structured so that RPSSLP paid the Priority Return to CHC

which covered the annual interest due on the loan.  (Stip. Nos. 154, 226.)  CHC received these

distributions and, out of them, paid the interest due on the loan.  (Stip. No. 232.)

        The transactions were structured with elaborate protections to ensure that CHC received

from RPSSLP the cash for the monthly loan payment.  The Priority Return distribution actually

went from RPSSLP to Citibank as security agent, and Citibank was obligated to first use the distribution to pay the monthly payment on the Credit Suisse loan. (Stip. Nos. 231-32.) The General Partner was obligated at all times to keep $10M in reserve, and to fund the Priority Return distribution from this reserve if RPSSLP's gross income was not sufficient to cover it. (Stip. No. 155.) RPSC was obligated to ensure that RPSSLP maintained the $10M reserve, and to replenish the reserve as needed. (6/9/09 Tr. 51:17-25.)

The transactions were also structured with elaborate protections to ensure that the loan principal would be repaid. GAF's capital account in RPSSLP could not fall below the principal amount of the loan, and RPSA, through RPSC, effectively guaranteed this. (Stip. No. 238.) In the event of default, there were three possible scenarios. First, GAF could force RPSSLP to liquidate, in which case GAF would receive a liquidating distribution equal to its capital account balance. (Stip. No. 192.) Second, instead of a forced liquidation, RP could direct RPSSLP to buy out GAF at a price equal to its capital account. (Stip. No. 194.) Third, under the terms of the Put Agreement, in the event of default, at Citibank's option, RPSA could be required to purchase GAF's and Citibank's interests in RPSSLP for the value of their capital accounts. (Stip. No. 241.) These provisions ensured that, in the event of a default by RPSSLP, GAF would have the money to pay off the Credit Suisse loan.

An additional measure of protection came from RPSA's guarantee of the financial obligations of RPSSLP to GAF:

> (174)   RPSC was a holding company created by RP specifically to act as the general partner in RPSSLP. In order to meet the parties' expectation that RPSA would in substance be the general partner in RPSSLP, at the time RPSSLP was formed, RPSA entered into the Guarantee Agreements, in which it guaranteed RPSC's and RPHI's performance of their financial

obligations under the Partnership Agreement.

(175)   RPSA entered into two Guarantee Agreements, one for the benefit of GAF and the other for the benefit of Citibank.  Under the terms of the Guarantee Agreements, RPSA unconditionally and absolutely guaranteed that RPSC and RPHI would fulfill their financial obligations under the Partnership Agreement.  The financial obligations guaranteed included RPSC's obligations as a general partner to cause RPSSLP to maintain a working capital reserve of $10 million, to cause RPSSLP to make the monthly distributions to GAF and Citibank related to the Class A priority return, to cause RPSSLP to maintain at all times an aggregate fair market value of assets in excess of its aggregate liabilities, and to make up any deficit in RPSC's capital account upon liquidation of RPSSLP.

This analysis of the structural protections built into the 1990 Transactions goes into more detail than is needed to show that responsibility for repayment of the loan rested, directly or indirectly, with the partnership and the other partner.  The bottom line is that none of these mechanisms required GAF to reach into its own pockets to pay back the loan, and all of the mechanisms ensured that some entity other than GAF – RPSSLP, RPSC, or RPSA – would do so.  CHC's obligation to make loan payments is but a fig leaf covering the true obligation that rested on RPSSLP and RPSA.  As a matter of substance, GAF was not liable on the debt.

GAF attempts to rebut the Government's "responsibility for repayment" argument, based on the legislative history, with two arguments that this case does not fall within the scope of the concerns stated by Congress: 1) "GAF's borrowing from Credit Suisse was *not* collateralized using 'the property' (*i.e.*, the surfactants assets) that GAF had contributed to RPSSLP" (GAF's Post-Trial Reply 9); and 2) responsibility for repayment of the loan remained entirely with GAF.

As to the first argument, GAF notes that tax law distinguishes between partnership assets, owned by the partnership, and partnership interests, owned by the individual partners.  This position, even if accurate, overlooks the phrase "related to" in the legislative history.  To come

within the scope of the concern expressed by Congress, the loan must be "related to" the property.  Congress did not limit its concern to loans which were collateralized with the actual assets which were contributed to the partnership; rather, its concern encompassed any loan which was <u>related</u> to the property, and the attribute which delimits the scope of this concern is the extent to which the repayment responsibility rests as described.  GAF does not argue – nor could it, reasonably – that the Credit Suisse loan was unrelated to the GAF SSC assets.  Thus, the distinction GAF points to is immaterial to the question of whether the 1990 Transactions fall within the scope of the concern of Congress, as stated in the legislative history.

GAF's second argument – that responsibility for repayment of the loan remained entirely with GAF – is also unpersuasive, for all the reasons just explained.  One of the principal determinations that this Court makes in this decision is that, putting substance over form, the partnership or partners indirectly bore responsibility for repayment of the loan.

GAF also asserts that Treas. Reg. § 1.707-5(a)(1), while not technically applicable to the 1990 Transactions, contradicts the Government's position, yet GAF does not explain how.  This Regulation states:

> (a) Liability assumed or taken subject to by partnership – (1) In general. For purposes of this section and §§ 1.707-3 and 1.707-4, if a partnership assumes or takes property subject to a qualified liability (as defined in paragraph (a)(6) of this section) of a partner, the partnership is treated as transferring consideration to the partner only to the extent provided in paragraph (a)(5) of this section. By contrast, if the partnership assumes or takes property subject to a liability of the partner other than a qualified liability, the partnership is treated as transferring consideration to the partner to the extent that the amount of the liability exceeds the partner's share of that liability immediately after the partnership assumes or takes subject to the liability as provided in paragraphs (a) (2), (3) and (4) of this section.

It is not clear how this contradicts the Government's position and this Court declines to

speculate.

GAF also contends that "extensive authority requires that a nonrecourse loan . . . may not be recharacterized as a sale of collateral. . ." (GAF's Post-Trial Reply 11.)  In support, GAF points only to Pleasant Summit Land Corp. v. Commissioner, 863 F.2d 263, 275 (3d Cir. 1988), an inapposite case which holds that "taxpayers are able to claim depreciation and interest deductions to the extent that nonrecourse debt does not exceed fair market value."  Pleasant Summit does not address the disguised sale statute, nor anything similar.

The parties energetically dispute the issue of whether the Put Agreement constitutes a guarantee or is, as GAF contends, a liquidity put.  This is another dispute over labels, not substance, since the parties have stipulated to the substance: the Put Agreement was RPSA's promise to purchase GAF's pledged loan collateral at a price that could not fall below the principal amount of the Credit Suisse loan.  (Stip. Nos. 238-241.)  Neither party has shown that the choice of label for this promise has any legal significance.  As just discussed, the legislative history shows that Congress placed emphasis on "the extent responsibility for the repayment of the loan rests, directly or indirectly, with the partnership (or its assets) or the other partners."  S. Rep. No. 98-169, Vol. I, at 231.  This calls for an inquiry into substance, not labels.  No single element of the 1990 Transactions may have fully placed this responsibility on the shoulders of RPSSLP and RPSA, but, as discussed above, the components together fully did so.

The Government has demonstrated that the Credit Suisse loan constitutes an indirect transfer of money from the partnership to the partner, following the principles stated in the legislative history.

GAF argues in rebuttal that, if "GAF was at all times the borrower," this defeats the

- 33 -

application of § 707(a)(2)(B)(ii).  (GAF's Post-Trial Reply 2 n.2.)  GAF does not explain the

basis for this contention, and it is unsupported by the express language of that provision – which

brings indirect transfers within its scope – as well as the legislative history which specifically

targets partners who have received proceeds from loans related to contributed property.  If GAF's

argument is correct, and borrowers are outside the reach of § 707(a)(2)(B)(ii), this portion of the

legislative history makes no sense.

GAF next argues that the Government's case fails to respect the independence of the

contribution and loan transactions, in violation of both the step transaction doctrine and the

holding of <u>Frank Lyon</u>.  This position find no support in either fact or law.  As a matter of fact,

the contribution and loan transactions were not independent.  Only by elevating form over

substance can that position be maintained.

As a matter of law, GAF overlooks what is well-known[16] about the intent of Congress in

enacting § 707(a)(2)(B): existing regulations appeared to have been insufficient in persuading

courts – particularly the Tax Court, in <u>Otey v. Commissioner</u>, 70 T.C. 312 (T.C. 1978) – to find

as taxable certain transactions in which a partnership contribution was followed by a partnership

distribution.  The legislative history leaves little room for doubt that Congress was dissatisfied

with how courts had applied existing law.[17]  It is thus no surprise that the disguised sale statute

---

[16] <u>See</u>, <u>e.g.</u>, <u>Jacobson v. Commissioner</u>, 96 T.C. 577, 588 (T.C. 1991) ("Congress
expressed its disapproval of our decision in *Otey* by enacting section 707(a)(2)(B) . . .")

[17] For example:

> In the case of disguised sales, the committee is concerned that
> taxpayers have deferred or avoided tax on sales of property
> (including partnership interests) by characterizing sales as
> contributions of property (including money) followed (or preceded)

targets such transactions so clearly.  Congress was instructing courts to question more stringently the appearance of independence of transactions, and to disregard the appearance of independence when the circumstances made it proper to do so.  The argument that urges the Court "to respect the formal independence of the two transactions" entirely misses the point that Congress was making in enacting § 707(a)(2)(B).

(iii).   <u>The transfers are properly characterized as a sale of assets</u>

The Government contends – again, without rebuttal from GAF – that the Court should decide this element using a substance-over-form analysis.  The Government contends that the economic reality underlying these transactions was that a sale had taken place: on February 12, 1990, GAF transferred control of $450M of business assets to the partnership and, in return, received $450M for which, in substance, it had no liability or responsibility for repayment.  To GAF, except for taxation, the economic effect of these transactions was the same as if it had been a sale.

*1.   When is it proper to characterize the transfers as a sale?*

The language of the third element of § 707(a)(2)(B) is quite open, requiring a determination that the transfers are "properly characterized as a sale."  As the application of §

---

by a related partnership distribution. Although Treasury regulations provide that the substance of the transaction should govern, court decisions have allowed tax-free treatment in cases which are economically indistinguishable from sales of property to a partnership or another partner. The committee believes that these transactions should be treated for tax purposes in a manner consistent with their underlying economic substance.

Deficit Reduction Tax Bill of 1984, Explanation of the Senate Finance Committee, 71 Fed. Tax Rep. (CCH) 16,225 (issued April 2, 1984), reprinted in 1985 U.S.L.C.A.N. 697, 884.

707(a)(2)(B) is a matter of first impression, this Court must interpret the statutory language to ascertain how this determination should be arrived at. Guidance is provided by the legislative history and the relevant Treasury Regulations which, although not binding at the time of the 1990 Transactions, are informative.

a.      Guidance from the legislative history

Treasury Regulation § 1.707-9(a)(2) states that, for transactions occurring prior to April 24, 1991, the determination of whether a transaction is a disguised sale under § 707(a)(2) is to be made on the basis of the statute and the guidance contained in the legislative history. 26 C.F.R. § 1.707-9(a)(2). After approving the Deficit Reduction Act of 1984, including the provision that became § 707(a)(2)(B), the Senate Finance Committee published an explanation of the provisions which included detailed instructions to the Treasury Department about the regulations it was authorized to promulgate. S. Rep. No. 98-169, Vol. I, at 226-228.

According to these instructions, the first step in the assessment of a disguised sale is to determine whether the transferor is actually a partner:

> Once it is determined that the service performer or property transferor is actually a partner, the committee believes the factors described below should be considered in determining whether the partner is receiving the putative allocation and distribution in his capacity as a partner.

Id. at 227. The explanation then describes, in detail, six factors to be considered. The fifth factor concerns distributions for services and is not applicable to the instant case. The sixth factor concerns distributions for property in circumstances that raise issues as to whether the property has been fairly valued, and there are no disputes in this case as to the valuation of the transferred assets. The four factors applicable to this case are:

- 36 -

The first, and generally the most important, factor is whether the payment is subject to an appreciable risk as to amount. Partners extract the profits of the partnership with reference to the business success of the venture while third parties generally receive payments which are not subject to this risk.

. . .

The second factor is whether the partner status of the recipient is transitory. Transitory partner status suggests that a payment is a fee or is in return for property. The fact that the partner status is continuing, however, is of no particular relevance.

The third factor is whether the distribution and allocation that are made to the partner are close in time to the partner's performance of services for or transfers of property to the partnership.

. . .

The fourth factor is whether, under all the facts and circumstances, it appears that the recipient became a partner primarily to obtain tax benefits for himself or the partnership which would not have been available if he had rendered services to the partnership in a third party capacity. The fact that a partner has significant non-tax motivations in becoming a partner is of no particular relevance.

. . .

The committee anticipates that the Secretary may describe other factors that are relevant in evaluating whether a purported allocation and distribution should be respected. In applying these various factors, the Treasury and courts should be careful not to be misled by possibly self-serving assertions in the Partnership Agreement as to the duties of a partner in his partner capacity but should instead seek the substance of the transaction.

Id. at 227-228.  By including "courts" in the last sentence quoted above, the Senate committee made clear that it intended for these statements to guide not only the Treasury, but also to guide courts in applying the disguised sale provision.

Considering the four applicable factors stated in the legislative history, this Court finds that none weighs in favor of finding that the $450M component was a bona fide equity contribution.  As to the first factor, the $450M that GAF received from the 1990 Transactions was subject to no risk whatever.  It walked away from the closing on February 12, 1990 with $450M free and clear.  Because this was a nonrecourse loan, GAF could never lose anything

other than the collateral for the loan, its interest in RPSSLP.  This factor weighs in favor of

finding that GAF did not participate in the $450M transactions as a partner.  As to the second

factor, GAF's continuing partner status does not weigh in either direction.  As to the third factor,

the fact that the $450M transaction occurred on the same day weighs in favor of finding that

GAF did not participate in the $450M transaction as a partner.  As to the fourth factor, this Court

finds that GAF's primary motivation for participating in the $450M transaction was to receive

tax benefits.  This too weighs in favor of finding that GAF did not participate in the $450M

transaction as a partner.  Thus, three of four factors weigh in favor of finding that GAF did not

participate in the $450M transaction as a partner, and none weighs in favor of finding that GAF

participated in this transaction as a partner.

       Thus, if the Court were to weigh only the factors set forth in the legislative history, it

would conclude that the transactions are properly characterized as a sale.

### b.       Guidance from the Treasury Regulations

       The parties agree that the Treasury Regulations promulgated in 1992 do not bind the

Government with regard to the 1990 Transactions.  As GAF's citation to these Regulations in its

post-trial reply brief implies, however, they are informative and useful as an indication of how an

expert in tax law – the Treasury Department – interpreted the disguised sale statute.  The

Regulations state a non-exclusive set of ten factors to be considered in deciding, under all the

facts and circumstances, whether a transaction is properly recharacterized as a sale:

    (1)    In general. A transfer of property (excluding money or an obligation to
           contribute money) by a partner to a partnership and a transfer of money or
           other consideration (including the assumption of or the taking subject to a
           liability) by the partnership to the partner constitute a sale of property, in
           whole or in part, by the partner to the partnership only if based on all the

facts and circumstances –

(i)     The transfer of money or other consideration would not have been made but for the transfer of property; and

(ii)    In cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations.

(2)     Facts and circumstances. The determination of whether a transfer of property by a partner to the partnership and a transfer of money or other consideration by the partnership to the partner constitute a sale, in whole or in part, under paragraph (b)(1) of this section is made based on all the facts and circumstances in each case. The weight to be given each of the facts and circumstances will depend on the particular case. Generally, the facts and circumstances existing on the date of the earliest of such transfers are the ones considered in determining whether a sale exists under paragraph (b)(1) of this section. Among the facts and circumstances that may tend to prove the existence of a sale under paragraph (b)(1) of this section are the following:

(i)     That the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer;

(ii)    That the transferor has a legally enforceable right to the subsequent transfer;

(iii)   That the partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured;

(iv)    That any person has made or is legally obligated to make contributions to the partnership in order to permit the partnership to make the transfer of money or other consideration;

(v)     That any person has loaned or has agreed to loan the partnership the money or other consideration required to enable the partnership to make the transfer, taking into account whether any such lending obligation is subject to contingencies related to the results of partnership operations;

(vi)    That a partnership has incurred or is obligated to incur debt to acquire the money or other consideration necessary to permit it to make the transfer, taking into account the likelihood that the partnership will be able to incur

that debt (considering such factors as whether any person has agreed to guarantee or otherwise assume personal liability for that debt);

(vii)   That the partnership holds money or other liquid assets, beyond the reasonable needs of the business, that are expected to be available to make the transfer (taking into account the income that will be earned from those assets);

(viii)  That partnership distributions, allocation or control of partnership operations is designed to effect an exchange of the burdens and benefits of ownership of property;

(ix)    That the transfer of money or other consideration by the partnership to the partner is disproportionately large in relationship to the partner's general and continuing interest in partnership profits; and

(x)     That the partner has no obligation to return or repay the money or other consideration to the partnership, or has such an obligation but it is likely to become due at such a distant point in the future that the present value of that obligation is small in relation to the amount of money or other consideration transferred by the partnership to the partner.

26 C.F.R. § 1.707-3(b).

        As to the facts and circumstances to be weighed under this Regulation, this Court finds the following.  The first three factors all deal with the circumstances which secured GAF's receipt of payment.  Because the transfers were performed at the same time, GAF's receipt of payment was absolutely secure and certain, and GAF walked away from the closing with the $450M payment in cash.  As to the fourth factor, as has been discussed _supra_, the transactions were structured with elaborate protections to ensure that RP was legally obligated to make such contributions to the partnership as might be needed to permit the partnership to make the transfer of money or other consideration.  As to the fifth factor, although RPSSLP was not in name the borrower on the Credit Suisse loan, as a matter of economic substance, Credit Suisse loaned the $450M to RPSSLP to fund the payment transfer.  As to the sixth factor, as a matter of economic

substance, RPSSLP incurred debt to fund the payment transfer.  The seventh factor does not

apply because the payment transfer was performed at the same time as the property transfer.  As

to the eighth factor, after the property transfer, GAF retained no operational control over the

transferred property, and had exchanged the burden of operational control of the property for

payment.  As to the ninth factor, there is no question that the $450M payment, made up front in

exchange for the property transfer, had no connection to partnership profits.  As to the tenth

factor, GAF had no obligation to return or repay the $450M to the partnership.

Thus, if the Court were to weigh only the factors set forth in the 1992 Treasury

Regulations, it would conclude that the transactions are properly characterized as a sale.

> 2.    *This Court's analysis of the proper characterization of the*
>       *transfers*

This Court has looked to the legislative history and to the 1992 Treasury Regulations for

guidance on the question of how to interpret the statutory requirement that the transfers be

"properly characterized" as a sale.  Having heard the evidence presented at trial, and having

considered all of the facts and circumstances of the 1990 Transactions, this Court concludes that

the following factors should be given the greatest weight in making the determination that the

$450M contribution transaction is properly characterized as a sale:

a.    The historical context suggests a sale was intended.
b.    The contribution and loan transactions were carefully planned and
      structured together.
c.    GAF restructured the asset sale with the principal objective of reducing
      taxation in an exchange of assets for cash.
d.    The contribution and loan transactions were integrated and interlocking.
e.    The contribution and loan transactions closed on the same date, February
      12, 1990.
f.    In making the contribution, GAF ceded operational control of its assets.
g.    The transactions were structured so that the Credit Suisse loan functioned

as a payment in substance.

### a. The historical context suggests a sale was intended.

As recently as five months before the 1990 Transactions, GAF and RP demonstrated a serious intent to engage in a sale of GAF SSC for a price of $480M by entering into the asset sale agreement.

(71)  After receiving the September 15, 1989 offer letter, GAF and RP negotiated the terms of an Asset Sale Agreement, by which RP would purchase GAF SSC for cash.

(73)  The purchase price in the Asset Sale Agreement was initially $465 million. However, this price was subsequently increased to $480 million between September 15 and September 19, 1989.

(75)  During the negotiations over the Asset Sale Agreement, Carl Eckardt of GAF informed RP that a parent company guarantee by RPSA of any note issued by any RP affiliate as part of the Asset Sale Agreement was important to GAF. Accordingly, in connection with the Asset Sale Agreement, GAF and RP also executed a letter agreement dated September 19, 1989, whereby RPSA assured GAF that if the Asset Sale Agreement closed and an RP affiliate issued a note in connection with such closing, then RPSA would guarantee the affiliate's obligations under such note.

(76)  GAF and RP never closed the transaction set forth in the Asset Sale Agreement.

It is undisputed that, in the end,[18] GAF received cash payments totaling exactly $480M. (GAF's Resp. to Gov't's FOF ¶ 101.) Viewed from start to finish, the history shows that GAF planned for a $480M asset sale and, when all related transactions had been completed, had transferred assets valued at $480M and received cash payments of $480M.

_____

[18] This $480M cash payment total is the sum of: 1) the $450M loan payment; 2) the $25.5M 1994 settlement; and 3) the $4.5M 1999 distribution. (Gov't's Proposed Findings of Fact and Conclusions of Law ("FOF") ¶ 101.)

Other circumstances subsequent to the transactions suggest a sale as well.  On February

12, 1990, GAF issued a press release which stated:

> GAF Corporation announced today that it has completed the transfer of its
> surfactant chemicals business to Rhone-Poulenc Inc. . . for a total consideration of
> $480 million plus assumption of certain liabilities.
>
> Under the transaction, GAF received $450 million in cash and will retain a
> continuing interest in the business.

(Ex. 224.)  Although the press release stated that GAF retained a continuing interest in the

business, there was no express statement that GAF and RP had formed a partnership to which

each had contributed $480M in assets.

> (244)   In 1990 through 1993, the employees that worked in the businesses that GAF and
>           RP transferred to RPSSLP were on RPI's payroll.  RPSSLP maintained no payroll
>           of its own.
>
> (246)   RP did not maintain a separate general ledger for RPSSLP.  Instead, RP included
>           within its own accounting records the businesses conducted by RPSSLP, and
>           extracted RPSSLP's data from its records, using "carve-out" accounting, to create
>           financial statements for RPSSLP.

These aspects of the historical context surrounding the 1990 Transactions constitute

strong circumstantial evidence that GAF intended the 1990 Transactions to include a sale.

### b.    The contribution and loan transactions were carefully planned and structured together.

There is ample evidence that the contribution and loan transactions were carefully

planned and structured together.

GAF states: "[T]he parties negotiated each transaction with the other in mind and

coordinated the terms so that the expected cash flow on GAF's partnership interest would be

sufficient to satisfy GAF's obligations under the Credit Suisse Loan."  (GAF's Post-Trial Reply

- 43 -

Br. 5.)

(94)   On October 23, 1989, Mr. McKee, Mr. Hudak, Ms. Weyeneth, Mr. Segal, Mr. Kenny, and Mr. Reilly met to discuss a partnership proposal related to the GAF SSC transaction.

(97)   From November 1989 through the time when GAF and RP ultimately formed RPSSLP on February 12, 1990, GAF and RP engaged in extensive negotiations over the terms of the partnership.

(101)  On December 4, 1989, Messrs. Valla, Leo, and Kenny of RP met with Messrs. Eckardt and Block of GAF to discuss the proposed partnership. At this meeting, the parties discussed how GAF would transfer assets valued at $480 million to the proposed partnership and borrow $450 million against its partnership investment.

(104)  On or about January 2, 1990, Mr. Hudak sent a fax to Mr. McKee with a handwritten draft presentation Mr. Hudak had prepared summarizing, among other things, certain proposals regarding how to borrow funds secured by an interest in the expected partnership.

(105)  On January 2, 1990, Mr. McKee reviewed the handwritten draft presentation that Mr. Hudak had faxed to him.

(207)  Citibank, with the assistance of RP and GAF, prepared an information memorandum to be provided to potential participants in a bank syndicate that would lend funds to CHC Capital Trust. Citibank held meetings with banks in New York, New York on January 4, 1990, and in Paris, France, on January 10, 1990, to discuss the loan syndication. During those meetings, Citibank described the terms of GAF's and Citibank's investments in RPSSLP, and set forth the terms on which GAF and Citibank sought to borrow against that investment. William McKee of King & Spalding, counsel for GAF, attended the January 4, 1990 bank meeting in New York.

(87)   Messrs. McKee and Nelson understood that the partnership proposal could potentially benefit GAF because forming a partnership with RP would not trigger a capital gains tax that would result from consummating the Asset Sale Agreement.

(95)   After the October 18 meeting between RP and Citibank, Peter Neff (RPI's President and Chief Operating Officer) learned of the partnership proposal and claims he was informed that one of the reasons GAF was interested in

a partnership structure was tax savings.

(98)   During the negotiations over the proposed partnership, Mr. Eckardt of
       GAF informed Mr. Leo of RP that ensuring that GAF's transfer to
       RPSSLP met the requirements for a nontaxable contribution to a
       partnership was a significant factor to GAF.

(200)  One of GAF's objectives in seeking transactions involving GAF SSC was
       to pay down some of the approximately $1.4 billion debt incurred in the
       1989 LBO, including the Increasing Rate Notes.  Completing the Asset
       Sale Agreement initially signed by RP and GAF would have generated
       cash that GAF could have used to pay down some of that debt.
       Contributing assets to RPSSLP in exchange for an interest in RPSSLP,
       standing alone, would not have generated cash to pay down the LBO debt
       or Increasing Rate Notes.

(201)  Although investing in RPSSLP or another joint venture would not by itself
       generate cash, GAF understood that it might be possible to pledge its
       interest in a joint venture for a loan that would generate cash to pay down
       debt.  Mr. Heyman presented this concept to GAF's board of directors in
       June 1989, when he initially sought approval to pursue transactions
       involving GAF SSC.

(202)  GAF would not have entered into the 1990 Transactions if they had not
       created an opportunity to raise funds to pay off some of the debt incurred
       in GAF's March 1989 LBO.

(203)  If the September 19, 1989 Asset Sale Agreement between GAF and
       Rhone-Poulenc had been consummated, GAF would have recognized an
       immediate taxable gain of at least $390 million, in approximate terms, on
       the transaction and paid income taxes accordingly.

(217)  GAF and its outside counsel, King & Spalding and Weil, Gotshal &
       Manges, participated in negotiations and consultations with Chase and its
       outside counsel at Milbank regarding the 1990 Transaction in late 1989
       and early 1990, including communications with Peter Rowntree, a
       Milbank banking attorney, Dale Ponikvar, a Milbank tax attorney, and
       other Milbank attorneys.  Among the issues analyzed by Milbank with
       respect to the 1990 Transactions was the federal tax consequences to GAF
       of the partnership structure that was consummated in the 1990
       Transaction.

(218)  On or about February 12, 1990, GAF provided Chase with a written tax

opinion authored by King & Spalding regarding the federal income tax consequences of the 1990 Transaction.

(248)   The above referenced deferred tax liability of $119 million approximates the amount of the federal income tax liability, before any reduction for applicable credits, offsets, net operating losses and carryovers from other taxable years, that GAF estimated it would have incurred had it sold GAF SSC for $480 million cash in February 1990, instead of transferring those assets to RPSSLP in the 1990 Transactions.

The contribution and loan transactions were planned and structured by the same people, at the same time, as part of the same package.

### c. GAF restructured the asset sale with the principal objective of reducing taxation on an exchange of assets for cash.

The evidence shows that, in 1989, GAF needed cash to pay down debt. (6/10/09 Tr. 74:12-25.) Had GAF and RP performed on the asset sale agreement, the transaction would have generated $480M for GAF before tax, with a taxable gain of at least $390M. GAF concedes that the after-tax cash consequence of changing from a $480M asset sale to the 1990 Transactions was a net gain to GAF of $78M ($360M vs. $438M). (GAF's Resp. to Gov't FOF 62.) GAF concedes that, had it closed on the $480M asset sale, it would have had a gross tax liability of $120M and a net tax liability, after various offsets, of approximately $70M. (GAF's Resp. to Gov't FOF 11.) As discussed supra, on February 12, 1990, GAF did not expect partnership profits in excess of its increased transaction costs. These circumstances support the inference that GAF engaged in the $450M transaction principally in order to minimize taxation on an exchange of assets for cash. This constitutes strong circumstantial evidence that the substance of the $450M Transaction was a sale.

The fact that GAF may have had other business purposes for the 1990 Transactions is of

little significance in weighing this factor.  Looking to the legislative history, the Joint Committee

on Taxation stated: "the existence of significant non-tax motivations for becoming a partner is of

no particular relevance in establishing that a transaction is not a disguised sale."  Staff of the J.

Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction

Act of 1984, at 232 (98th Cong., 2nd Sess.) (Comm. Print 1984).  Rather, as discussed supra in

regard to the fourth factor in the six-factor analysis proposed in the legislative history, it is the

fact that the primary motivation is to obtain tax benefits that carries the greatest weight in the

disguised sale analysis.

> ### d. The contribution and loan transactions were integrated and interlocking.

The contribution and loan transactions were carefully structured as integrated and

interlocking.  A number of pieces of evidence support this conclusion.

Heyman stated: "[W]e wouldn't have been able to get this Credit Suisse loan unless we

did the partnership and were able to pledge our partnership interest."  (6/8/09 a.m. Tr. 72:18-20.)

When GAF and RP amended the Partnership Agreement in 1994, they modified the

Credit Suisse loan to reflect some of the changes.  (Stip. Nos. 286, 287.)

The Partnership Agreement and the loan transactions were carefully structured so that

RPSSLP was obligated to make Priority Return distributions sufficient to cover GAF's loan

payments for the Credit Suisse loan:[19]

> (154)   RPSSLP was required to make monthly cash distributions to GAF and
> Citibank.  This monthly distribution was approximately one-twelfth of the

---

[19] As Leo, Senior Vice President, legal and regulatory affairs, of GAF at the time of the
1990 Transactions testified: "[t]he priority return is basically the interest on the Credit Suisse
debt."  (6/9/09 Tr. 52:13-14.)

annual Class A priority return of $44.7 million (i.e., 9.125% of GAF's and Citibank's initial capital accounts of $489.5 million), cumulative and compounded, if ever in arrears.

(204) GAF negotiated the terms of its interest in RPSSLP so that it would be good collateral for a loan.  In particular, GAF sought to negotiate an interest in RPSSLP that, among other things, had low risk and generated a minimum amount of regular cash flows that could be used to pay interest on a loan.

(205) As discussed above, as early as June 1, 1989, it was contemplated that GAF could possibly borrow against its interest in a joint venture involving its surfactants assets to pay down LBO debt.

(226) At the time of the 1990 Transactions, the parties thereto intended that the proceeds from the Class A Priority Return that CHC Capital Trust received from RPSSLP would be sufficient to pay the interest due on the Credit Suisse Loan as fixed by the Citibank Swap.  This expectation was met, as the annual interest due on the Credit Suisse Loan, as fixed by the Citibank Swap, was approximately $42 million, which was less than the annual amount of the Class A priority return distribution of approximately $44.7 million.

(232) The monthly Class A Priority Return distributions that CHC Capital Trust received from RPSSLP were first used to pay any interest due on the Credit Suisse Loan as fixed by the Citibank Swap.9 (192)   In the event of a Liquidating Default under Sections 13.1(a) or 13.2 of the RPSSLP Partnership Agreement, GAF and Citibank could force RPSSLP to liquidate, in which event the partners would receive a liquidating distribution equal to their respective capital account balances.  For example, under the terms of the Partnership Agreement, GAF could declare a Liquidating Default (and thereby commence winding up and dissolution of RPSSLP), in the event of a material breach of any material covenant in the Partnership Agreement by RPSSLP that was not remedied within a certain period of time specified in the Partnership Agreement. GAF could also declare a Liquidating Default if RP failed to certify that RPSSLP had sufficient gross income to allocate the Class A priority return or did not make the scheduled monthly distribution to GAF and Citibank related to the Class A Priority Return.

The Partnership Agreement and the loan transactions were carefully structured to

protect the funding of GAF's loan payments.  In the event that RPSSLP did not make a

Priority Return distribution, GAF could force RPSSLP into liquidation:

(155)   In the event RPSSLP's gross income was insufficient to cover the monthly Class A priority return distribution, the General Partner was required to release any funds then held in reserve by RPSSLP, including a $10 million working capital reserve required to be maintained by the General Partner, in order to enable RPSSLP to have sufficient funds to make such distribution.

(193)   Section 13.1(a) of the Partnership Agreement provides that if the "General Partner shall commit a material breach of any of the material covenants contained in this agreement or defaults on any financial payment obligation," and fails to remedy such breach or default within 45 days after notice from another partner (10 business days in the case of a breach or default of any financial payment obligation), "such breach or default shall constitute a Liquidating Default."

(194)    As an alternative to liquidating RPSSLP, in the event of a Liquidating Default under the Partnership Agreement, RP, through RPSC, the general partner, could direct RPSSLP to buy out GAF and Citibank at a price equal to their capital account balances, after taking into account the Adjustment to Gross Asset Value.

(195)   Sections 5.1(a), 5.1(f), 5.3(a)(ii), and 5.3(a)(iv) of the Partnership Agreement prohibited RPSC, as general partner, from causing RPSSLP to incur any capital expenditures, or to prepay, in whole or in part, any liability of RPSSLP, to the extent such expenditures would leave RPSSLP with insufficient cash or other funds to make the required monthly Class A priority return distributions, without the consent of all of the partners, or causing RPSSLP to acquire any equity or debt securities of RPSC (provided, however, that RPSSLP could make loans of up to $50 million to RPSC).

(196)   Section 13.2(b) of the Partnership Agreement provided that a Liquidating Default would occur if RPSC, as general partner, failed to distribute on a monthly basis cash equal to the ratable portion of the Class A priority return for that month to the Class A interest holders.

The partnership and loan agreements contained interlocking default provisions:

(235)   The Credit Suisse Loan Credit Agreement provided that CHC Capital Trust's failure to timely pay interest, principal, or any other amount payable with respect to the Credit Suisse Loan was an Event of Default.

- 49 -

The Credit Agreement further provided that a Liquidating Event under the Partnership Agreement was an Event of Default under the Credit Suisse Loan. The Credit Agreement also provided that CHC Capital Trust's failure to perform or observe any covenant contained in § 5.02 thereof was an Event of Default regarding the Credit Suisse Loan.

(236)   The Pledge, Assignment and Security Agreement, described above, incorporates the definitions of "Default" and "Event of Default" set forth in the Credit Agreement for the Credit Suisse Loan.

(237)   The Credit Agreement provided that the filing of a bankruptcy or insolvency proceeding by or against CHC Capital Trust was an Event of Default regarding the Credit Suisse Loan. The Credit Agreement further provided that the occurrence of an "RP Event," as defined in the "Trustee RP Agreement" (RPSA's guarantee of the financial obligations of RPSC as general partner, described above) is an Event of Default regarding the Credit Suisse Loan. The Credit Agreement also provided that an Event of Default regarding the Credit Suisse Loan would occur in the event of (i) RP's failure to honor the guarantee in the Guarantee Agreements, (ii) the failure of RPSA, RPSC, RPI, or any RPI subsidiary to timely pay principal or interest on any indebtedness exceeding $50 million, or (iii) the bankruptcy or insolvency of RPSA, RPSSLP, RPSC, RPI, or any RPI subsidiary.

The evidence shows that the agreements effecting the contribution and loan transactions were integrated and interlocking parts of a whole.

### e.   The contribution and loan transactions closed on the same date, February 12, 1990.

(106)   GAF, RP, and Citibank formed RPSSLP on February 12, 1990, at which time each party transferred certain assets to RPSSLP.

(107)   GAF transferred the assets of GAF SSC to RPSSLP. Those assets included manufacturing facilities in Winder, Georgia; Spartanburg, South Carolina; and Toronto, Canada. GAF, RP, and Citibank agreed that the value of the assets transferred to RPSSLP by GAF was $480 million.

(219)   Pursuant to a loan agreement dated February 12, 1990, CHC Capital Trust borrowed $459,234,375 from Credit Suisse. The CHC Capital Trust Agreement, dated February 12, 1990, required CHC Capital Trust to distribute the funds received from Credit Suisse to the Chemicals Trust I

Trustee, the Chemicals Trust II Trustee, and ESSL-RP, Inc., in accordance with the percentage interest of these entities in CHC Capital Trust.  The collective percentage interest of the Chemicals Trust I Trustee and Chemicals Trust II Trustee in CHC Capital Trust was 97.98918%, which resulted in a distribution to these entities by CHC Capital Trust of approximately $450,000,000 of the $459,234,375 Credit Suisse funds.  In turn, GAF received $450,000,000 from Chemicals Trust I and Chemicals Trust II on February 12, 1990, which GAF used to pay down its LBO debt, including the Increasing Rate Notes.

### f.  In making the contribution, GAF ceded operational control of its assets.

(191)   RPSC, as the general partner in RPSSLP, was responsible for managing RPSSLP's businesses.  GAF and Citibank, as limited partners in RPSSLP, did not participate in the management of RPSSLP's businesses.

### g.  The transactions were structured so that the Credit Suisse loan functioned as a payment in substance.

(228)   The Credit Suisse Loan was secured by GAF's and Citibank's interests in RPSSLP, but was otherwise nonrecourse to GAF and Citibank.

(229)   Because the Credit Suisse Loan was secured by GAF's and Citibank's interests in RPSSLP, but was otherwise nonrecourse to CHC Capital Trust, GAF, and Citibank, Credit Suisse's recourse for the repayment of the loan was to GAF's and Citibank's investments in RPSSLP, represented by the Class A limited partnership interest held by CHC Capital Trust.

(230)   Pursuant to a Pledge, Assignment and Security Agreement, dated February 12, 1990, CHC Capital Trust pledged its Class A interest in RPSSLP as collateral for the Credit Suisse Loan.  Citibank, as Security Agent for CHC Capital Trust, Credit Suisse, and itself, held and controlled the collateral pledged by CHC Capital Trust.  Citibank also acted as Security Agent on its own behalf with respect to the Citibank Swap.

(234)   GAF's and Citibank's collective capital account in RPSSLP was not expected to fall below the principal amount of the Credit Suisse Loan.  Under the terms of the Partnership Agreement, no more than $26.8 million in losses could be allocated to GAF and Citibank.  Accordingly, their collective capital account balance was not expected to fall below $463,050,000, which exceeded the $459,234,375 principal amount of the Credit Suisse Loan.

- 51 -

(235)  The Credit Suisse Loan Credit Agreement provided that CHC Capital Trust's failure to timely pay interest, principal, or any other amount payable with respect to the Credit Suisse Loan was an Event of Default. The Credit Agreement further provided that a Liquidating Event under the Partnership Agreement was an Event of Default under the Credit Suisse Loan.  The Credit Agreement also provided that CHC Capital Trust's failure to perform or observe any covenant contained in § 5.02 thereof was an Event of Default regarding the Credit Suisse Loan.

(236)  The Pledge, Assignment and Security Agreement, described above, incorporates the definitions of "Default" and "Event of Default" set forth in the Credit Agreement for the Credit Suisse Loan.

(237)  The Credit Agreement provided that the filing of a bankruptcy or insolvency proceeding by or against CHC Capital Trust was an Event of Default regarding the Credit Suisse Loan.  The Credit Agreement further provided that the occurrence of an "RP Event," as defined in the "Trustee RP Agreement" (RPSA's guarantee of the financial obligations of RPSC as general partner, described above) is an Event of Default regarding the Credit Suisse Loan.  The Credit Agreement also provided that an Event of Default regarding the Credit Suisse Loan would occur in the event of (i) RP's failure to honor the guarantee in the Guarantee Agreements, (ii) the failure of RPSA, RPSC, RPI, or any RPI subsidiary to timely pay principal or interest on any indebtedness exceeding $50 million, or (iii) the bankruptcy or insolvency of RPSA, RPSSLP, RPSC, RPI, or any RPI subsidiary.

(238)  RPSC, as the general partner, was required to contribute additional capital to RPSSLP in the event it had a negative capital account balance upon retirement of any portion of GAF's or Citibank's interest in RPSSLP. This deficit capital account makeup provision provided further assurance that GAF's and Citibank's collective capital account in RPSSLP would not fall below the principal amount of the Credit Suisse Loan.  (Ex. 113, Partnership Agreement, at § 11.3.)  RPSA guaranteed RPSC's performance of its deficit capital account makeup obligations.

(239)  In the event of default by CHC Capital Trust under the Credit Suisse Loan, Citibank, as the security agent, had the right to sell GAF's and Citibank's interests in RPSSLP for the fair market value of those interests, and apply the proceeds of such sale to repayment of the Credit Suisse Loan.

(240)  Under the terms of the Put Agreement, RPSA agreed to purchase GAF's and Citibank's interests in RPSSLP for the then-current value of their

respective capital accounts in the event of a default by CHC Capital Trust under the Credit Suisse Loan.  The Put Agreement did not require Citibank to sell GAF's and Citibank's interests in RPSSLP to RPSA in the event of default.  Citibank, as security agent, could sell the interests in RPSSLP to anyone under the terms of the Security Agreement; however, RPSA was required to purchase the interests at Citibank's option.

(241)   The Put Agreement assured Credit Suisse that in the event of default Citibank, as security agent, would be able to find at least one purchaser (RPSA) willing to buy GAF's and Citibank's interests in RPSSLP for the value of their capital accounts.

As discussed above, these complex arrangements ensured that responsibility for repayment of the Credit Suisse loan rested not with GAF, but with RPSSLP and RP.  Because responsibility for repayment of the loan rested with RPSSLP and RP, the Credit Suisse loan transaction was, in substance, a cash payment from RPSSLP to GAF of $450M.

This Court has weighed the evidence presented at trial and finds that: 1) GAF's transfer of $450M to RPSSLP was a direct transfer of property by a partner to a partnership; 2) the Credit Suisse loan proceeds constituted a related indirect transfer of money by the partnership to the partner; and 3) these transfers, when viewed together, are properly characterized as a sale of property.  The Government has proven, by a preponderance of the evidence, that the $450M transaction was a disguised sale, pursuant to § 707(a)(2)(B).[20]  As to the $450M transaction, GAF

_____

[20] In the Final Pretrial Order, the Government advanced four alternative theories which attempt to set out a more detailed view of the elements of the disguised sale.  (FPO at 221-222.)  In the Government's Proposed Findings of Fact and Conclusions of Law, however, the Government did not reference these alternative theories.  This Court holds that the analysis it has already stated in the body of this Opinion provides a sufficient basis to conclude that the requirements of the disguised sale provision have been satisfied, but offers the following as commentary.  The Government's second theory of the 1990 transactions, as proposed in the Final Pretrial Order, is useful in conceptualizing the economic substance of the transactions.  Setting aside the bona fide $30M partnership contribution, the transactions have an underlying economic substance that resembles this structure: 1) GAF sells $450M of assets and receives in return an installment note; 2) GAF then pledges the installment note as collateral for a $450M nonrecourse

has failed to meet its burden of proving that the Government's tax assessment is in error.

## II.    The Government's claim is barred by the statute of limitations.

Pursuant to 26 U.S.C. § 6501(a), a three-year limitations period applies to tax

assessments, unless the case falls within the exception provided by § 6501(e), which states:

Substantial omission of items. Except as otherwise provided in subsection (c)–

  (1) Income taxes. In the case of any tax imposed by subtitle A [26 USCS §§ 1 et seq.]--

  (A) General rule. If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph–

    (i) in the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and

    (ii) in determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

In the Opinion of September 8, 2006, this Court summarized the legal framework for the

application of § 6501(e) in this case as follows:

The bar of the statute of limitations is an affirmative defense and, as such, the party raising it maintains the burden of proof. Hoffman v. Commissioner, 119 T.C. 140, 146 (2002). Here, therefore, Debtors must initially show that the IRS did not assess the tax due for the 1990 taxable year within the normal three-year statute of limitations period under § 6501(a). Hoffman, 119 T.C. at 146. It is undisputed in this case that the IRS did not assess the tax due for 1990 before the running of the three-year statute of limitations. Therefore, Debtors have

_____

loan.

- 54 -

established a *prima facie* case that the three-year limitation period has expired.

Having established a *prima facie* case, the United States has the burden of going forward to establish that Debtors omitted from the 1990 GAF Return "an amount properly includible therein which is in excess of 25% of the amount of gross income stated in the return," within the meaning of § 6501(e)(1)(A). Hoffman, 119 T.C. at 146.

(Opinion of September 8, 2006 at 7-8.)

In the Final Pretrial Order, the parties made the following relevant stipulations:

(39)   The United States did not assess any tax with respect to the 1990 Transactions before the three-year statute of limitations pursuant to § 6501(a) had expired.

(40)   In determining whether the United States has the benefit of the six-year statute of limitations under § 6501(e) in connection with any assessment relating to Debtors' 1990 tax return, the Court must determine whether the United States has sustained its burden of proving that income omitted from Debtors' 1990 tax return was in excess of 25% of the gross income stated on Debtors' 1990 tax return.

(41)   The amount of nonpartnership gross income stated on Debtors' 1990 tax return was $997,712,646.

(42)   Debtors' priority return from RPSSLP for 1990 was $38,640,000.

(43)   Debtors' priority return from RPSSLP was 46.07% of the total § 61 income reported on RPSSLP's 1990 tax return of $83,868,331.

(44)   The amount of gross income stated on RPSSLP's 1990 tax return, which is comprised of the gross receipts reported on the return and the other income reported on the return, was $353,553,727.  46.07% of RPSSLP's reported gross income for 1990 was $162,882,202.

The ratio specified in § 6501(e)(1)(A) may be expressed as a fraction in which the

numerator is omitted gross income and the denominator is reported gross income.  The parties

dispute how the fraction should be calculated: the Government's calculations all show that the

ratio exceeds 25%, while GAF's calculations show that the ratio is less than 25%.  The statute of

limitations dispute turns on two issues: 1) the calculation of imputed partnership gross income; and 2) whether the amount omitted in the numerator is calculated on an item-by-item basis, or based on the total.

      A.      The calculation of imputed partnership gross income

Section 702(c) states: "In any case where it is necessary to determine the gross income of a partner for purposes of this title, such amount shall include his distributive share of the gross income of the partnership." Thus, the gross income calculations in both the numerator and the denominator of the fraction must include the taxpayer's distributive share of the gross income of the partnership. The applicable regulation is Treasury Reg. § 1.702-1(c)(2), which states:

> In determining the applicability of the 6-year period of limitation on assessment and collection provided in section 6501(e) [26 USCS § 6501(e)] (relating to omission of more than 25 percent of gross income), a partner's gross income includes his distributive share of partnership gross income (as described in section 6501(e)(1)(A)(i) [26 USCS § 6501(e)(1)(A)(i)]). In this respect, the amount of partnership gross income from which was derived the partner's distributive share of any item of partnership income, gain, loss, deduction, or credit (as included or disclosed in the partner's return) is considered as an amount of gross income stated in the partner's return for the purposes of section 6501(e) [26 USCS § 6501(e)]. For example, A, who is entitled to one-fourth of the profits of the ABCD partnership, which has $ 10,000 gross income and $ 2,000 taxable income, reports only $ 300 as his distributive share of partnership profits. A should have shown $ 500 as his distributive share of profits, which amount was derived from $ 2,500 of partnership gross income. However, since A included only $ 300 on his return without explaining in the return the difference of $ 200, he is regarded as having stated in his return only $ 1,500 ($ 300/$ 500 of $ 2,500) as gross income from the partnership.

This regulation requires that, in computing the amounts of gross income in the numerator and denominator of the § 6501(e) ratio, gross income includes "the amount of partnership gross income from which was derived the partner's distributive share of any item of partnership income." Id. Thus, some amount of the partnership's gross income, although it is not actually

- 56 -

stated in the taxpayer's return, is treated as if it were stated on the taxpayer's return as gross income. This is the imputed partnership gross income ("IPGI").

Regulation § 1.702-1(c)(2) sheds light on the question of how to calculate IPGI only by giving a single example. The example concerns taxpayer "A" who has understated his partnership income, and begins with the assumption that A has an entitlement to one-fourth of the profits of the partnership. The partnership has $10,000 gross income and $2,000 taxable income. The example looks to the partnership taxable income of $2,000 and states that A's distributive share of the profits is $500, "which amount was derived from $2,500 of partnership gross income." Treasury Reg. § 1.702-1(c)(2). The regulation does not give any further details as to the method of calculation used.

In applying the Regulation to this case, a cause for concern is that the Regulation example involves a very simple profit-sharing arrangement, not a complex arrangement like the tiered arrangement specified in the Partnership Agreement. The Regulation example involves a partnership with a simple arrangement for profit allocation, a 25%/75% split. In the instant case, in contrast, the allocation arrangement is not a simple split. It is, instead, a tiered arrangement, summarized in the chart in Stipulation No. 147. This leads to the question of whether application of the method used in the example gives an accurate result when applied to the facts of the instant case. Careful analysis of the Partnership Agreement, in light of the Regulation, suggests an alternative calculation method. This Court has compared the result using the Regulation example method to the result from the alternative method. The results of the two approaches do not differ materially.

1.     *The Regulation example method*

This Court construes the Regulation example to imply two possible methods of calculation:

Method 1

[(distributive share of taxable income) / (partnership taxable income)] = R1

R1 x (partnership gross income) = (imputed partnership gross income)

Method 2

[(partnership taxable income) / (partnership gross income)] = R2

(distributive share of taxable income) / R2 = (imputed partnership gross income)

Although appearing to differ, these methods are mathematically equivalent.  Thus, applying method 1 to the example, R1 equals $500/$2,000, or 25%.  Multiplying R1 by $10,000 produces the imputed partnership gross income amount of $2,500.  Applying method 2 to the example, R2 equals $2,000/$10,000, or .2.  Dividing $500 by R2 produces the imputed partnership gross income amount of $2,500.

This is the exact method used by GAF in its calculation of IPGI.  GAF arrives at its IPGI figure through the following steps.  GAF's Priority Return from RPSSLP for 1990 was $38,640,000, which is 46.07% of the total § 61 income reported on RPSSLP's 1990 tax return of $83,868,331.  The amount of gross income stated on RPSSLP's 1990 tax return was $353,553,727.  The IPGI is 46.07% of RPSSLP's reported gross income for 1990, or $162,882,202.  The parties stipulated to all of the basic numbers in the FPO.

The calculation method used by GAF is the same as that specified in Treasury Regulation § 1.702-1(c)(2).  GAF first calculated R1 by dividing GAF's distributive share of taxable income

- 58 -

by the partnership taxable income, yielding 46.07%.  GAF then multiplied R1 and the partnership

gross income of $353,553,727, resulting in $162,882,202.  This is the imputed partnership gross

income, using the Regulation example method.

The Regulation example method makes intuitive sense when the profit allocation scheme

is as simple as that in the example.  The result of this method is that the costs of generating net

income are allocated in proportion to the partner's share of net income, an allocation method that

seems reasonable when profits are shared according to a simple proportion: when profits are

allocated based on a simple proportion, one would expect that costs would also be allocated

based on the same simple proportion.  When profits are allocated using a complex, tiered

scheme, however, it is not clear that costs would be accurately allocated by a simple proportion.

2.    *An alternative method*

It is undisputed that GAF stated in its return as partnership income the Priority Return

payments it received from RPSSLP.  The central concern of Regulation § 1.702-1(c)(2) is the

gross income from which the distributive share was derived.  Here, the Partnership Agreement

specifies how the Priority Return payments were derived.[21]  Stipulation No. 136 explains the

Partnership Agreement as follows:

> Under the first tier of profit allocations, the Class A limited partners would
> receive a priority return of 9.125% per year (cumulative and compounded, if ever
> in arrears) of their initial capital account balances of $489.85 million ($480
> million for GAF and $9.85 million for Citibank), equal to approximately $44.7
> million per year.  The Class A priority return would be allocated to GAF and

---

[21] At post-trial oral argument, the Government contended that "you have to look at the
Partnership Agreement and determine in substance what their interest in the gross receipts were .
. ."  (9/29/09 Tr. 47:11-13.)  This Court agrees.  The problem for the Government is that the
Partnership Agreement, as reflected in Stipulation Nos. 136 and 147, does not support the
Government's argument that GAF was allocated no costs of generating the first tier of income.

Citibank from RPSSLP's gross income, defined as revenues less the costs of goods sold, with certain adjustments.

In contrast, 26 U.S.C. § 6501(e)(1)(A)(i) states:

in the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services . . .

Thus, in determining partnership gross income in connection with § 6501(e), gross income must be gross receipts prior to subtracting the cost of goods. To calculate the gross receipts from which the Priority Return was derived, we need to find the cost of the goods which were sold to produce the Priority Return, and add it to the Priority Return.

The parties do not dispute that RPSSLP's partnership return states a cost of goods sold of $273,246,396. The question is how to allocate the cost of goods sold between the partners. GAF argues that the cost of goods sold should be allocated in proportion to the share of income. The Government argues that no costs should be allocated to GAF, and that GAF's 1990 Priority Return income should be considered costless.

### 3.    *The Government's approach: the problem of costless income*

The Government contends that the Partnership Agreement "says nothing [] about how to assign costs to the priority return specifically, or how to allocate costs among the alleged partners generally." (Gov't's Supp. § 6501 Br. 2.) This position is not consistent with Stipulation No. 136, which states: "The Class A priority return would be allocated to GAF and Citibank from RPSSLP's gross income, defined as revenues less the costs of goods sold, with certain adjustments." The Government is correct that this does not specify a method for allocating costs for the Priority Return, but it does not support the Government's contention that the agreement

- 60 -

says nothing on the subject.  Rather, this Stipulation indicates that the parties considered

generally the relationship between gross receipts, costs of goods sold, and the Priority Return,

and agreed that RPSSLP would first subtract the cost of goods sold from gross receipts and then

allocate the Priority Return from the result.  While this does not define a method to allocate the

costs, it makes clear that the partners understood the Priority Return to be derived by subtracting

costs of goods sold from gross receipts.  Thus, while it is true that the partners did not specify a

method for allocating costs, the Government's "costless income" position is inconsistent with the

Partnership Agreement.  Stipulation No. 136 compels the inference that the partners understood

the Priority Return to be derived from gross receipts minus costs of goods sold.

      The Government argues that GAF's method for calculating the IPGI is wrong, but does

not show that GAF has incorrectly comprehended the calculation method stated in the example in

Regulation § 1.702-1(c)(2).  Instead, the Government tries a variety of approaches to argue that

GAF's reported partnership income of approximately $38M should be considered to have been

derived from itself, or $38M.  The Government's main thrust is that the Court should rely on

substance-over-form principles and conclude that the Priority Return was costless income.  This

has two major problems.

      First, the Government's position is in clear conflict with the statutory language, which

states that the amount in the denominator of the fraction is "the amount of gross income stated in

the return."  26 U.S.C. § 6501(e)(1)(A).  The Government urges this Court to apply the economic

substance doctrine here, but the express language of the statute conflicts with that approach.  Nor

does the Government cite case law in accord with its position.  Rather, as explained by the Tax

Court in <u>Harlan v. Comm'r</u>, 116 T.C. 31, 38 (T.C. 2001), courts have generally understood the

statute to require that "we must look through the various forms, etc., attached to the taxpayer's basic tax return form in order to identify the components of gross income that must be added together in order to determine the total amount of gross income stated in the taxpayer's tax return." This is not the place for economic substance analysis, which requires that the Court look beyond what is stated on the forms to determine the underlying economic reality. A statute that expressly refers to what is "stated in the return" precludes use of an approach that seeks to determine the underlying truth that may not have been stated in the return.

Looking at the scheme established by Congress in § 6501(e)(1)(A), it is inappropriate to use the economic substance doctrine to compute the denominator of the fraction, as the Government contends. The point of the provision is to look to what should have been reported, based on economic reality, in the numerator, and to compare it with what was stated in the return in the denominator. Application of the economic substance doctrine is appropriate when computing what should have been reported, and contrary to the statutory language when computing the denominator.[22]

---

[22] The Government makes a related argument when it contends that GAF has erred in its computation of the § 6501(e)(1)(A) fraction by mixing "apples with oranges." (Gov't's Post-Trial Reply 22.) The Government argues that GAF has improperly mixed figures derived from the reported state of affairs with figures derived from conclusions about the economic reality of the transactions. The problem for the Government, as GAF points out, is that this mixing of apples and oranges is expressly required by § 6501(e)(1)(A): the calculation revolves entirely around comparing the reported state of affairs with the economic reality, and determining whether the difference between the two involves a substantial omission.

The statute specifies that the denominator is the gross income "stated in the return." The statutory language is absolutely clear and free of ambiguity: the denominator, then, is taken from whatever is stated in the return. There is no room here for adjustments based on economic reality. The numerator, on the other hand, is an amount of gross income omitted that is "properly includible therein." Because it is well-established that proper taxation is based on economic reality, the statutory language requires that the determination of what is "properly includible"

In support of its argument that this Court should use a substance-over-form approach to determine the gross income stated in the return, the Government cites 26 C.F.R. §§ 1.704-1(b)(1)(i) and (b)(3). These regulatory sections do not make reference to the § 6501(e) calculation, and this Court is not persuaded that Congress intended the phrase "stated in the return" to allow a substance-over-form analysis.

Second, even if this Court had not concluded that the Government's position was inconsistent with the "stated in the return" requirement of § 6501(e), the Government's view of the economic substance of the Priority Return is quite problematic. The Government has not persuaded this Court that the money that RPSSLP distributed to GAF in 1990 was derived from itself – i.e., that it was costless income. For the Government to succeed with its argument, it would have to persuade this Court that the cost of goods sold to generate the Priority Return was zero. The Government has presented no evidence to support this conclusion.[23]

The economic reality appears to be that, in 1990, RPSSLP had to sell well over a hundred million dollars worth of chemicals, and to pay costs of over a hundred million dollars, to generate the money that it distributed as Priority Return to GAF. It is unpersuasive to argue that, had

---

requires a determination based on economic reality. The statutory language thus requires that the denominator reflect what was stated on the return and that the numerator reflect what is economic reality. The Government has provided no rationale for interpreting the statutory language in any other way. The Government's "apples and oranges" criticism is meritless.

[23] The Government also argues, in the alternative, that GAF derived its distributive share from roughly $54M of gross receipts. (Gov't's FOF ¶ 383.) The Government states that it calculated this figure by adding 4.9% of the remaining gross receipts of RPSSLP (roughly $15.4M) to the 1990 Priority Return. The Government does not assert, however, that this adjustment adds the cost of goods sold to the Priority Return. Thus the Government fails to persuade that $54M is the correct amount of partnership gross income from which GAF's distributive share was derived.

things been different, and had RPSSLP not had enough money to pay the Priority Return, it would have turned to RP to pay the Priority Return for it, and that then the money might have truly been costless.  There is no dispute that, in 1990, that did not occur.

The Government has shown no justification for concluding that some portion of the gross income of RPSSLP required no cost to generate.  There is no dispute that RPSSLP reported approximately $354M of gross income and approximately $84M of net income.  As a matter of simple arithmetic, that means that it cost approximately $270M (cost of goods sold) for RPSSLP to generate the $84M.  The Government's position implies, then, that all of the costs of generating income should be apportioned to RP, and none to GAF.

The Government argues that this makes sense because the Priority Return was guaranteed.  The problem with this argument is that "guaranteed" does not mean costless.  Even if true that GAF's priority income was guaranteed, that does not mean that it was costless money.  The money to pay a guaranteed return still has to be generated.  One partner may guarantee a payment to the other partner, but that does not mean that there is no cost to generate that payment.

In considering the Government's argument that GAF's $38M Priority Return was derived from $38M, the question arises of whether costless income is even possible.  In theory, it is possible; a business could have pure profit.  Yet, in the case of a very large chemical manufacturing business, it does seem unlikely.  Is it possible that two partners could agree that one would absorb all the costs of generating income, so that one partner receives income that is

- 64 -

costless to him?  Perhaps, although its legality under the Tax Code is unclear.[24]  For present purposes, it is sufficient to say that the Partnership Agreement does not indicate that RP agreed to absorb all costs of generating GAF's Priority Return.  Nor has the Government pointed to anything that suggests that this is what the partners intended.

The Government argues that the guarantee meant that, even if RPSSLP had insufficient receipts to pay GAF its Priority Return, the Priority Return would still have been paid.  There are two problems with this argument.  First, it does not reflect what actually happened: it is undisputed that, in 1990, RPSSLP had more than enough gross and net income to cover the Priority Return.  Second, even if, for example, RPSSLP had had only $20M in gross receipts, then some part of the guaranteed payment would not have been derived from gross receipts.  Since the evidence shows that the partnership's income was sufficient to pay the Priority Return, the Priority Return payment was derived from income.

GAF observes that, in arguing that the Priority Return was a guaranteed and costless payment, the Government has confused a cash distribution with an income allocation.  Had RPSSLP had insufficient gross income to pay the Priority Return, GAF might have received a cash distribution in the amount of the Priority Return, but it would not have received an allocation of income.  Again, however, this is not what happened in 1990.

At post-trial oral argument, the Government conceded that, when considering the gross receipts required to generate the $38M of income, "there are business expenses that have to be

---

[24] GAF, in its supplementary § 6501 brief, suggests that such an arrangement might run afoul of Revenue Ruling 75-458.  Mercifully, the Court need not reach this question.  GAF also argues that allowing partners to reallocate costs of goods sold or gross receipts in a way that is not proportionate to income would permit manipulation of the statute of limitations calculation.

paid."  (9/29/09 Tr. 49:3-4.)  This is an acknowledgment that the Government's theory that GAF's 1990 income was costless does not fit the facts.  Furthermore, the Government's position is inconsistent with the testimony of its expert, Dr. Loos, who recognized that the Priority Return was "paid out of gross income," which was "sales less cost of goods sold."  (6/18/09 Tr. 75:19, 76:10.)

Lastly, GAF points out that if no costs are allocated to GAF's partnership income, all costs must be allocated to RP's partnership income – giving it costs and gross receipts that exceed its proportionate share.  GAF persuasively argues that such a position would not pass muster under Treas. Reg. § 1.702-1(c)(2): it would give RP a vastly inflated amount of gross receipts deemed stated in its return.  Nor would it make sense to say that all of the costs of goods went toward generating RP's share of partnership profits, and no costs went toward generating GAF's share.

Having rejected the Government's argument that the 1990 Priority Return payment was costless, the next question is how to allocate the costs of goods sold to the partners.  GAF argues that this should be done in proportion to the share of net income.  Given all the circumstances, this appears to be consistent and reasonable, and the only alternative that has been proposed – that the income was costless – has been rejected.  RPSSLP's partnership return states a cost of goods sold of $273,246,396.  GAF's share of the total cost of goods sold is calculated based on the proportion of its share of net income, approximately 46.07%, resulting in a cost of goods sold of $125,890,674.  Adding the Priority Return to this cost of goods sold yields the sales revenues

from which the Priority Return was derived, which is $164,530,674.[25]   Stipulation No. 136

indicates that "certain adjustments" might also affect the computation of gross income but, in the

supplemental briefs, the parties agreed that no other adjustments were applicable here.

This is equivalent to the amount of § 6501(e) partnership gross income, since 26 U.S.C. §

6501(e)(1)(A)(i) states:

> in the case of a trade or business, the term "gross income" means the total of the
> amounts received or accrued from the sale of goods or services (if such amounts
> are required to be shown on the return) prior to diminution by the cost of such
> sales or services . . .

The total § 6501(e) gross income stated in the return is the sum of non-partnership and

partnership gross income.  Pursuant to Stipulation No. 41, the amount of nonpartnership gross

income stated on GAF's1990 tax return was $997,712,646.  Adding in $164,530,674 of

partnership gross income, the total gross income stated in the return is $1,162,243,320.

The IPGI, calculated by the Regulation example method, is $162,882,202.  The IPGI,

calculated by the alternative method, is $164,530,674.  These two results do not differ materially,

because the use of one or the other in the § 6501(e) calculation does not alter the determination

that the fraction is over or under 25%.

---

[25] In the supplementary § 6501(e) brief, GAF points out that a fully accurate computation would need to take into account the effect of the fairly small amount of income not from sales ($5,579,727).  Also, the parties have both independently stated that GAF was additionally entitled under the Partnership Agreement to a residual allocation of 4.9% of items of income and loss.  In its proposed findings of fact, the Government asserted that adjustment for this 4.9% would produce an increase in § 6501(e) gross income of roughly $15.4M.  (Gov't's FOF ¶ 298.)  Thus, this Court concludes that $164,530,674 states the minimum gross income from which GAF's distributive share of partnership income was derived.  Adjusting the computations to more accurately reflect these considerations would not result in a change in the § 6501(e)(1)(A) gross income figure that would materially impact the determination of whether the proportion was under or over 25%.  A fully accurate computation would produce a higher total gross income, which could only inure to GAF's benefit in calculating the § 6501(e) fraction.

The Government also attempts to deflate the IPGI calculation with two arguments related to the adequacy of GAF's reporting of its distributive share of partnership income. Primarily, the Government argues that GAF failed to "properly identify" the partnership on its tax return, within the meaning of Harlan, 116 T.C. at 38. In addition, the Government contends that GAF's reference on its return to income from a "surfactants partnership" did not adequately disclose the name, address, and employer identification number of RPSSLP, and that therefore GAF did not include or disclose any distributive share of partnership income. (Gov't's FOF ¶¶ 303, 304.) The Government urges the Court to use these grounds to find that no partnership income was stated in GAF's return.

As GAF observes, in considering these issues, it is essential to distinguish between the matter of the incorporation by reference of the partnership return into the taxpayer's return, and the safe harbor provided by adequate disclosure of omitted gross income. The principle of incorporation by reference is a judicially-created solution to a problem of statutory wording. As discussed in detail by the Harlan court, 26 U.S.C. § 6501(e)(1)(A) requires courts to determine "the amount of gross income stated in the return" in order to assess whether an omission was substantial. The problem is that, pursuant to 26 U.S.C. § 702(c), gross income of a partner must "include his distributive share of the gross income of the partnership" – an amount which is not stated in the taxpayer's return. Courts have recognized that it is impossible to include a partner's distributive share of partnership gross income in the computation of a partner's stated gross income except by looking outside the taxpayer's return to the information return of the partnership. Thus, to accurately calculate the § 6501(e)(1)(A) fraction, courts must incorporate by reference information stated in the partnership return.

- 68 -

In contrast, courts determine adequate disclosure pursuant to § 6501(e)(1)(A)(ii), which states that amounts of gross income shall not be considered omitted if adequately disclosed. Among the many differences between the matter of incorporation by reference and the matter of adequate disclosure, a key one is that § 6501(e)(1)(A)(ii) uses the word "if" and expressly states a condition. Pursuant to the statute, a court must determine whether the condition of adequate disclosure is met. Incorporation by reference, on the other hand, arises from judicial interpretation of statutory mandates. Far from being conditional, § 702(c) begins by stating: "In any case where it is necessary to determine . . ." The language "in any case" suggests that the statute's application is unconditional. In calculating both the numerator and the denominator pursuant to § 6501(e)(1)(A), § 702(c) <u>must</u> be applied. There appears to be nothing in the language of either § 702(c) or § 6501(e)(1)(A) that suggests that a court has the latitude to decide not to allow incorporation by reference.

Nor does the Government point to any case law to the contrary. In support of its position, it cites <u>Harlan</u>, and a number of adequate disclosure cases. As discussed, the adequate disclosure cases are inapposite. As for <u>Harlan</u>, the Government relies on the use of the phrase "properly identified" in this paragraph:

> Under section 6501(e)(1)(A), the denominator of the 25- percent fraction is "the amount of gross income stated in the return". But the taxpayer ordinarily does not state the amount of gross income anywhere on the tax return. As a result, we must look through the various forms, etc., attached to the taxpayer's basic tax return form in order to identify the components of gross income that must be added together in order to determine the total amount of gross income stated in the taxpayer's tax return. It has long been accepted that, for these purposes, the information return of the taxpayer's <u>properly identified</u> 1st-tier partnership is treated as part of the taxpayer's tax return. But the 1st-tier partnership's information return suffers from the same "defect" in that we must look through the various forms, etc., attached to the 1st-tier partnership's information return in

- 69 -

order to identify the components of gross income that must be added together in order to determine the total amount of gross income stated in the 1st-tier partnership's information return. Every explanation that has been drawn to our attention, or that we have discovered, as to why we must treat the properly identified 1st-tier partnership's information return as part of the taxpayer's tax return applies with equal force to treating the properly identified 2d-tier partnership's information return as part of the 1st-tier partnership's information return.

116 T.C. at 37-38 (emphases added).

A Tax Court decision is, at most, persuasive authority, and this Court does not find this Harlan reference persuasive, for several reasons.  First, the case does not turn on any issue of the adequacy of identification; these references are dicta.  Moreover, this is ambiguous dicta: the Harlan court states no standard for what constitutes proper identification.  Also, it is unsupported dicta: while the Harlan court asserts that it has long been accepted, the decision cites no authority, nor does the Government point to any other authority.   The Government cites no cases in which a court did what the Government asks this Court to do: find an implied condition of proper identification precedent to incorporation by reference.

Lastly, there is reason to believe that not even the Tax Court views Harlan as standing for the proposition advanced by the Government.  In the most recent § 6501(e) Tax Court case citing Harlan, the court did not apply a "properly identified" standard.  Benson v. Comm'r, T.C. Memo 2006-55 (T.C. 2006).  Rather, setting forth the relevant legal standards, the court in Benson stated:

When taxpayers' individual returns contain references to other documents or returns, those references provide a clue or serve as notice to the Commissioner. Specifically, when a return includes a reference to a partnership return, partnership returns are considered together with individual returns to determine the amount omitted from gross income.

- 70 -

Id. (citations omitted).  Again, this is not a holding, but it suggests that the <u>Benson</u> court required no more than "a reference."  Such a standard would be easily met in the instant case.

The Government cites no case in which in which a court refused to incorporate a partnership return by reference, and it is not difficult to find cases in which the absence of specific identification of the partnership passed without comment.  Notable is the case of <u>Rose v. Commissioner</u>, 24 T.C. 755, 759 (T.C. 1955), a key case in the development of the jurisprudence of incorporation by reference.  In <u>Rose</u>, the taxpayers' returns stated only "income from partnerships."  <u>Id.</u>  It does not appear that there was any identification of the specific partnership from which the income came.  Moreover, even though the <u>Rose</u> court found that the alleged partnership was not truly a partnership, it held that the gross income stated on the partnership return must be incorporated into the taxpayers' returns by reference.  <u>Id.</u> at 768-69.

This Court concludes that GAF's return contains a reference to the partnership return, and this Court has no basis to refuse to incorporate the partnership return by reference.

The Government also contends that, in the Opinion of September 8, 2006, this Court held that "GAF's tax reporting was simply insufficient to identify RPSSLP."  (Gov't's FOF ¶ 354.) This is incorrect, as the Opinion states:

> The crux of the argument by the United States in the instant motion is that Debtors failed to disclose the connection between their $450 million investment of assets into RPSSLP and their receipt of $450 million in proceeds of the Credit Suisse loan in an adequate manner. This Court agrees. The Court finds that Debtors failed to make an adequate disclosure of the Credit Suisse loan, or present any significant link to its existence.

(Opinion of September 8, 2006 at 15.)  This Court did not make any finding regarding the identification of RPSSLP.

The denominator of the § 6501(e)(1)(A) fraction, the total gross income stated in GAF's return, is $1,162,243,320.

B.     Is the amount omitted in the numerator calculated on an item-by-item basis, or based on the total?

The parties use different methods to compute the numerator of the § 6501(e)(1)(A) fraction as well.  The choice of method has a material impact on the result of the § 6501(e) calculation.  Surprisingly, the Government's post-trial reply brief did not address this issue, and appeared to assume that its method was the only method to consider.

The parties agree that, if the Court finds that GAF contributed only $30M to the partnership and sold $450M of assets, GAF's unreported income from the 1990 Transactions is $369,986,956.  (GAF's Response to Gov't's FOF No. 314.)  They differ in their approach to using this number to calculate the numerator: the Government contends that the omitted amount is the amount of the gain on sale, or roughly $370M, while GAF contends that the omitted amount is the difference between the amount of gross income stated in the return and the amount of gross income that should have been reported in the return.

The relevant statutory provision states: "If the taxpayer omits from gross income an amount properly includible therein . . ."  26 U.S.C. § 6501(e)(1)(A).  The parties do not dispute that this states the numerator of the § 6501(e) fraction.  The key difference between the parties' positions as to the calculation of the numerator appears to turn on the construction of the phrase "an amount."  The Government's position depends on construing "an amount" to mean "any item."  GAF construes "an amount" to mean "a total amount."

At oral argument on the calculation of the § 6501(e) fraction, this Court asked the

Government to explain why the numerator should not be calculated using GAF's method. The Government stated that there was "no need to net the two items," but conceded that it had no authority for this position, beyond the statutory language itself. (9/29/09 Tr. 50:14-15; 52:12-13.) The Government proposed the principle that the Court should aggregate only items that are "related to the same business transaction." (9/29/09 Tr. 50:14-15; 53:2-3.) There are three problems with relying on this proposition. First, as the Government conceded, there is no authority for it. Second, although the government argues that they are relying on the clear statutory language, there is nothing in the express language of § 6501(e) that indicates that items should be aggregated only when they relate to the same business transaction. Third, even if this were the law, the numerator would still be calculated as GAF proposes, since the Government contends that all of the component transactions that occurred on February 12, 1990 were "a single, integrated  transaction." (Gov't's Trial Br. 4 n.1.) This Court does not see how the increase in gross income due to gain from the recharacterization of the disguised sale and the decrease in gross partnership income due to the recharacterization of the disguised sale could be seen as not related to the same business transaction. The Government has failed to show any reasonable basis for its position on the calculation of the numerator.

The Government has failed to persuade this Court that the § 6501(e)(1)(A) fraction should be calculated on an item-by-item basis (rather than looking at the total gross income omitted). The Government's position has two main problems. First, it seems inconsistent with the text of § 6501(e)(1)(A)(i), which states that "the term 'gross income' means the <u>total</u> of the amounts received . . ." (emphasis added). The Government contends that the numerator should be calculated not from total gross income, but from particular items of gross income, contrary to

the language of this provision.

Second, the Government's approach appears unfair.  If a taxpayer omitted a particular item of gross income that meets the 25% standard, but the total amount of gross income omitted is less than 25%, did Congress intend that such a case should be considered a substantial omission?  This Court thinks not.  Moreover, the Government here relies on an argument which, when offered defensively by taxpayers, must surely be regularly rejected by courts.  If a taxpayer has a number of individual omitted items of gross income, none of which alone meet the 25% standard, but which meet it in the aggregate, it seems unreasonable to find that the fraction should be calculated on an item-by-item basis.[26]

Since, as explained infra, this Court finds that, in the final analysis, GAF omitted from its return $205M of gross income, $369M does not fairly represent the amount of gross income that GAF omitted from its return.  Nor does it seem fair to perform the statute of limitations calculation using a number that inflates the size of GAF's actual omission.  The economic reality is that, had GAF reported a $450M sale, there would have been an increase in gross income on its return of $205M, not $369M.

Because the Government failed to articulate a justification for its method of calculating the numerator at oral argument, and offered no such justification in its briefs, this Court finds that

---

[26] Were item-by-item analysis the rule, cases like Insulglass Corp. v. Commissioner, 84 T.C. 203, 208 (T.C. 1985) would have been decided differently.  In Insulglass, the taxpayer omitted two unrelated items of income, one of which, taken individually, represented less than 25% of reported gross income.  Id.  The Tax Court, nonetheless, used the aggregate of the two items to compute the § 6501(e) fraction.  Id. at 210.  If the Insulglass Court had done item-by-item analysis, as recommended by the Government in the instant case, the Court would have lifted the statute of limitations bar for one item but not for the other.  There is no evidence that Congress intended such an outcome when it enacted § 6501(e).

the Government has not carried its burden of proof that the requirements of 26 U.S.C. § 6501(e) have been satisfied.

This Court thus rejects the Government's position that the numerator should be the roughly $369M by itself. The total amount of gross income omitted is calculated as GAF contends, by finding the difference between the total gross income reported and the total gross income that should have been reported. As established above, the total gross income deemed reported on GAF's 1990 tax return has been calculated as $1,162,243,320. The sole remaining question is how to calculate the total gross income that should have been reported. There is no dispute over that this figure includes the $997,712,646 reported as non-partnership gross income; the question is what should have been reported as partnership gross income. This Court concludes that, based on its analysis of the economic substance of the 1990 Transactions, GAF should have reported no distributive share of income from the partnership in 1990. The parties have agreed that, this Court having found that GAF made only a $30M bona fide equity contribution to RPSSLP and a $450M sale, the amount of unreported gain from the sale is $369,986,956. The total amount of gross income that should have been reported is the sum of $997,712,646 and $369,986,956, which is $1,367,699,602. The difference between the total amount of gross income that should have been reported and the total amount that is deemed reported ($1,367,699,602 - $1,162,243,320) is $205,456,282. Following § 6501(e)(1)(A), the fraction is calculated as the total amount omitted over the total amount deemed reported ($205,456,282 / $1,162,243,320), which equals .177, or 17.7%. The total amount omitted is not in excess of 25% of the gross income deemed stated in GAF's 1990 tax return.

Pursuant to Fed. R. Civ. P. 52(a), the Court presents its findings of fact and conclusions

- 75 -

of law.

**FINDINGS OF FACT**

I.    This Opinion incorporates by reference all stipulated facts set forth in the Final Pretrial

Order.

II.    Based on the evidence presented at trial, this Court now makes the following findings of

fact:

1.    On September 19, 1989, GAF and RP entered into an asset sale agreement in

which RP agreed to purchase GAF SSC for $480M in cash.

2.    During the period from October of 1989 through February 12, 1990, GAF worked

to change the structure of the asset sale transaction. GAF expended at least $11.8

on the costs of restructuring the transaction.

3.    GAF restructured the asset sale transaction into a set of transactions with three key

parts: 1) the RPSSLP partnership was created; 2) GAF transferred business assets

valued at $480M, which included GAF SSC, to RPSSLP (the contribution

transaction); and 3) GAF received $450M in cash through a nonrecourse loan

made by Credit Suisse (the loan transaction).

4.    The contribution and loan transactions were carefully planned and structured

together.

5.    GAF restructured the asset sale with the principal objective of reducing taxation

on an exchange of assets for cash.

6.    On February 12, 1990, GAF expected a final return (profit beyond the Priority

Return) from RPSSLP of approximately $8.3M.

- 76 -

7.      On February 12, 1990, GAF expected that having restructured the asset sale transaction would produce at least $70M in tax savings.

8.      The contribution and loan transactions were integrated and interlocking.

9.      The contribution and loan transactions were structured so that, on February 12, 1990, GAF received $450M in cash, and responsibility for repayment of the Credit Suisse loan rested entirely, directly or indirectly, with the partnership and other partner.

10.     When GAF transferred GAF SSC on February 12, 1990, GAF ceded operational control of its assets.

11.     On February 12, 1990, GAF entered into the Partnership Agreement with RP which created RPSSLP.

12.     In good faith and acting with a business purpose, GAF joined together with RP in order to conduct RPSSLP as a partnership.

13.     Under the terms of the Partnership Agreement, GAF shared in the profits and the losses of the venture.

14.     Under the terms of the Partnership Agreement, the potential loss associated with GAF's limited partnership interest in RPSSLP was capped at $26.3 million. GAF's investment in RPSSLP thus placed only $26.3M at risk.

15.     No side agreements otherwise protected GAF from this loss or predetermined its losses.

16.     As to $450M of the contribution transaction, GAF had no risk of loss.

17.     GAF's primary business purpose in restructuring the asset sale transaction was to

- 77 -

avoid paying the tax GAF would have incurred from an asset sale.

18.     As to the transfer of $30M of assets to RPSSLP, GAF engaged in the transaction with a good faith intent to join together with RP in the present conduct of the RPSSLP enterprise.

19.     As to the transfer of $450M of assets to RPSSLP, GAF did not engage in the transaction with a good faith intent to join together with RP in the present conduct of the RPSSLP enterprise.

20.     The amount of nonpartnership gross income stated on GAF's 1990 tax return was $997,712,646.

21.     The United States did not assess any tax with respect to the 1990 Transactions before the three-year statute of limitations pursuant to § 6501(a) had expired.

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the Debtors' Objection to the IRS's proofs of claim pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     The statutory predicate for the relief requested in Debtors' Objection is 11 U.S.C. §§ 502(b)(1) and 505(a).

3.     The parties accept this Court's personal jurisdiction.

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     "The incidence of taxation depends upon the substance of a transaction." Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). "In all cases, the substance of the transaction will govern rather than its form." 26 C.F.R. §

- 78 -

1.707-1(a).

6. To determine whether an interest is a bona fide equity partnership participation, a

court must conduct an analysis under the "all-facts-and-circumstances test" of

Culbertson.  In Culbertson, the Supreme Court stated:

> The question is . . . whether, considering all the facts – the
> agreement, the conduct of the parties in execution of its
> provisions, their statements, the testimony of disinterested
> persons, the relationship of the parties, their respective
> abilities and capital contributions, the actual control of
> income and the purposes for which it is used, and any other
> facts throwing light on their true intent – the parties in good
> faith and acting with a business purpose intended to join
> together in the present conduct of the enterprise.

Comm'r v. Culbertson, 337 U.S. 733, 743 (1949).

7. The substance of the 1990 Transactions produces tax results inconsistent with the

form embodied in the underlying documentation of the 1990 Transactions.

8. Substance-over-form analysis demonstrates that, as a matter of substance, GAF's

February 12, 1990 $480M transfer of assets to RPSSLP consisted of a $30M

transfer and a $450M transfer.

9. Under the Culbertson test, RPSSLP was a valid partnership for federal income tax

purposes.

10. "No gain or loss shall be recognized to a partnership or to any of its partners in the

case of a contribution of property to the partnership in exchange for an interest in

the partnership."  26 U.S.C. § 721(a).

11. GAF's February 12, 1990 transfer of $30M in assets to RPSSLP was a bona fide

equity contribution of a partner to a partnership and is not taxable, pursuant to §

721(a).

12.    GAF's February 12, 1990 transfer of $450M in assets to RPSSLP was a direct
        transfer of money or other property by a partner to a partnership, within the
        meaning of § 707(a)(2)(B)(i).

13.    Substance-over-form analysis demonstrates that, as a matter of substance, the
        Credit Suisse loan proceeds of $450M, paid to GAF on February 12, 1990,
        constituted an indirect transfer of money or other property by the partnership to a
        partner, within the meaning of § 707(a)(2)(B)(ii).  The Credit Suisse loan was
        structured to function as a payment to GAF in substance.

14.    The $450M transfer and the Credit Suisse loan transaction, when viewed together,
        are properly characterized as a sale of property, pursuant to § 707(a)(2)(B)(iii).

15.    The $450M transfer is not a bona fide equity contribution protected from taxation
        under § 721(a), but a disguised sale, pursuant to § 707(a)(2)(B)(iii).

16.    "Assessments are presumed to be valid, and establish a prima facie case of
        liability against a taxpayer."  United States v. Green, 201 F.3d 251, 253 (3d Cir.
        2000).  The taxpayer bears the burden of proving that the IRS determination is in
        error.  Welch v. Helvering, 290 U.S. 111, 115 (1933).

17.    As to the $30M transfer, GAF has proven by a preponderance of the evidence that
        the Government's tax assessment is in error.

18.    As to the $450M transfer, GAF has failed to prove by a preponderance of the
        evidence that the Government's tax assessment is in error.

19.    Within the context of 26 U.S.C. § 6501(e)(1)(A), "an amount properly includible

therein" means the difference between the total amount deemed reported and the total amount that should have been reported.

20.    The amount of partnership gross income from which GAF's distributive share of partnership income was derived was $164,530,674.  The cost of goods sold that generated that amount of gross income was $125,890,674.

21.    The denominator of the § 6501(e)(1)(A) fraction, the total gross income stated in the return, is the sum of $997,712,646 and $164,530,674, which is $1,162,243,320.

22.    The amount of unreported gain from the unreported sale is $369,986,956.

23.    As a matter of substance, GAF received no income from RPSSLP in 1990.  On its 1990 return, GAF should have reported no RPSSLP partnership income.

24.    The total amount of gross income that GAF should have reported on its 1990 tax return is the sum of $997,712,646 and $369,986,956, which is $1,367,699,602.

25.    The difference between the total amount deemed reported and the total amount that should have been reported is $1,367,699,602 minus $1,162,243,320, which is $205,456,282.

26.    Following § 6501(e)(1)(A), the fraction is calculated as the total amount omitted over the total amount deemed reported ($205,456,282 / $1,162,243,320), which equals .177, or 17.7%.

27.    Because the parties agree that the IRS did not assess the tax due for the 1990 taxable year within the three-year statute of limitations period under § 6501(a), the Government bears the burden going forward to establish that GAF omitted from

the 1990 GAF Return "an amount properly includible therein which is in excess
of 25% of the amount of gross income stated in the return," within the meaning of
§ 6501(e)(1)(A), in order to establish its entitlement to the six-year statute of
limitations.  <u>Hoffman</u>, 119 T.C. at 146.

28.     The Government failed to prove by a preponderance of the evidence that GAF
        omitted from the 1990 GAF Return an amount properly includible therein which
        is in excess of 25% of the amount of gross income stated in the return.

29.     The Government failed to establish its entitlement to the six-year statute of
        limitations, pursuant to 26 U.S.C. § 6501(e)(1)(A).  The Government's claims
        with respect to the 1990 Transactions are time-barred.

30.     Debtors' Objection to the Government's proof of claim concerning the 1990
        Transactions is sustained.

An appropriate Order follows.

                                        ___s/ Stanley R. Chesler_____
                                        STANLEY R. CHESLER, U.S.D.J.

Dated: December 14, 2009